PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 03-2607

———

UNITED STATES OF AMERICA

v.

MARCRESSE MCCOY
a/k/a MARK SHINNE
a/k/a MARK CHIN
a/k/a JERRON MCCOY

Marcresse McCoy,
Appellant

———

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 98-cr-00005-2E)
District Judge: Honorable Sean J. McLaughlin

———

Argued February 14, 2005

Before: SLOVITER, AMBRO, and ALDISERT, Circuit Judges.

(Filed:   June 6, 2005)

———

Bruce A. Antkowiak    (Argued)
Greensburg, PA 15601

Attorney for Appellant

Bonnie R. Schlueter
Michael L. Ivory   (Argued)
Paul M. Thompson
Office of United States Attorney
Pittsburgh, PA 15219

       Attorneys for Appellee

———

OPINION OF THE COURT

———

SLOVITER, Circuit Judge.

       Marcresse McCoy appeals from the order of the United
States District Court for the Western District of Pennsylvania
denying his motion for a writ of habeas corpus pursuant to 28
U.S.C. § 2255.  The sole substantive issue on appeal is whether
the District Court abused its discretion by denying an evidentiary
hearing.

## I.

       A police officer in the Erie Area Gang and Law
Enforcement Task Force was informed by a reliable source that a
man named Joseph Barnette would be arriving in Erie,
Pennsylvania, from Detroit, Michigan via Greyhound bus on
March 17, 1998, at approximately 5:15 p.m.  According to the
source, Barnette would be traveling with friends, would be
armed, and would be carrying crack cocaine.  Based on this
information, Task Force agents established surveillance at the
bus station.

       When the scheduled bus arrived, a man matching
Barnette's description exited the bus with no bags and made his
way to the front door of the bus terminal.  Shortly thereafter,
three other black males carrying garbage bags and a blue canvas
duffel bag left the bus, exited the bus terminal through the front
door, and set their bags on the sidewalk next to Barnette.  Police
Sergeants Joseph Kress and Robert Liebel observed that
Marcresse McCoy carried the blue duffel bag, while two other

individuals, later identified as Kendrick Grier and Michael McQueen, carried the trash bags. Once outside, the four men were observed sharing cigarettes and talking as if they knew each other.

Officers approached the group of men, identified themselves, and questioned each of the four men separately. The officers received conflicting answers in response to inquiries of whether the men knew each other, whether they had traveled together, and the purpose of their visit. Barnette, for instance, initially identified himself as "Ardell Griffen" and denied knowing the other individuals. McCoy represented that his name was "Mark Chin" and stated that he knew "Ardell Griffen," but denied knowing Grier, who was traveling under the name "Carlton Davidson." Grier, in contrast, admitted traveling with both Barnette and McCoy.

Because of these inconsistent responses, the officers inquired as to the ownership of the garbage bags and blue duffel bag. McCoy claimed ownership of two garbage bags and gave officers permission to search them; they contained shoes, shoe boxes, wet clothing, and a screwdriver. McQueen claimed ownership of the remaining garbage bag, which contained clothing. All four men denied ownership of the blue duffel bag. McCoy specifically denied carrying it from the bus. A search revealed that the duffel bag contained 270 individually packaged plastic baggies of crack cocaine, forty slightly-larger plastic baggies of crack cocaine, a large ziploc-type bag containing one pound of marijuana, a 9mm pistol wrapped in a towel, and a .380 caliber pistol hidden inside a pair of jeans.

All four men were arrested and taken into custody. Individual searches revealed that all four bus tickets, issued under fictitious names, were purchased at the same ticket counter within four minutes of each other and approximately ten minutes prior to the scheduled departure. A search incident to McCoy's arrest revealed that he had possession of Barnette's bus ticket in the fictitious name of "Ardell Griffen," along with his own ticket in the fictitious name of "Mark Shinne." McCoy also had a pager in his possession. A number retrieved from the pager

3

matched a number written on a piece of paper found in Barnette's pocket.

On April 14, 1998, a grand jury in the Western District of Pennsylvania returned an indictment charging McCoy and Barnette with violating federal drug and gun laws. A five count superseding indictment was filed on June 16, 1998.[1] Count One charged that beginning on or about March 17, 1998 (the day of the arrest), the defendants had conspired to distribute and possess with intent to distribute cocaine base and marijuana in violation of 21 U.S.C. § 846. Count Two charged that the defendants possessed with the intent to distribute in excess of fifty grams of cocaine base in violation of 21 U.S.C. §§ 841(a), (b)(l)(A)(iii). Count Three charged the defendants with possession with the intent to distribute less than 500 grams of marijuana in violation of 21 U.S.C. §§ 841(a), (b)(1)(C). Counts Four and Five charged Barnette and McCoy, respectively, as convicted felons in knowing possession of firearms in violation of 18 U.S.C. § 922(g)(1).

Prior to trial, the Government provided notice of its intent to introduce Fed. R. Evid. 404(b) evidence against both Barnette and McCoy. The Government sought to introduce evidence of Barnette's prior state felony drug conviction. As for McCoy, the Government sought to introduce his 1991 felony conviction for carrying a concealed weapon. Beyond these convictions, the prosecution also intended to introduce testimony of the parties' prior bad acts; specifically, it proffered that it had testimonial evidence establishing that Barnette and McCoy had been involved in the sale of drugs in Erie on a number of occasions prior to March 1998, and that the drug transactions perpetrated by the two were unique because the drugs were distributed in small ziploc-type baggies identical to those found in the duffel

---

[1] For reasons not clear from the record, the two other individuals, Kendrick Grier and Michael McQueen, were not indicted.

bag.[2]  The Government argued that collectively the Rule 404(b) evidence would establish that the defendants had knowledge of the contents of the bag, intended to distribute the drugs, and did not act by mistake or other innocent reason.  In addition, the Government argued that the prior convictions were admissible as predicate convictions for the firearms charges that were the subject of Counts Four and Five.

Following a pretrial hearing, Barnette's attorney filed a "Jemal stipulation" seeking to prevent the introduction of his prior felony conviction for dealing cocaine and the testimonial evidence of his prior drug dealing activity.  See United States v. Jemal, 26 F.3d 1267 (3d Cir. 1994) (holding that district court should ordinarily refuse to admit evidence of defendant's prior bad acts to show knowledge and intent when defendant has proffered stipulation that removes issues of knowledge and intent from jury's consideration).

The stipulation was signed by Barnette on October 19, 1998, and provided that:

> (a) With regard to the two (2) charges of possession with intent to distribute cocaine and marijuana, I agree and stipulate that in the event the jury finds as a matter of fact that I possessed the blue duffel bag seized at the Greyhound Bus Station in which the drugs were found, then the jury may also find without further evidence that I would know that the substances which were contained in the bag were cocaine and marijuana and further that I intended to distribute them.  My

---

[2] This testimonial evidence alluded to by the prosecution is not in the record.  It was given as Jencks material, see 18 U.S.C. § 3500(b); Jencks v. United States, 353 U.S. 657 (1957), to McCoy's trial counsel on the day before the trial began, but was not placed in the record.  However, the material, which was also given to McCoy's present counsel, is referred to in general terms in his appellate brief.  Appellant's Br. at 11-14.

5

defense in this case is that I was not in possession
of the bag or the drugs or guns found in it.

App. at 393-94. Notably, Barnette's <u>Jemal</u> stipulation did not
extend to the conspiracy charged in Count One; the burden
remained on the Government to prove that there was in fact an
agreement between Barnette and McCoy.

In a second Notice of Intent, the Government declared its
intention, notwithstanding Barnette's <u>Jemal</u> stipulation, to
introduce the Rule 404(b) prior bad acts and signature drug
packaging evidence as relevant to the agreement element of the
conspiracy charged in Count One. At a pretrial hearing held on
October 23, 1998, the District Court ruled that the prior bad acts
evidence was inadmissible because its prejudicial effect
outweighed its probative value, and because the bad acts conduct
occurred too remote in time to the one-day conspiracy charged to
have occurred on March 17, 1998. Although the Court stated it
would allow the Government to offer evidence about some prior
personal association between Barnette and McCoy, it excluded
evidence of drug dealing altogether.

The Court also rejected the Government's attempt to
introduce "signature" drug packaging evidence associated with
Barnette and McCoy's alleged previous drug transactions on the
ground that the evidence was not "sufficiently unique to warrant
the inference that an individual who [was] a perpetrator in one
case is a perpetrator in another." App. at 330. Finally, the Court
held that, given Barnette's <u>Jemal</u> stipulation, the Government
would be restricted from discussing the nature of Barnette's
prior felony at trial; it could only introduce evidence of his status
as a convicted felon for purposes of the firearms charge in Count
Four. The Court did not explicitly rule whether the nature of
McCoy's prior felony was admissible.

At the same pretrial hearing, McCoy's trial attorney,
Khadija Diggs, expressed her reluctance to enter into a <u>Jemal</u>
stipulation similar to that entered into by Barnette. McCoy's
prior state felony conviction was for carrying a concealed
weapon, not for drug distribution, and thus carried far less

6

probative value relative to the drug charges in Counts One, Two and Three. Further, the Government specified the prior bad acts evidence closely tying Barnette to the guns and drugs found in the bag. In contrast, the bad acts evidence allegedly implicating McCoy was never specified before the trial, and that which was referred to appeared relatively sparse. Nonetheless, at some point following the October 23, 1998 hearing, Diggs entered into a <u>Jemal</u> stipulation on behalf of McCoy.[3] McCoy also entered a separate written stipulation, admitting his status as a convicted felon for purposes of the firearms charge in Count Five.[4]

The jury trial began on October 27, 1998, and lasted through November 4, 1998. The Government's evidence was heavily weighted towards Barnette. The Government presented

---

[3] At the October 23, 1998 hearing, Diggs stated that "McCoy should not even be asked to stipulate based on my understanding of the government's 404(b) proffer because that information is not appropriate as against McCoy." App. at 281-82. She went on to say, however, that "[t]o the extent that the court is inclined to allow 404(b) evidence in, I believe that McCoy's willingness to stipulate to knowledge and intent would preclude that 404(b) evidence," and that she would "present that to my client" for his consideration. App. at 282-83. Although the record includes the written <u>Jemal</u> stipulation entered into by Barnette, <u>see</u> App. at 392-95, it does not include a similar written stipulation entered into by McCoy. <u>See</u> App. at 68 (docket sheet reflecting stipulation of Barnette, but not McCoy); App. at 1385 (Affidavit of Barnette's counsel stating: "While Ms. Diggs did not assist me in the preparation of the written <u>Jemal</u> stipulation signed by my client, I recall that she adopted the stipulation on behalf of Mr. McCoy in the late pre-trial stage of the proceedings. I also recall that we concurred in the jury instructions regarding the <u>Jemal</u> stipulation."). According to McCoy's present counsel, McCoy's <u>Jemal</u> stipulation was not formally entered until the point at trial when Diggs agreed to the proposed jury instruction.

[4] This stipulation states that "McCoy . . . was convicted of a felony offense punishable by a term of imprisonment exceeding one (1) year." App. at 402.

Terry Siegworth, the Government informant who had identified
Barnette as the person who was to arrive in Erie with crack
cocaine. Siegworth also testified that he had seen Barnette on
various occasions with a .380 caliber handgun similar to the one
seized from the blue duffel bag, and that he had taken Barnette
to a location in Anderson, Indiana, where the hand gun was
stipulated to be registered. This testimony was corroborated by
Marion Smith, who testified that he had seen Barnette in
possession of the .380 caliber handgun on several instances in
the past. Belinda Peterson testified that the 9mm handgun found
in the duffel bag was similar to one she had observed Barnette
carrying in late November or early December of 1997; she also
turned over to the prosecution a holster that fit the 9mm
handgun, which she testified Barnette had stored in her
apartment.

Kendrick Grier, one of the four men who traveled on the
bus, testified for the Government that he had escaped from a
halfway house when Barnette offered to take him to Erie. When
Grier met Barnette at the home of Barnette's aunt, he observed
the packed blue duffel bag on the floor. Barnette and Grier
picked up McQueen and McCoy and then doubled back to
Barnette's aunt's house to pick up the duffel bag before traveling
to the bus station. Grier testified that Barnette carried the duffel
bag into the terminal and paid for each person's ticket. Grier
also testified that Barnette stated he had a pair of shoes inside
the duffel bag similar to the shoes that Grier was wearing on the
day at issue. This remark was particularly significant because a
pair of shoes was recovered from the blue duffel bag, in
Barnette's size, which were the same make as the shoes Grier
was wearing.

The Government's evidence against McCoy was
relatively weak in comparison. Several witnesses, including
Sergeant Kress, Sergeant Liebel, and Grier, testified that McCoy
carried the blue duffel bag from the bus to the location on the
street where it was seized. When questioned by police, McCoy
acted nervously and gave inconsistent responses. Furthermore,
there was evidence that McCoy and Barnette had traveled
together and that they had a prior relationship. Finally, the

Government rebutted McCoy's purported innocent purpose for his bus trip--meeting a girl named Chereka Jackson–through the testimony of Ms. Jackson herself, who stated that she knew McCoy but was not expecting him in Erie on March 17, 1998. Notably, the Government presented no evidence to demonstrate that McCoy helped pack the blue duffel bag or knew of its contents.

McCoy, in turn, sought to refute the Government's case against him by presenting evidence of a prior back and leg injury which purportedly precluded him from lifting heavy objects. McCoy's grandmother, Rayven Chinn, testified that McCoy walked with a limp and utilized a leg brace, and opined that McCoy would be unable to carry the blue duffel bag. She also explained the use of his alias, stating that McCoy was called Mark by family members and had been known to use her last name, which was sometimes mistaken for "Chin," or "Shinn," or "Shinne." Chinn further testified that McCoy had received the pager, which was found in his possession on the day of arrest, from his uncle. Finally, Chinn testified that McCoy had told her he was traveling to Erie to meet a girl. Further, McCoy attempted to undermine the credibility of Sergeants Kress and Liebel through the testimony of their former supervisor, Gregory Dollinger. Dollinger stated that Kress and Liebel would do anything necessary to secure a drug conviction, including lying under oath.

Given the <u>Jemal</u> stipulations entered by both Barnette and McCoy, the jury was read the following instructions regarding the substantive drug charges in Counts Two and Three:

> [In] this case, the defendants have stipulated to certain elements of each of the offenses. That is, with regard to the crimes of possession with intent to distribute marijuana and possession with intent to distribute cocaine. <u>If you should find from all of the evidence that the government has proven beyond a reasonable doubt that Joseph Barnette and/or Marcresse McCoy were in possession of the blue duffel bag seized by the law</u>

9

<u>enforcement officers at any time, then you may</u>
<u>conclude without further evidence that Joseph</u>
<u>Barnette and Marcresse McCoy knew that the blue</u>
<u>duffel bag contained cocaine and marijuana and</u>
<u>that they or he intended to distribute them</u>.
However, you may conclude this only in the event
that you find that the government has proved
beyond a reasonable doubt that Joseph Barnette
and/or Marcresse McCoy were in possession of the
blue duffel bag. The defense of each defendant in
this case is that they were not in possession of the
blue duffel bag.

App. at 1271-72 (emphasis added).

On November 4, 1998, the jury returned a verdict of
guilty as to both Barnette and McCoy on Counts One, Two and
Three (the drug counts). Barnette was found guilty on Count
Four of the indictment, the firearm charge against him. McCoy
was found not guilty on the firearm charge at Count Five. On
March 3, 2000, McCoy was sentenced to concurrent terms of
132 months imprisonment at Counts One and Two and sixty
months imprisonment on Count Three.

On direct appeal, this court in a non-precedential opinion,
affirmed the judgment of the District Court, holding that there
was no plain error in the above jury instruction. We stated that
the District Court merely held Barnette and McCoy "to the
bargain that they made when they entered into the <u>Jemal</u>
stipulation and thereby avoided the introduction of other crimes
evidence that was probative of their knowledge and intent." App.
at 46. However, pursuant to <u>United States v. Tobin</u>, 155 F.3d
636 (3d Cir. 1998) (refusing to entertain ineffective assistance of
counsel claim on direct appeal), we declined to reach the merits
of McCoy's ineffective assistance of counsel claim.

On May 28, 2002, McCoy filed a timely motion under 28
U.S.C. § 2255 for a writ of habeas corpus, alleging that his trial
counsel's decision to enter into the <u>Jemal</u> stipulation constituted
ineffective assistance of counsel because "there was no

10

reasonable or tactical basis for counsel to stipulate away" the elements of knowledge and intent on the drug charges. App. at 1316. On May 20, 2003, the District Court <u>sua sponte</u> joined McCoy's § 2255 action with the separate and independent § 2255 action of Barnette, which was filed on June 5, 2002. The District Court granted Barnette relief on a re-sentencing issue that was wholly independent of McCoy's claim; McCoy's ineffective assistance claim was denied outright.

On May 28, 2003, McCoy filed a Notice of Appeal. On February 13, 2004 we granted a Certificate of Appealability ("COA") as follows:

> The foregoing request for a certificate of appealability is granted with regard to the appellant's claim that trial counsel was ineffective for stipulating that if the jury found the appellant was physically in possession of the blue duffle bag, it could, without more, find that he both knew that the bag contained the drugs which were the subject of his conviction and that he intended to distribute them.

App at 36.

## II.

Barnette was not re-sentenced pursuant to the District Court's May 20, 2003 Order until May 11, 2004, and this court has not yet issued a decision as to whether he will be given a COA. The Government argues that we lack jurisdiction to hear McCoy's appeal from the District Court's May 20, 2003 Order because Barnette had yet to be re-sentenced as of the date McCoy filed his notice of appeal. <u>See</u> <u>Andrews v. United States</u>, 373 U.S. 334, 339-40 (1963) (holding that order vacating sentence does not become final until re-sentencing).

We reject the Government's challenge to our jurisdiction. When Barnette was re-sentenced on May 11, 2004, McCoy's Notice of Appeal, filed on May 28, 2003, "ripened" into an appeal from a final order. <u>See</u> <u>Lazy Oil Co. v. Witco Corp.</u>, 166

F.3d 581, 585 (3d Cir. 1999) (reiterating our position in <u>Cape May Greene, Inc. v. Warren</u>, 698 F.2d 179 (3d Cir. 1983), that "a premature notice of appeal, filed after disposition of some of the claims before a district court, but before entry of final judgment, will ripen upon the court's disposal of the remaining claims"); <u>see also</u> <u>Welch v. Cadre Capital</u>, 923 F.2d 989, 992 (2d Cir. 1991).

The consolidation of McCoy's case with Barnette's case in the District Court does not deprive McCoy's case of its finality. <u>See</u> <u>United States v. $8,221,87.16 in United States Currency</u>, 330 F.3d 141, 146 (3d Cir. 2003) ("The consolidation of two cases does not automatically preclude the appealability of an order in one. We have consistently rejected a bright-line rule, preferring a case-by-case approach that examines the overlap among the claims, the relationship of the various parties, and the likelihood of the claims being tried together.") Their cases on ineffective assistance of counsel are markedly different. At the time McCoy's § 2255 motion was filed, and for the entire course in which it was pled, answered, and argued, it was kept separate and distinct from Barnette's § 2255 motion. The two actions were joined <u>sua sponte</u> by the District Court for what appears from the record to be administrative convenience. Moreover, this court granted a COA limited to McCoy's claim. Thus, for the above reasons, we hold that we have jurisdiction of this appeal under 28 U.S.C. §§ 1291, 2253.

### III.

We thus turn to the only issue before us: whether the District Court erred by denying an evidentiary hearing on McCoy's ineffective assistance of counsel claim. We review the District Court's decision for an abuse of discretion. <u>Solis v. United States</u>, 252 F.3d 289, 293 (3d Cir. 2001).

28 U.S.C. § 2255 provides that:

A prisoner in custody under sentence of a court established by Act of Congress . . . may move the court which imposed the sentence to vacate, set

12

aside or correct the sentence.  Unless the motion
and the files and records of the case <u>conclusively
show</u> that the prisoner is entitled to no relief, the
court <u>shall</u> cause notice thereof to be served upon
the United States attorney, <u>grant a prompt hearing</u>
thereon, determine the issues and make findings of
fact and conclusions of law with respect thereto . .
. .

(emphasis added).

      We have held that a district court's failure to grant an
evidentiary hearing when the files and records of the case are
inconclusive on the issue of whether movant is entitled to relief
constitutes an abuse of discretion.  <u>Solis</u>, 252 F.3d at 294-95; <u>see
also</u> <u>Smith v. United States</u>, 348 F.3d 545, 550 (6th Cir. 2003)
(citing <u>Fontaine v. United States</u>, 411 U.S. 213, 215 (1973) (per
curiam)).[5]

A.

<u>Prejudice</u>

      The District Court devoted the entirety of its discussion to
the prejudice prong of <u>United States v. Strickland</u>, 466 U.S. 668
(1984),[6] finding that based on the record before it, "McCoy has
not established a <u>reasonable probability</u> that, but for the alleged
errors of his trial counsel, he would have been acquitted on
Counts 1, 2, or 3 of the Superseding Indictment."  App. at 30
(emphasis added).  That misstates the appropriate standard.

------------------------------------

      [5] The issue of whether McCoy's trial counsel was
ineffective is not before us. Such an inquiry would be subject to <u>de
novo</u> review. <u>See</u> <u>Duncan v. Cross</u>, 308 F.3d 308, 314 (3d Cir.
2002).

      [6] We have previously advised courts to consider the
prejudice prong before examining the performance of counsel
because this course of action is less burdensome to defense
counsel. <u>See</u> <u>McAleese v. Mazurkiewicz</u>, 1 F.3d 159, 170-71 (3d
Cir. 1993); <u>see also</u> <u>Strickland</u>, 466 U.S. at 697.

Instead, under the statute the District Court was required to grant an evidentiary hearing unless the record before it "conclusively show[ed]" that McCoy was not prejudiced by Diggs' decision to enter the Jemal stipulation.

McCoy argues that Diggs' decision to enter into the Jemal stipulation relieved the Government of its burden to prove the most difficult elements of the drug charges—knowledge and intent. The jury instructions provided that "[i]f you should find from all of the evidence that . . . McCoy [was] in possession of the blue duffel bag . . . then you may conclude without further evidence that . . . McCoy knew that the blue duffel bag contained cocaine and marijuana and that . . . he intended to distribute them." App. at 1271-72. The District Court concluded that McCoy was not prejudiced by the Jemal stipulation because of the permissive nature of the jury charge.

Although these instructions "allowed – but did not require – the jury to find the elements of knowledge and intent, consistent with the stipulation," App. at 29, they focused the jury on possession of the duffel bag rather than McCoy's knowledge and intent. We are not convinced that the permissive nature of the jury instructions "conclusively show[s]" that McCoy was not prejudiced. 28 U.S.C. § 2255.

As a result of the Jemal stipulation, the prosecution was left with the relatively simple burden of proving that at some point McCoy was in possession of the blue duffel bag. Three witnesses, two of them police officers, testified that McCoy carried the duffel bag from the bus to the sidewalk outside the Erie bus station. Although McCoy attempted to rebut this testimony through evidence of his physical ailment, which he alleged would have prevented him from carrying the bag, and through impeachment of the Government's witnesses for bias, the issue of possession vel non amounted to a determination of credibility. Faced with overwhelming first-hand accounts of multiple witnesses observing McCoy carrying the blue duffel bag, and no first-hand witnesses contesting these accounts, the jury could easily have reached its conclusion that the Government satisfied its burden with respect to the possession

14

element.  However, even if the jury believed that McCoy carried the duffel bag from the bus to the Erie station, it would not be dispositive of the key issue of whether McCoy was aware of the contents of the bag.

The knowledge and intent elements presented a far greater burden for the Government.  McCoy contends, and we agree, that the Government's evidence against him in this regard, was "no different in any meaningful respect than the facts the [G]overnment had against the other two men [Grier and McQueen]" who were not even indicted.  Appellant's Br. at 25.  Although McCoy used a fictitious name on his bus ticket, so did Grier and McQueen; furthermore, all four tickets were purchased by Barnette.  Grier testified that Barnette already had the blue duffel bag packed and prepared when he met Barnette at Barnette's aunt's house on the day of the arrest.  There was no evidence that McCoy assisted in packing the bag or that he made any statements implying that he knew of its contents.  Further, Grier testified that McQueen had handled the bag during a stop over in Cleveland.  All four men had denied possession of the bag during the police questioning.  Finally, although there was testimony that McCoy and Barnette had a prior relationship, it is evident that both Grier and McQueen had a similar, if not more substantial, prior relationship with Barnette.  Grier had called Barnette upon escaping from his halfway house and McQueen had fathered a baby with Barnette's aunt.

We need not decide on this appeal whether there exists a reasonable probability that the Government would have been unable to meet its burden on the elements of knowledge and intent without the Jemal stipulation.  That is an issue for the District Court in the first instance after an evidentiary hearing when it considers whether McCoy suffered prejudice.

We do note that in several cases with facts even more compelling than those in the present case, this court has held that there was insufficient evidence to support the element of knowledge in a drug conspiracy.  In United States v. Wexler, 838 F.2d 88 (3d Cir. 1988), the Government presented evidence that defendant had driven a lookout car in a drug delivery, had

gestured to and spoken to active conspirators during the conspiracy, and was in possession of a stolen CB radio. 838 F.2d at 90-92. We stated that while there is "ample circumstantial evidence . . . from which the jury could have concluded that Wexler was involved in a conspiracy . . .[.] [w]hat is missing is any evidence that Wexler knew that a controlled substance was couched behind the doors of the Ryder truck." Id. at 91. Accordingly, we reversed the defendant's conviction on the ground that it was supported by insubstantial evidence. Id. at 92.

The principle enunciated in Wexler, that the Government bears the heavy burden of proving the knowledge element of a drug possession charge, is reflected in our subsequent decisions reversing convictions because of insufficient evidence of knowledge. See United States v. Cartwright, 359 F.3d 281, 291 (3d Cir. 2004) (reversing conviction where armed defendant functioned as lookout for conspirators and had messaging device similar to others arrested); United States v. Thomas, 114 F.3d 403, 405-06 (3d Cir. 1997) (reversing conviction where defendant arrived at hotel room where drug package was dropped, used key to enter, carried handgun, and contacted drug source by phone numerous times); United States v. Brown, 3 F.3d 673, 680-84 (1993) (reversing conviction where defendant arrived at drug "cut house" using key, referred to place as hers, left her clothing and weapon there, and had prior drug conviction); United States v. Salmon, 944 F.2d 1106, 1112-15 (3d Cir. 1991) (reversing conviction where defendant admitted traveling to drug delivery site with someone to "watch [his] back," performed surveillance, and had surveillance equipment).

We therefore conclude that there is ample basis for the District Court to have held an evidentiary hearing focusing on whether Diggs' decision to enter into the Jemal stipulation may have prejudiced McCoy by affecting the outcome of the trial.

B.
Counsel's Performance

In reaching the second prong of the Strickland inquiry, we

16

must consider whether Diggs' decision to enter into the <u>Jemal</u> stipulation fell below an objective standard of reasonableness. <u>Strickland</u>, 446 U.S. at 686-94. The District Court would have been justified in denying to hold an evidentiary hearing only if it was indisputable that Diggs' decision to enter into the <u>Jemal</u> stipulation satisfied the <u>Strickland</u> standard for effectiveness of counsel. Our review is confined to whether "the files and records of the case <u>conclusively show</u> that the prisoner is entitled to no relief . . . ." 28 U.S.C. § 2255 (emphasis added). If McCoy's petition alleges any facts warranting relief under § 2255 that are not clearly resolved by the record, the District Court was obliged to follow the statutory mandate to hold an evidentiary hearing. <u>See</u> <u>Engelen v. United States</u>, 68 F.3d 238, 240 (8th Cir. 1995) (stating that § 2255 motion "can be dismissed without a hearing [only] if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact"); <u>see also</u> <u>Fontaine</u>, 411 U.S. at 214-15 (requiring evidentiary hearing for movant's § 2255 claim asserting that his plea of guilty was induced by, <u>inter alia</u>, his poor physical condition and heroin addiction notwithstanding appropriate colloquy pursuant to Fed. R. Crim. P. 11) . It has been recognized that "[t]he standard governing . . . requests [for evidentiary hearings] establishes a reasonably low threshold for habeas petitioners to meet." <u>Phillips v. Woodford</u>, 267 F.3d 966, 973 (9th Cir. 2001).

In the present case, although it appears that Barnette benefitted from the <u>Jemal</u> stipulation because his prior conviction for drug distribution was kept from the jury, it is difficult from the record to discern the strategic advantage to McCoy from the same stipulation. During the October 23, 1998 pretrial hearing (before McCoy's counsel adopted the <u>Jemal</u> stipulation), the District Court ruled that the Government's Rule 404(b) evidence of McCoy's prior drug selling relationship with Barnette would be inadmissible. Moreover, McCoy's prior felony conviction was for possession of a concealed weapon, not for drug distribution (as was the case for Barnette); thus, it appears that the probative value of this conviction to the

17

conspiracy and drug charges at Counts One, Two and Three was minimal. Finally, McCoy had entered into a separate stipulation stating that he had committed a predicate felony for the 18 U.S.C. § 922(g)(1) firearms charge. It is likely that McCoy could nonetheless have argued lack of knowledge or intent with regard to the contents of the duffel bag.[7] Cf. Old Chief v. United States, 519 U.S. 172 (1997) (holding that district court abuses its discretion under Fed. R. Evid. 403 when it refuses to permit defendant, charged under 18 U.S.C. §922(g)(1), to stipulate to his/her status as a convicted felon when nature of the prior conviction is unduly prejudicial and where the purpose of the evidence is solely to prove the element of prior conviction).

We agree with the Government that courts have been highly deferential to counsel's strategic decisions, see, e.g., Strickland, 466 U.S. at 690 (stating that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"); United States v. Otero, 848 F.2d 835, 838 (7th Cir. 1988), but merely labeling a decision as "strategic" will not remove it from an inquiry of reasonableness. See generally Davidson v. United States, 951 F. Supp. 555, 558 (W.D. Pa. 1996); see also Gov't of the V.I. v. Weatherwax, 77 F.3d 1425, 1431-32 (3d Cir. 1996).

The difficulty facing us is that because of the District Court's failure to hold an evidentiary hearing at which trial counsel could have been questioned, we cannot ascertain the reasons or strategy underlying Diggs' acceptance of the Jemal stipulation. Without the opportunity to evaluate the rationale

---

[7] The Government argues that the Jemal stipulation benefitted McCoy because Barnette and McCoy were co-defendants and "[a] stipulation by one of them, but not the other . . . would probably have struck the jury as very odd." Appellee's Br. at 43. We find this argument unconvincing. The evidence at trial was very strong against Barnette, and relatively weak against McCoy. It is not apparent that it was reasonable for McCoy to forfeit what was arguably his best line of defense for the sole reason that he and Barnette could present consistent defenses.

given by trial counsel, the issue of possible ineffectiveness cannot be conclusively determined.[8] An evidentiary hearing is therefore appropriate. <u>Cf.</u> <u>Everett v. Beard</u>, 290 F.3d 500, 514-15 (3d Cir. 2002) (finding ineffectiveness of counsel for failure to object on due process grounds to jury instructions).

At that time, the District Court may also consider whether Diggs' decision to enter into the <u>Jemal</u> stipulation was unduly influenced by Barnette's counsel. In its response to McCoy's § 2255 petition, the Government appended an affidavit by Barnette's trial counsel asserting that Diggs was initially reluctant to enter into the <u>Jemal</u> stipulation but that he had persuaded her to do so in order to "avoid[] inconsistent defenses." App. at 1385. He asserted that those benefits "remained even after the Court later deemed the 404(b) bad acts evidence to be inadmissible." App. at 1385. The affidavit, however, provides no rationale for this statement nor does it specify which prior bad acts evidence was successfully stipulated away as a result of entering into the <u>Jemal</u> stipulation.

Also appended to the Government's response was a document consisting of handwritten notes taken from Diggs' trial file which contain brief phrases such as "rule 14 improper joinder"; "404b not to be used as evidence"; "re-evaluate the <u>Jemal</u> stipulation"; "what are the consequences"; "might have to sever"; and "exclude or stipulate." App. at 1395. Most notably, this document also contains the phrase "prosecutorial misconduct causing tactical decision." App. at 1395. At a hearing, it may be useful to question trial counsel whether the latter refers to the Government's continual representation during pretrial hearings that it had evidence of McCoy's prior drug dealing relationship with Barnette, when the actual existence of such evidence was never fully disclosed.

---

[8] Because the COA is limited to the claim of ineffectiveness in entering the <u>Jemal</u> stipulation, we do not consider any possible issue as to whether the stipulation was entered into with McCoy's knowledge and voluntary consent.

19

**IV.**

For the above reasons, we will reverse the judgment of the District Court denying McCoy's motion under 28 U.S.C. § 2255 and remand the case to it with instructions to hold an evidentiary hearing.

————————————————