IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| VS. | ) **CRIMINAL NO.:** 98-5 |
| | ) **CIVIL NO.:** 02-182 ERIE |
| MARCRESSE MCCOY, | ) |
| | ) |
| DEFENDANT. | ) |
| | ) |
| | ) |
| | ) |
| | ) **TYPE OF PLEADING:** |
| | ) |
| | ) PETITIONER'S PROPOSED FINDINGS |
| | ) OF FACT AND CONCLUSIONS OF |
| | ) LAW WITH A CONCLUDING |
| | ) COMMENT |
| | ) |
| | ) |
| | ) |
| | ) **FILED ON BEHALF OF:** |
| | ) |
| | ) MARCRESSE MCCOY |
| | ) |
| | ) DEFENDANT |
| | ) |
| | ) |
| | ) |
| | ) **ATTORNEY OF RECORD:** |
| | ) |
| | ) BRUCE A. ANTKOWIAK, ESQ. |
| | ) PA I.D. NO.:  25506 |
| | ) |
| | ) ONE NORTHGATE SQUARE |
| | ) GREENSBURG, PA  15601 |
| | ) |
| | ) [724] 837-2100 |
| | ) |
| | ) |
| | ) |
| | ) |

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| VS. | ) **CRIMINAL NO.:** 98-5 | |
| | ) **CIVIL NO.:** 02-182 ERIE | |
| MARCRESSE MCCOY, | ) | |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |
| | ) | |
| | ) | |

<u>**PETITIONER'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH A CONCLUDING COMMENT**</u>

AND NOW, comes the Petitioner, Marcresse McCoy, through counsel, BRUCE A. ANTKOWIAK, ESQUIRE, and respectfully files the following proposed findings of fact and conclusions of law, followed by a brief, concluding comment.

### I.    PROPOSED FINDINGS OF FACT

#### A. Procedural History

**1.**    The Petitioner is presently serving a judgment of conviction and sentence entered against him on February 29, 2000, by the United States District Court for the Western District of Pennsylvania.[1]

**2.**    The judgment of conviction and sentence requires the Petitioner to serve a period of 132 months imprisonment followed by a term of 5 years supervised release.

**3.**    The Petitioner was initially indicted in four counts of a five count indictment with various violations of the law of the United States.  In Count 1, he was charged along with

---

[1] The source for the proposed findings of fact is, in all cases where not specifically noted otherwise, the official docket entries of this Honorable Court.  A copy of same was admitted as Government Exhibit 1 at the hearing of September 16, 2005.

Joseph Barnette with the offense of conspiracy to distribute marijuana and crack cocaine. In Counts 2 and 3, he was charged with possession with the intent to distribute crack cocaine and marijuana, respectively.   In Count 5, the Petitioner was charged with a violation of Title 18, U.S.C. Section 922(g)(1), felon in possession of a firearm.   The Petitioner was acquitted of this Count.

**4.**     The Petitioner was convicted after trial by jury.

**5.**     The Petitioner perfected a timely appeal from the judgment of conviction and sentence and such direct appeal was affirmed by the United States Court of Appeals by Order dated June 7, 2001.

**6.**     The Petitioner thereafter timely filed a petition pursuant to Title 28, U.S.C. Section 2255 alleging the ineffectiveness of trial counsel in agreeing to a stipulation and related jury instruction that if the jury was to find that the defendant possessed a blue duffle bag then it could find, without more, that the defendant knew its contents to be contraband and that he intended to distribute that contraband in the Western District of Pennsylvania.

**7.**     After this Honorable Court denied this petition without hearing, the United States Court of Appeals for the Third Circuit reversed in a published opinion appearing at 410 F.3d 124 (3rd Cir. 2005).   The appeals court remanded the matter for an evidentiary hearing. That hearing was to address two primary issues:

- The reason why counsel agreed to the stipulation/jury instruction since, while Barnette benefited from it, "it is difficult to discern the strategic advantage to McCoy from the same stipulation", 410 F.3d at 134, and since, given the disparity in evidence against McCoy when compared with Barnette, it is "not

apparent that it was reasonable for McCoy to forfeit what was arguably his best line of defense for the sole reason that he and Barnette could present consistent defenses". 410 F.3d at 134, note 7.

- Whether, in light of counsel's tactical choice, McCoy was prejudiced in exclusively pursuing a defense that he did not possess the bag when the Government had three witness (including two police officers) who said he did and McCoy had no one to say he did not, while abandoning a defense of insufficient proof of knowledge and intent where that evidence against him was no greater than that against two men the government had not indicted, and where that evidence was as insubstantial as in other cases where charges were dismissed against defendants by the Court of Appeals. 410 F.3d at 132-133.

The Court also suggested inquiry on two secondary issues:

- Whether counsel for McCoy was unduly influenced in the decision to stipulate by Barnette's attorney. 410 F.3d at 135.

- Whether the stipulation was entered into with McCoy's knowledge and voluntary consent. 410 F. 3d at 135, note 8.

**8.**    The evidentiary hearing in this matter was held September 16, 2005, before this Honorable Court. The only witness at that time was Khadija Diggs [hereinafter, Diggs], the former federal public defender, who had represented McCoy at all stages of the pre-trial and trial of this matter.

### B. The Nature of the Charges and the Issue Raised

**9.**    The charges arouse out of an arrest of McCoy and others on March 17, 1998, at approximately 5:15 p.m. in Erie, Pennsylvania. The United States Court of Appeals for

4

the Third Circuit has properly rendered the facts and circumstances surrounding that

arrest in the light most favorable to the government in its recent opinion. The relevant

portions of which are as follows:

> A police officer in the Erie Area Gang and Law Enforcement Task Force was informed by a reliable source that a man named Joseph Barnette would be arriving in Erie, Pennsylvania, from Detroit, Michigan via Greyhound bus on March 17, 1998, at approximately 5:15 p.m. According to the source, Barnette would be traveling with friends, would be armed, and would be carrying crack cocaine. Based on this information, Task Force agents established surveillance at the bus station.

> When the scheduled bus arrived, a man matching Barnette's description exited the bus with no bags and made his way to the front door of the bus terminal. Shortly thereafter, three other black males carrying garbage bags and a blue canvas duffel bag left the bus, exited the bus terminal through the front door, and set their bags on the sidewalk next to Barnette. Police Sergeants Joseph Kress and Robert Liebel observed that Marcresse McCoy carried the blue duffel bag, while two other individuals, later identified as Kendrick Grier and Michael McQueen, carried the trash bags. Once outside, the four men were observed sharing cigarettes and talking as if they knew each other.

> Officers approached the group of men, identified themselves, and questioned each of the four men separately. The officers received conflicting answers in response to inquiries of whether the men knew each other, whether they had traveled together, and the purpose of their visit. Barnette, for instance, initially identified himself as "Ardell Griffen" and denied knowing the other individuals. McCoy represented that his name was "Mark Chin" and stated that he knew "Ardell Griffen," but denied knowing Grier, who was traveling under the name "Carlton Davidson." Grier, in contrast, admitted traveling with both Barnette and McCoy.

> Because of these inconsistent responses, the officers inquired as to the ownership of the garbage bags and blue duffel bag. McCoy claimed ownership of two garbage bags and gave officers permission to search them; they contained shoes, shoe boxes, wet clothing, and a screwdriver. McQueen claimed ownership of the remaining garbage bag, which contained clothing. All four men denied ownership of the blue duffel bag. McCoy specifically denied carrying it from the bus. A search revealed that the duffel bag contained 270 individually packaged plastic baggies of crack cocaine, forty slightly-larger plastic baggies of crack cocaine, a large ziploc-type bag containing one pound of marijuana, a 9mm pistol wrapped in a towel, and a .380 caliber pistol hidden inside a pair of jeans.

> All four men were arrested and taken into custody. Individual searches revealed that all four bus tickets, issued under fictitious names, were purchased at the same

ticket counter within four minutes of each other and approximately ten minutes prior to the scheduled departure. A search incident to McCoy's arrest revealed that he had possession of Barnette's bus ticket in the fictitious name of "Ardell Griffen," along with his own ticket in the fictitious name of "Mark Shinne." McCoy also had a pager in his possession. A number retrieved from the pager matched a number written on a piece of paper found in Barnette's pocket.

On April 14, 1998, a grand jury in the Western District of Pennsylvania returned an indictment charging McCoy and Barnette with violating federal drug and gun laws. A five count superseding indictment was filed on June 16, 1998. [FN1] Count One charged that beginning on or about March 17, 1998 (the day of the arrest), the defendants had conspired to distribute and possess with intent to distribute cocaine base and marijuana in violation of 21 U.S.C. § 846. Count Two charged that the defendants possessed with the intent to distribute in excess of fifty grams of cocaine base in violation of 21 U.S.C. §§ 841(a), (b)(1)(A)(iii). Count Three charged the defendants with possession with the intent to distribute less than 500 grams of marijuana in violation of 21 U.S.C. §§ 841(a), (b)(1)(C). Counts Four and Five charged Barnette and McCoy, respectively, as convicted felons in knowing possession of firearms in violation of 18 U.S.C. § 922(g)(1).

FN1. For reasons not clear from the record, the two other individuals, Kendrick Grier and Michael McQueen, were not indicted.

See, 410 F.3d at 125 to 126.

**10.** McCoy's sole defense to this case was a challenge to his possession of the blue duffle bag. **Closing Argument of McCoy's Counsel, November 3, 1998 Hearing, at 76 and following.** The reason McCoy did not contest his knowledge of its contents or his intent to distribute same was his trial counsel's agreement to a jury instruction given by the Court during its explanation of the elements of the crimes of possession with intent to distribute controlled substances. That jury instruction was as follows:

"[In] this case, the defendants have stipulated to certain elements of each of the offenses. That is, with regard to the crimes of possession with intent to distribute marijuana and possession with intent cocaine. If you should find from all of the evidence that the government has proven beyond a reasonable doubt that Joseph Barnette and/or Marcresse McCoy were in possession of the blue duffle bag seized by the law enforcement officers at any time, then you may conclude without further evidence that Joseph Barnette and Marcresse McCoy knew that the blue duffle bag contained cocaine and marijuana and that they or he intended to distribute them. However, you may conclude this only in the event that you find that

the government has proved beyond a reasonable doubt that Joseph Barnette and/or Marcresse McCoy were in possession of the blue duffle bag.  The defense of each defendant in this case is that they were not in possession of the blue duffle bag".  **November 3rd transcript at 122 to 123.**

**11.**     Counsel for McCoy agreed to this instruction (the language was proposed by co-defendant Barnette's counsel) at the charge conference the day before it was given.

**November 2nd transcript page 25 to 20; testimony of Khadija Diggs of September 16, 2005, [hereinafter Diggs] Page 6.**

**12**.     The instruction was the product of a *Jemal* stipulation to the same effect Diggs acquiesced in on behalf of her client at some point prior to November 2, 1998. The stipulation was a "tacit agreement" by counsel, and never reduced to a writing signed either by McCoy or his counsel.  **Diggs at Page 12.**

**13.**     The circumstances that led to counsel's tacit decision to agree to the *Jemal* stipulation, and counsel's formal decision not to oppose the jury instruction proffered on November 2, 1998, began when the government filed notices of intent to use evidence under Rule 404(b), Federal Rules of Evidence. **September 16, 2005 hearing exhibit A.**

**14.**     The Government notices (filed October 14 and 16, 1998) gave no specifics as to the witnesses the government intended to call or the details of their allegations of prior drug dealing against McCoy and Barnette.  McCoy's counsel initially took the position of opposing the Rule 404(b) evidence, and, more directly, demanded specifics as to what the government claimed that evidence would show.  **Diggs at 9 to 10**.  Her position consistently throughout pre-trial hearings on the issue was that she needed to have specifics of the information before she could give an absolute answer.  **Diggs at 13.**

**15.**    At some point shortly after the Government's notices, Barnette's lawyer initiated the idea of a *Jemal* stipulation. On October 19, 1998, he filed a written stipulation to that effect  signed by himself and his client and he pressed Diggs to join it. Prior to this trial, Diggs had never heard of a *Jemal* stipulation and had no idea what is was.  **Diggs at 7.**

 **16.**    Diggs' first reaction was that the Government's proffered evidence, and the stipulation supposed to deal with it, did not pertain to McCoy.   **Diggs at 9.** Diggs believed that the circumstances regarding McCoy were different than Barnette particularly, but not limited to the fact, that McCoy's prior, seven year old conviction was for a firearm while Barnette's prior conviction was for drugs.  **Diggs at 12.**

**17.**    Prior to October 26, 1998, when the Jencks material was made available to the defendants, Diggs had not received the specifics of the alleged 404(b) material she had requested from the government. While the government made certain representations on the record, and may have made certain representations off the record that were no more specific than what appears on the record of the hearings of October 15 and 23, 1998, at no time before getting the *Jencks* material did Diggs specifically know what testimony was supposed to be coming in under the proffered 404(b) evidence. **Diggs at 10, 33.**

**18.**    Diggs' conversations with Barnette's lawyer provided her with no more specifics of the information than she had received from the government.  **Diggs at 19.**  Barnette's lawyer, however, continued to press the matter of the *Jemal* stipulation, claiming to her that he was concerned about inconsistent defenses and the possibility of the jury learning about prior drug dealing.  **Diggs at 11 to 12.**

**19**.    Through and including the conclusion of the October 23, 1998, pre-trial hearing, Diggs did not formally enter into the *Jemal* stipulation.  See, 410 F.3d, at 128 and note 3,

128.  Diggs opposed the government's notice of its intention to use 404(b) evidence and never (during any recorded hearing) specifically said that she would or would not enter into this stipulation.  **Diggs at 13**.  Comments she made at the October 23rd hearing (**October 23rd transcript page 41 to 45**) were, at best, her agreement to consider it and speak about it to her client at some unspecified later point.  **Diggs at 55**[2].

**20.**    As the matter of the admissibility of the proffered 404(b) evidence was not resolved by October 23, 1998, at the conclusion of the hearing of that date, the Court ruled that the government, a) would be precluded from offering 404(b) evidence of the defendants' alleged drug dealing during the previous year, b) would be precluded from offering so-called "signature" evidence about Barnette's prior drug dealing, and c) would be permitted to offer evidence establishing a prior association between the defendants in support of the conspiracy charge. **October 23 transcript page 89-90.**

**21.**    Diggs, however, did not realize that the Court had so ruled. **Diggs at 14.**

**22.**    As of the end of the October 23 hearing, Diggs also did not believe that she had actually agreed to the Barnette stipulation.  **Diggs at 14.**  At some point, however, more closely proximate to jury selection, she agreed tacitly to the matter, and tried her whole case under the theory that she had agreed to the stipulation**.  Diggs at 14, 53**.[3]  Thus, the Third Circuit Court of Appeals correctly concluded that McCoy's counsel agreed the jury instruction that ratified and  encapsulated the stipulation *after* the court had already ruled

---

[2] It is not clear from the transcript of the October 23, 1998 hearing but present counsel believes that McCoy may not even been present for this hearing in as much as he was on pre-trial release in Detroit and did not arrive for trial until the day of jury selection.
[3]  Indeed, at the October 27, 1998 pre-trial hearing, counsel for the United States complained that while he was dissatisfied generally with the language of Barnette's stipulation, he had at that point received no stipulation from McCoy.  **October 27th transcript at page 90.**

that much of the government's proffer 404(b) evidence would be inadmissible. See, 410 F.3d at 134.

23.     Diggs did not perceive the *Jemal* stipulation/jury instruction to be connected with the firearm count McCoy was facing. **Diggs at 42.** As the Court of Appeals has pointed out, the Court did not specifically rule on the whether the nature of McCoy's seven year old prior conviction could be presented to the jury for 404(b) purposes, and McCoy's separate stipulation under Old Chief v. United States, 519 U.S. 172 (1997) was sufficient to eliminate the need for the use of the nature of the conviction to prove the firearms charge. 410 F. 3d at 128, 134. Without the *Jemal* stipulation, McCoy was still capable of arguing lack of knowledge or intent with respect to the contents of the bag.  Id.

24.     The reason that through and including the time of Diggs' agreement to the jury instruction on November 2, 1998, Diggs never did openly "come out and agree" to the stipulation was because she "was never satisfied that it was the right decision".  **Diggs at**

25.     Through the moment of the agreement of the jury instruction, Diggs had simply acquiesced, or tacitly agreed to it, although she never reached a conclusion that it was in her client's best interest to do so. **Diggs 14, 53.** Prior to her tacit agreement, she had never received the specifics of the 404(b) information she originally sought.

### C. McCoy's Lack of Consent to the Stipulation/Jury Instruction

25.     McCoy did not voluntary consent to or have effective knowledge of the *Jemal* stipulation, its purposes, or effects.  At most, Diggs had a very short conversation with McCoy about it as trial was beginning.  McCoy did not understand the nature of the stipulation and was neither able to agree nor disagree with it; he simply did not grasp it. The decision to stipulate was made solely by his counsel.  **Diggs at 6 to 7.**

26.    Diggs did not believe that, merely because McCoy had denied carrying the bag when he was arrested, she was compelled to defend the case solely on his alleged lack of possession. Rather, she realized that evidence that he did not physically possess it could still have been a small part of an intent/knowledge based defense. But it became the entirety of the defense when the *Jemal* stipulation prevented the defense from presenting "the entirety of a reasonable defense", that is, that McCoy lacked knowledge of the contents and an intent to distribute the drugs that were seized. Diggs at 43 to 44.

### D. The Decision to Agree to the Jury Instruction

27.    Counsel for McCoy received the *Jencks* material after the Court's ruling of October 23rd excluding much of the government's proffered 404(b) evidence. Indeed, Diggs received the *Jencks* sometime on October 26, 1998. **Diggs at 30.**

28.    At the time McCoy's counsel received the *Jencks* material, she immediately realized that the specifics of the proffered testimony did not comport with the general representations made by government counsel during the hearings. **Diggs at 9, 15 to 16, 26, 33 to 34.**

29.    Indeed, at the October 27th hearing, Diggs challenged the government, asking whether what she had received was all of the *Jencks* material since virtually all of it related to Barnette and not McCoy. The Assistant United States Attorney admitted at that time that the information regarding McCoy was "rather limited". **October 27th hearing at 73; Diggs at 16 to 17.**

30.    The *Jencks* material that was provided to McCoy's counsel is now part of the record under seal as Petitioner's <u>Exhibit B</u>. **Diggs at page 17.**

**31.**    A review of that material reflects that the *Jemal* stipulation kept out nothing of substance from the government's case against McCoy, making the stipulation/jury instruction a unilateral concession, not an agreement supported by adequate consideration. Four of the witnesses (Rose Blackwell, Terry Siegworth, Patrick Quinn and Marion Smith) gave extensive incriminating information against Barnette but said not one word about McCoy.  Belinda Peterson's statement related to extensive contact with Barnette over a considerable period of time.  Her only reference to McCoy was her alleged recognition of a picture of him, identifying him as a person that she had seen with Barnette at another person's residence one time in the past. [4] She could not recall his name and her *Jencks* material is devoid of any allegations of drug activity by McCoy. **Hearing Exhibit B.**

**32.**    There was only one drug related reference in the entire *Jencks* material to McCoy. That reference was contained in the *Jencks* material attributing statements to an individual who never did testify at trial, Roxanne Arnold.  Arnold's *Jencks* material is contained in three statements.  In the statement given April 7, 1998, she spoke extensively about Barnette's travels to and from Detroit for narcotics purposes and his various criminal associates in Erie.  This statement makes no reference to McCoy whatsoever. **Hearing Exhibit B.**

**33.**    In the statement given May 22, 1998, Arnold indicated that she recognized a photograph of an individual known to her as "2-4", the boyhood nickname of McCoy. She simply said that this person had stayed at an apartment on Parade Street sometime during the summer of 1997 with several people who spoke Spanish.  She said she saw

---

[4] Peterson never gave any such testimony at trial, although, pursuant to the Court's prior ruling, the Government was free to offer it.

him in Siegworth's car one day with another black male and that, later that same day, she gave him and Barnette a ride in her own car.  No drug related information is contained in that report.  **Hearing Exhibit B.**

**34.**     In the interview dated April 10, 1998, Arnold made a statement alleging that during the summer of 1997, McCoy, whom she identified as Mark Chinn, had "hung around" with others in the area near 13th Street and Parade "selling drugs for Egypt" a nickname for Barnette.  Arnold claimed that she had not seen Chinn since the summer of 1997.  **Hearing Exhibit B.**

**35.**     There was no indication in the *Jencks* material how Arnold allegedly knew that McCoy was selling drugs in the summer of 1997. This information could have been based purely on hearsay.  McCoy's counsel realized this.  **Diggs 64.  Hearing Exhibit B.** In addition, of course, testimony about drug dealing in the summer of 1997 was excluded by the Court's pre-trial ruling.

**36.**     The *Jencks* material also reflected considerable information that could have been used to impeach Arnold if she did testify and claimed any personal knowledge of McCoy adverse to his case.  In late 1995, Arnold signed a plea agreement with government regarding her cooperation and plea of guilty to a count of possession with intent to distribute less than 5 grams of crack cocaine.  Minimally, as of May 2, 1996, she was on a period of home detention and supervised release through at least sometime in 1999. While the government argued on October 27th that there had been no deal with Ms. Arnold, **October 27th transcript 66 to 72**, to whatever extent she had participated in any drug transactions with Barnette, she would have done so in violation of her supervised release terms and conditions and her testimony about it would either be personally

incriminating or would have to be the subject of some understanding that she had that she would not suffer a violation by giving such testimony.   Arnold also had a retail theft conviction and perhaps one or more outstanding bench warrants at the time.   Trial counsel for McCoy acknowledged that while direct information about McCoy's selling drugs in the summer of 1997 would have been a negative factor against him (assuming, of course, that the Court changed It's ruling on the matter), **Diggs at 36 to 37**, Diggs also knew that, even had Arnold testified, she would have had at least as good a chance to impeach Arnold's credibility as she did the credibility of the two veteran policeman who claimed to have seen her client possess the bag.   **Diggs at 65.**

37.     Regardless of what Arnold may have been able to say in court, and whatever value it may have had given the substantial impeachment evidence available, Roxanne Arnold was not, and could not have been a factor in any decision made by counsel to agree to the jury instruction since, at the moment of that agreement, it was clear that ***Arnold was not going to be a Government witness in the case***. The Government never did call her, although under the Court's ruling of October 23, she could have provided her alleged "associational" testimony about the defendants.     The jury instruction kept nothing Roxanne Arnold might have said out of the case because Roxanne Arnold would not have said it anyway.

38.     Diggs acknowledged that at the time she agreed to the jury instruction, it was clear to her that Roxanne Arnold was not going to testify.   Nonetheless, Diggs failed to object to the jury instruction that critically limited the nature of the defense.   **Diggs 64 to 65.**

**39.**     Indeed, after McCoy's counsel reviewed the *Jencks* material, Diggs concluded that her tacit agreement to the *Jemal* stipulation was not in her client's best interest. **Diggs 17 to 18.**

**40.**     The trial notes Diggs made (Hearing Exhibit C) reflect that after she received the *Jencks* material, she contacted a fellow federal public defender in an effort to discuss how to "undo the damage" caused by her tacit agreement.  **Diggs 18, 24, 26.**  The entry "prosecutorial misconduct" referred to her concern that the prior general representations made by government counsel about the nature of the 404(b) evidence were not realized by the actual *Jencks* material and that her tactical decision to tacitly agree to the *Jemal* stipulation may have been the product of such misconduct.  **Diggs 26 to 28.**

**41.**     Indeed, when asked at the most recent hearing whether she believed that at the point the *Jemal* stipulation became a reality she believed it was error, Diggs was emotionally unable to answer the question at first. After a recess, Diggs admitted that the stipulation was, indeed, an error.  **Diggs 19 to 20.**

**42.**     Upon the Court's question of why she believed it was an error, counsel stated the following: "[o]nce I actually had the specific evidence that the government would present, if it was allowed to use prior bad acts against McCoy, I felt like it was so far below the nature of evidence that I should be seeking to preclude by the *Jemal* stipulation.  I felt like that it was so minimal that there was no advantage in agreeing to defend the case on possession alone.  I felt like the case, I felt basically like I was bamboozled into an agreement that damaged my client".  **Diggs at 20.**

**43.**     Counsel testified that she simply "didn't know how to get out of it".  **Diggs at 20.**

**44.**   Counsel acknowledged that there was no strategic or tactical purpose to persist in the stipulation and the jury instruction that manifested it.  **Diggs at 20 to 21**.  As she said, "No, the only reason-that I entered into to the *Jemal* stipulation was to keep the jury from hearing some long saga of the history of McCoy and Barnette in Erie trafficking drugs.  I didn't want that to come out.  And then there was no evidence of that."  The "*Jemal* stipulation", she said , "was of no benefit".  **Diggs at 20 to 21.**

**45.**  Despite this recognition, counsel took no action. Diggs stipulated away McCoy's best possible defense and got nothing in return.

**46.**   McCoy's counsel recognized then and now the effect of this stipulation/jury instruction.  She acknowledged that this stipulation kept her "from presenting the entirety of a reasonable defense".  **Diggs at 44.**  She stated that prior to her tacit agreement to the *Jemal* stipulation "the defense on the case would not have been limited to possession". After the stipulation, while she put her best efforts to defend the possession, "we relinquished the opportunity to defend on knowledge and intent", and that this was not a wise course of action.  **Diggs at 49.**

**47.**   Counsel provided this overall assessment during cross-examination:

> "My client did not choose that defense.  My client was linked to Barnette anyway. But the *Jemal* stipulation was strictly a defense to possession.  And yes, I did the best that I thought I could do within that restriction.  But there was no value in creating that restriction for him or for his defense.  That then gave the opportunity to say to the jury, even if you think I possess this bag there is no reason to believe that I knew what was in it or I had the intent to distribute drugs.  And those equally if not more powerful defenses then do you think I held bag.  Especially when you have two, as you say, veteran police officers testifying that he did hold the bag."
> **Diggs at 51.**
>
> And again,

> "I challenge the credibility of the officers, yes, I did.  What I did not do was challenged knowledge and intent.  That a decision I made without my client's input and the decision undermined and was counter productive to the defense of the case.  It was an error in judgment on my part.  And I am the one that had the responsibility to defend him.  And you can stand here in court and say its convenient today but you don't know".
> **Diggs at 52.**

**48.**  Trial counsel vigorously pursued the limited possession defense, calling witnesses and trying to impeach the two veteran police officers who testified that they saw McCoy hold the bag.  She also sought to impeach government witness Kendrick Grier, one of four men on the trip, who also said that McCoy carried the bag off the bus in Erie.  However, as counsel acknowledged, all of her efforts in this impeachment could have occurred anyway in the absence of a *Jemal* stipulation.  **Diggs at 21**.  All of the witnesses she called and all of the efforts to impeach the government's case would have been unaffected by her refusal to stipulate to her client's knowledge and intent.  She could have done all of it *and* preserved the right to argue matters of his knowledge and intent, something she characterized as the entirety of a reasonable defense.  **Diggs 21 and 44.**

**49.**  Counsel's assessment of the effect of the *Jemal* stipulation on the government's burden of proving the only remaining element of the crime (possession) accords with that anticipated by the Court of Appeals:

> As a result of the <u>*Jemal*</u> stipulation, the prosecution was left with the relatively simple burden of proving that at some point McCoy was in possession of the blue duffel bag. Three witnesses, two of them police officers, testified that McCoy carried the duffel bag from the bus to the sidewalk outside the Erie bus station. Although McCoy attempted to rebut this testimony through evidence of his physical ailment, which he alleged would have prevented him from carrying the bag, and through impeachment of the Government's witnesses for bias, the issue of possession *vel non* amounted to a determination of credibility. Faced with overwhelming first-hand accounts of multiple witnesses observing McCoy carrying the blue duffel bag, and no first-hand witnesses contesting these accounts, the jury could easily have reached its conclusion that the Government satisfied its burden with respect to the possession element. However, even if the

jury believed that McCoy carried the duffel bag from the bus to the Erie station, it would not be dispositive of the key issue of whether McCoy was aware of the contents of the bag.

410 F.3d at 132.

**50.**     Counsel's assessment of the effect of the *Jemal* stipulation on the unilateral benefit to the government of not having the burden of proving knowledge and intent accords with that anticipated by the Court of Appeals:

> The knowledge and intent elements presented a far greater burden for the Government. McCoy contends, and we agree, that the Government's evidence against him in this regard, was "no different in any meaningful respect than the facts the [G]overnment had against the other two men [Grier and McQueen]" who were not even indicted. Appellant's Br. at 25. Although McCoy used a fictitious name on his bus ticket, so did Grier and McQueen; furthermore, all four tickets were purchased by Barnette. Grier testified that Barnette already had the blue duffel bag packed and prepared when he met Barnette at Barnette's aunt's house on the day of the arrest. There was no evidence that McCoy assisted in packing the bag or that he made any statements implying that he knew of its contents. Further, Grier testified that McQueen had handled the bag during a stop over in Cleveland. All four men had denied possession of the bag during the police questioning. Finally, although there was testimony that McCoy and Barnette had a prior relationship, it is evident that both Grier and McQueen had a similar, if not more substantial, prior relationship with Barnette. Grier had called Barnette upon escaping from his halfway house and McQueen had fathered a baby with Barnette's aunt.

410 F.3d at 132-133.

**51.**     In the end, trial counsel agreed with the assessment of Assistant U.S. Attorney Trucilla at the October 15th hearing that whether or not McCoy carried the blue canvas bag "in and of itself [is] not necessarily an incriminating factor in this particular case, its not the vital issue.  The vital issue is whether or not McCoy had knowledge of the contents of that bag and in conjunction with his possession of it." **October 15 Transcript, page 6.**   Counsel admitted that by tacitly agreeing to the *Jemal* stipulation and by not objecting to the jury instruction that was proffered on November 2, 1998, she

abandoned without any reasonable strategic or tactical purpose the argument on this central issue in the case.  **Diggs at 66**.

## II.    CONCLUSIONS OF LAW

### A. The Overall Standard

**1.**    Pursuant to Strickland v. Washington, 466 U.S. 668 (1984) and United States v. Cronic, 466 U.S. 648 (1984), the grant of a new trial based on a finding of ineffective of counsel requires, a) a showing that counsel's performance fell below an objective standard of reasonableness and, b) that a reasonable probability exists that, but for those errors, the result would have been different.  Strickland at 686 to 694.

### B. Counsel's Performance Fell Below the Objective Standard of Reasonableness

**2.**    As the Court of Appeals has pointed out, "merely labeling a decision 'strategic' will not remove it from the inquiry of reasonableness".  410 F. 3d at 134. The Court's mandate to this Honorable Court "to evaluate the rationale given by trial counsel" for this stipulation, Id. at 135, leads to the inescapable conclusion of law that, far from being simply an unreasonable rationale, counsel's judgment reflected no proper rationale at all.

**3.**    Not only was there no reasonable strategic or tactical reason designed to advance her client's interests for trial counsel to enter into this stipulation, trial counsel actually knew that the stipulation was detrimental to her client at the time it was effectuated.  Trial counsel continued to stipulate knowing that it was an error simply because she did not know how to "undo the damage" that the tacit stipulation had achieved by a jury instruction that gutted from her case its most compelling defense.  Therefore, trial counsel allowed the considerable damage to continue by an action that fell below the objective standards of reasonableness.

**4.**    Trial counsel's tacit agreement to stipulate, made formal on November 2, 1998, when she agreed to the jury instruction, was also objectively unreasonable in the following specific respects:

a. It came after the Court had ruled that prior drug activity evidence against McCoy would be excluded, thereby limiting or eliminating the value of such a stipulation to McCoy in absolute terms;

b. It came after counsel reviewed the *Jencks* material which showed virtually no references whatsoever regarding drug related or other inculpatory information about McCoy, thus limiting or eliminating the value of the stipulation to McCoy in specific terms;

c. It came after counsel reviewed one passive voice reference in one of three statements given by Roxanne Arnold that generally alleged that McCoy had been dealing drugs in the summer of 1997, an assertion which the Court's ruling of October 23rd would have kept out of the case in any event.  Counsel knew that, even if Roxanne Arnold were to testify about any matters regarding McCoy, Arnold could be impeached in multiple ways: on the basis that she gave three statements, only one of which had any reference whatsoever to illegal conduct by McCoy; that she was a convicted federal drug felon with an additional prior conviction for retail theft; and that although the government claimed she had no deal to support her testimony, if she had any direct knowledge of drug trafficking activities in the summer 1997, she would have been in violation of her then imposed supervised release and, accordingly, an assertion that she was not testifying in order to avoid violation of that term was ludicrous.  Counsel knew

that the impeachment of Roxanne Arnold would have been far more compelling than any impeachment she did of any other witness at the trial of this case;

d.  It was agreed to when it was clear that Roxanne Arnold *was not going to and had not testified as a government witness in any event*. Accordingly, counsel agreed to a jury instruction that vastly limited critical defenses available to her client but did not, by that agreement, preclude the government from putting in any evidence that it otherwise could have offered in the trial of this case. All that the stipulation did was unfairly limit the defense of McCoy and enhanced government's ability to convict him.

**5.**    The stipulation/jury instruction was not supported by any strategic or tactical reason that even arguably outweighed the unnecessary limitation it placed on the theory of defense.

**6.**    The decision of counsel to stipulate was, to some degree, the product of influence by the co-defendant's counsel who initiated the matter and pressed Diggs to do so under the flawed theory that it would be helpful to present consistent defenses. The result of this was a disadvantage to McCoy, and an extreme tactical advantage to Barnette who, by having his co-defendant's counsel agree to this, made it appear that each of the men were equally potentially culpable whereas the weight of evidence rested heavily against Barnette. The Court of Appeals correctly anticipated that a consistent defense rationale was unreasonable as a matter of law:

> The evidence at trial was very strong against Barnette, and relatively weak against McCoy. It is not apparent that it was reasonable for McCoy to forfeit what was arguably his best line of defense for the sole reason that he and Barnette could present consistent defenses.

> 410 F.3d at 135, note 7.

**7.**     Trial counsel's performance fell below the objective standard of reasonableness because, by focusing on possession of the bag as the sole defense, she left the government "with relatively simple burden of proving that at some point McCoy was in possession of the blue duffle bag". 410 F.3d at 132.  On this matter the government had three witnesses, two policemen and Kendrick Grier, who testified that McCoy did physically possess the bag.  McCoy had no one to say he did not.  Given this vast disparity, "the jury could easily have reached its conclusion that the government satisfied its burden with respect to the possession element".  Id. Counsel's choice unreasonably abandoned "the key issue of whether McCoy was aware of the contents of the bag", Id, an issue on which the government's evidence against McCoy was not different in any meaningful respect than against the other two men who had accompanied Barnette on March 17, 1998, but who were never even indicted.  In exchange for this polar shift in the Government's burden of proof, counsel kept out no evidence significant to the government's case, rendering her decision unreasonable.

**8.**     By stipulating away this critical defense, and receiving nothing in exchange for it, counsel agreed to a jury instruction that fundamentally denied her client due process by failing to pursue a proper course of defense based upon known facts.  See <u>Everett v. Beard</u>, 290 F.3d 500, 514 to 515 (3rd Cir., 2002); <u>United States vs. Kauffman</u>, 109 F.3d 186 (3rd Cir., 1997); <u>United States v. Riley</u>, 236 F.3d 982 (8th Cir., 2001).

**9.**      Counsel's performance thus fell below the objective standard of reasonableness, meeting the first prong of the *Strickland* test.

### C. Counsel's Error Prejudiced McCoy to the Degree Requiring the Grant of a New Trial

**10.**     As it is now clear that the stipulation/jury instruction kept out nothing that could have carried the government's burden of proving the elements of knowledge and intent without the *Jemal* stipulation, the prejudice to McCoy is palpable and established as a matter of law. The Court of Appeals has said that there have been "several cases with facts even more compelling than those in present case,[in which] this court has held that there was insufficient evidence to support the element of knowledge in a drug conspiracy".  410 F.3d at 133.  As the stipulation/jury instruction did not prevent the Government from offering anything more than it did, McCoy forfeited a viable chance at dismissal because of this erroneous action by counsel.

**11.**     Indeed, given the absence of even any proffer by the government as to what other evidence it would have offered in this case *but for* that stipulation, McCoy would arguably have been entitled to the entry of judgment of acquittal under the standards set forth in the multiple cases cited by the Appeals Court in which convictions based upon greater evidence were dismissed.  This level of prejudice ran to both the substantive counts and the conspiracy which was intertwined with the substantive counts in an inextricable way in this case.

**12.**     McCoy was prejudiced because the central issue in this case was his knowledge and intent with respect to the contents of the bag, not simply whether he was the person who happened to carry it from the bus on that afternoon in March 1998.   The observations of then Assistant U.S. Attorney Trucilla about the central issue in case were correct and, without compelling reason, counsel stipulated away this central factor in the case.  McCoy was fatally prejudiced.

**13.**     Finally, neither trial counsel's flawed tactical judgment nor the matter of prejudice can be mitigated by any conduct attributed to McCoy himself.  McCoy *did not* voluntarily consent to the course of action taken by his counsel with full knowledge of its meaning and consequences.  410 F. 3d, at 135, note 8. McCoy did not understand it and the matter was one entirely within control of his trial counsel.

**14.**     McCoy has satisfied both elements of the *Strickland* test, and is entitled to a new trial as a matter of law.

### III.     <u>CONCLUDING COMMENT</u>

It is respectfully submitted that based upon all facts and circumstances of record, only one decision consistent with dictates of due process of law is mandated here. McCoy must be granted a new trial.

In Its extensive Opinion remanding the matter for hearing, the Court of Appeals anticipated this outcome. Reading that Opinion, it is clear that unless trial counsel had some compelling reason that was not evident on the record to date to agree to the stipulation/jury instruction, the Court of Appeals expected that a new trial would ensue. The hearing has shown not only the absence of such a reason, but the unfortunate circumstance of a lawyer who, despite her personal good faith, committed a major error she then knowingly allowed to go uncorrected.

We sometimes mistakenly believe that due process is something only the courts are to give defendants by application of the law, or that it is something prosecutors are supposed to ensure by their good faith.  It certainly is both of those, but it is more.

24

The position of defense counsel is one of the key structural features of a system that seeks to ensure due process of law.  In the end, it is not a question of the personal good faith of the defense attorney, although our system is littered with tragic circumstances in which many defense counsel operate in terribly bad faith.  All who have been in this system longer than a little while have seen circumstances where defense attorneys are lazy and uncaring, and put forth no effort for their clients in any meaningful respect.  These are reprehensible creatures of the first order and the system should never tolerate them or the damage they do to all concerned.

But there are also circumstances where a good and honorable lawyer who tries very hard for a client may, through lack of experience, knowledge or guidance, make a huge blunder in a case.  Where that blunder fundamentally alters the potential outcome of the matter in such a way that the conviction cannot be judged one worthy of our trust as a reflection of justice, it is equally compelling that a remedy by given.

McCoy has never doubted that Khadija Diggs is a good and honorable lawyer who tried hard for him.  However, in one ultimate and most crucial respect, she not only made a fatal error in judgment, but knew it at the time.  Tragically, she did not know how to undo the damage that she had done and she lacked the guidance to simply advise the Court at the time that she reviewed the *Jencks* material that she could not possibly agree to a stipulation that would, without any measure of balancing benefit, take from McCoy's defense its most critical argument.

It is evident that Ms. Diggs has now publicly acknowledged what she realized then. She suffers, as good and honorable lawyers will, in the acknowledgment of so fundamental a mistake.  But it is McCoy who suffers the consequences of that tragic

error.  The remedy for that error is to give him a new trial.  Justice, even at this late stage

of this proceeding, demands it.

RESPECTFULLY SUBMITTED,


s/Bruce A. Antkowiak
BRUCE A. ANTKOWIAK, ESQ.
PA I.D. NO.:  25506