IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA
                 CIVIL ACTION NO. 02-182 ERIE
   v.
                 CRIMINAL NO. 98-5 ERIE
MARCRESSE McCOY


EVIDENTIARY HEARING



Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Friday, September 16, 2005.



APPEARANCES:
       MARSHALL J. PICCININI, Assistant United States
       Attorney, appearing on behalf of the Government.

       BRUCE A. ANTKOWIAK, Esquire, appearing on behalf
       of the Defendant, Marcresse McCoy.

Ronald J. Bench, RMR - Official Court Reporter

2

1           I N D E X

2

3    WITNESSES:           DIRECT  CROSS  REDIRECT  RECROSS

4   FOR THE PETITIONER:

5   Khadija Diggs           4      22     63        --

6

7                - - -

8

9

10    EXHIBITS:            IDENTIFIED    ADMITTED

11   FOR THE PETITIONER:

12   Petitioner's Exhibit A           18         --

13   Petitioner's Exhibit B           18         --

14  Petitioner's Exhibit C              18        --

15

16

17  FOR THE GOVERNMENT:

18  Government Exhibit 1                44        --

19

20

21

22

23

24

25                    - - -

3

1              P R O C E E D I N G S

2

3        (Whereupon, the proceedings began at 10:00 a.m., on

4  Friday, September 16, 2005, in Courtroom C.)

5

6           THE COURT:  This is the time that we have set for an

7  evidentiary hearing.  The focus of this hearing, pursuant to

8    the instructions from the circuit, will be to determine whether

9    there exists a reasonable probability that the government would

10   have been unable to meet its burden on the elements of

11   knowledge and intent without a Jemal stipulation.  And,
                    _____

12   secondly, I would be considering whether Ms. Diggs' decision to

13   enter into a Jemal stipulation fell below an objective standard
              _____

14   of reasonableness.  Those are the issues as I understand it.

15   Are you ready to go?

16          MR. ANTKOWIAK:  Yes, your Honor.

17          THE COURT:  All right.

18          MR. ANTKOWIAK:  Your Honor, we'll call Ms. Diggs.

19          THE CLERK:  Please state your full name for the

20   record?

21          THE WITNESS:  Khadija T. Diggs.

22          MR. ANTKOWIAK:  Before we begin questioning, I have

23   prepared and given Mr. Piccinini copies, these are copies of

24   things that are already in this record.  There is nothing new

25   in here except for the Jencks material documents that I will be
                    _____

4

1  offering.  I just assumed that we write on a slate that is

2  filled with this record so far.

3      THE COURT:  There's not much room left to write.

4      MR. ANTKOWIAK:  I was going to add we need a bigger

5  board.  For the convenience of the court, any of these

6  documents that are referred to, I have a set.

7      THE COURT:  That will be fine, that will be helpful.

8      MR. ANTKOWIAK:  Thank you.

9      KHADIJA T. DIGGS, PETITIONER'S WITNESS, SWORN

10              DIRECT EXAMINATION

11  BY MR. ANTKOWIAK:

12  Q.  For the record would you please state your name?

13  A.  Khadija T. Diggs.

14  Q.  And, Ms. Diggs, during the months of October and November

15  of 1998 specifically, were you serving as an assistant Federal

16  Public Defender here in Erie, Pennsylvania?

17  A.  Yes.

18  Q.  And were you in fact at that time trial counsel for the

19  defendant, Marcresse McCoy, in a trial of the matter that you

20  are now before the court?

21  A.  Yes.

22  Q.    Now, Ms. Diggs, as the court has already indicated, we're

23  here regarding some specific matters that particularly pertain

24  to what would be reflected in the record as a portion of the

25  jury charge that his Honor gave that appears on November 3rd

5

1  transcript, beginning at page 122.  Simply for the record, the

2  portion that has been the subject of this post-appeal

3  litigation concerns the court's description of the elements of

4  possession within intent to distribute and the court's

5  instruction as follows from the record:  "However, in this

6  case, the defendants have stipulated to certain elements of

7  each of the offenses.  That is with regard to the crimes of

8  possession with intent to distribute marijuana and possession

9  with intent to distribute cocaine.  If you should find from all

10  of the evidence that the government has proven beyond a

11  reasonable doubt that Joseph Barnette and/or Marcresse McCoy

12  were in possession of the blue duffel bag seized by law

13  enforcement officers at any time, then you may conclude without

14  further evidence that Joseph Barnette and Marcresse McCoy knew

15  that the blue duffel bag contained cocaine and marijuana and

16  that they or he intended to distribute them.  However, you may

17  conclude this only in the event that you find that the

18  government has proved beyond a reasonable doubt that Joseph

19  Barnette and/or Marcresse McCoy were in possession of the blue

20  duffel bag.  The defense of each defendant in this case is that

21  they were not in possession of the blue duffel bag."  Do you

22  understand that to be the subject matter here?

23  A.   Yes.

24  Q.   And am I correct that that jury instruction was given

25  without any objection by you?

6

1  A.   That's correct.

2  Q.   And indeed with your consent?

3  A.   Yes.

4  Q.   And am I also correct that that jury instruction

5  memorialized for the record the stipulation that you had

6  entered into on behalf of Mr. McCoy?

7  A.   You're correct.

8  Q.   Now, before I ask you to describe the circumstances that

9  led to the decision to stipulate, my first question is was the

10  decision to stipulate, the decision to agree on the jury

11  instruction, was that a decision you made only with the

12  specific consent of your client, Mr. McCoy?

13  A.    No.

14  Q.    Did he ask you to do that?

15  A.    No.

16  Q.    Could you describe for the court what if any discussions

17  you had with him about that, and whether that was either before

18  or after the decision to go ahead and do it?

19  A.    There was a very limited exchange immediately preceding

20  trial, in fact, we may have already been in the midst of jury

21  selection, that would have been the first time I would have had

22  any conversation with Mr. McCoy about a Jemal stipulation.  And

_____

23  the conversation was very short, and I did not have a sense

24  that he really understood what I was describing to him and he

25  did not agree to it or even disagree, I think he just didn't

7

1  grasp it.

2  Q.    But as his counsel you did agree to it and did stipulate?

3  A.    Yes.

4        THE COURT:  Run that by me again I didn't hear the

5    question and answer, I'm sorry.

6    BY MR. ANTKOWIAK:

7    Q.    But as his counsel you did agree to it and you did

8    stipulate?

9    A.    And my answer was yes.

10        THE COURT:  Thank you.

11    BY MR. ANTKOWIAK:

12    Q.    Now, you made reference to the fact of what has been

13    called a Jemal stipulation throughout the course of this
              _____

14    proceeding.  Prior to the trial of this case, had you ever

15    heard of a Jemal stipulation?
              _____

16    A.    No.

17    Q.    And did you know what it was?

18    A.    No.

19    Q.    As it became a factor in this case, what did you

20    understand its purpose to be, particularly in the context of

21    this case?

22    A.    With regard to this case, the purpose of a Jemal
                                                        _____

23    stipulation would be to keep from the jury's attention and to

24  keep the government from putting on evidence that would show a

25   prior history and relationship between Barnette and McCoy in

8

1  Erie distributing drugs.  So it would take out the elements of

2  knowledge and intent, and it would reduce the trial basically

3  to a trial on possession of the duffel bag.

4  Q.    So that you would be precluded from arguing knowledge and

5  intent to the jury?

6  A.    Correct.

7  Q.    Now, am I correct that the whole issue of a Jemal

_____

8  stipulation arose after the government filed certain notices of

9  its intent to use certain evidence under Rule 404(b)?

10  A.    Yes, you're correct.

11          MR. ANTKOWIAK:  Does your Honor prefer I ask leave

12  to approach the witness?

13          THE COURT:  You don't have to ask to approach the

14  witness, you can go up whenever you want.

15          MR. ANTKOWIAK:  Thank you.

16  BY MR. ANTKOWIAK:

17  Q.    Ms. Diggs, I'm handing you and I've supplied to the

18  court, and it's part of the record as the government's notices

19  of intent to use 404(b) evidence.  I believe there were two of

20  them.  I think the top one was filed on the 14th of October,

21  and then there was a status conference, and then there was

22  another one filed on the 16th of October.  Are those the ones

23  you remember getting?

24  A.    Yes.

25  Q.    Now, when you got those, how did you respond to that,

9

1   what legal position did you initially take with respect to

2   those notices?

3   A.    I responded, the legal position was ultimately that I

4   agreed to a Jemal stipulation to preclude the 404(b) evidence
         _____

5   from coming in, would be the legal position.

6   Q.    Initially, what position did you take, did you stipulate

7   right away when you got these?

8   A.    No, the stipulation developed primarily as a result of

9   counsel for Joseph Barnette initiated the stipulation concept.

10  I believe he may have even brought a draft to court for a

file:///A|/MCCOY916.TXT

11   pretrial hearing.  And I was asked if Mr. McCoy would join in a

12   similar stipulation.  Basically, my response at that point was

13   I would consider it.  I would discuss it with my client, but I

14   did not see that it was really something that pertained to him

15   in a way that pertained to the co-defendant, Barnette.

16   Q.   When you got these notices, did you have any concerns

17   about the specifics of the 404(b)?

18   A.   The representation that had been made by the U.S.

19   Attorney's Office did not match up with the specifics that were

20   ultimately provided.  So I felt like I was being asked to make

21   a stipulation without knowing the details of what the 404(b) or

22   prior bad acts evidence was.  And I felt like I needed

23   specifics so that I would be able to investigate those things.

24   I needed to know when and where and who.

25   Q.   Prior to the time you would have received any Jencks

———

10

1   material in the case, did the United States provide you with

2   any specifics in terms of the names of witnesses, details of

3   their allegations about these supposed 404(b) materials?

4   A.   No, prior to the Jencks material, we were moving forward

————

5   based on the verbal representations of the assistant United

6   States Attorney.

7   Q.   And were those representations made on the record or were

8   there additional recommendations made off the record?

9   A.   I think probably both.  But they were consistent

10   representations.  Whatever he said on the record was the same

11   as the things that were said off the record.

12   Q.   Now, you mentioned that you also had discussions with

13   counsel for the co-defendant in this case?

14   A.   Yes.

15        THE COURT:  If I could interrupt for one second.

16   When you say there were representations by the U.S. Attorney

17   both on and off the record, by the term representations, I

18   assume you mean descriptions as to the nature of the 404(b)

19   evidence that they intended to present, is that right?

20        THE WITNESS:  Yes, your Honor.

21        THE COURT:  Okay, go ahead.

22   BY MR. ANTKOWIAK:

23   Q.   So we can be clear, to follow up the court's question,

24   you said whatever may have been said off the record, was no

25  more specific than what was said on the record?


11


1  A.   Correct.

2  Q.   Okay.  Now, you had conversations with Mr. Sambroak who

3  represented Joseph Barnette?

4  A.   Yes.

5  Q.   Now, did Mr. Sambroak tell you that the government had

6  given him any more specifics about what the 404(b) was?

7  A.   No.

8  Q.   Now, who was it that first talked about this Jemal

_____

9  stipulation?

10  A.   Mr. Sambroak.

11  Q.   And did he approach you about joining into it?

12  A.   Yes.

13  Q.   Tell the court about the discussions you had with him

14  concerning that matter?

15  A.   My best guess would be the evening before the pretrial

16  hearing, we definitely talked about it on the phone, I think he

17  may have even faxed me a draft version that he was going to

18  present, and suggested that I consider a similar approach with

19  regard to representing Mr. McCoy.

20  Q.    Now, at that time did you agree with him?

21  A.    No, I wasn't familiar with the concept.  So I started to

22  research it.  And I did not agree at that time or even the

23  following day, if it was the following day that we had a

24  pretrial conference or a pretrial hearing.

25  Q.    I believe the record will reflect that on behalf of Mr.


12


1  Barnette, Mr. Sambroak filed a stipulation on the 19th of

2  October, there was a copy of that signed by him and his client;

3  you didn't sign that?

4  A.    No.

5  Q.    And, in fact, you never signed any particular written

6  stipulation about this, did you?

7  A.    No.

8  Q.    Did you perceive at the time Mr. Sambroak first talked to

9  you about entering into this stipulation, did you perceive a

10  difference in the situations facing your client and the

11  situation facing Mr. Barnette?

12  A.    Yes.

13   Q.   What was that difference?

14   A.   The prior history for the two defendants was different.

15   My client's prior history was for a firearm.  Mr. Barnette's

16   prior history included drugs.  So I didn't have the same

17   concern about the prior history of drug trafficking that Mr.

18   Barnette would have had.

19   Q.   Okay.  And did Mr. Sambroak urge you to do this

20   stipulation with him?

21   A.   Yes.

22   Q.   What did he express to you were his reasons for that?

23   A.   He was concerned that the defenses not be in conflict

24   with each other.  He was concerned that the prior history that

25   the government represented existed between the two clients and


13


1   in Erie not be put forward in front of the jury.  He was

2   concerned that would taint their perspective of the two

3   defendants and give them reason to believe that if they had

4   similar conduct in the past, they should believe that was the

5   same conduct at the time of trial for the charges that were

6   being tried.

7  Q.    When he initially said that to you, what was your

8  reaction?

9  A.    I told him I'd look at it and consider it.

10  Q.    On the record when there were, I believe, at least two

11  hearings before Judge McLaughlin that concerned the 404(b), did

12  you initially take the position to oppose its admission?

13  A.    I wouldn't describe my position as opposing it.  I think

14  my position pretty consistently was asking for the specific

15  information that would support it.  I needed the details so

16  that I could make an informed decision about whether it was or

17  was not sufficiently harmful to Mr. McCoy, so that I could

18  decide whether or not it would make sense to enter a Jemal

————

19  stipulation.  I don't know that I ever just flat out said no,

20  we're not going to do it or yes, we are going to do it.

21  Q.    That was with respect to stipulating?

22  A.    Yes.

23  Q.    But insofar as the government was offering Rule 404(b)

24  evidence, did you object to that?

25  A.    Yes, I thought it was inappropriate.

14

1  Q.   And do you recall that ultimately, particularly, the end

2  of the October 23rd hearing, Judge McLaughlin ruled with

3  respect to 404(b) evidence in this case?

4  A.   I now know that he did because I reviewed the transcript.

5  But never during the course of the hearing or at trial did I

6  realize that Judge McLaughlin had ruled.

7  Q.   Okay.  You know now that at the end of the October 23rd

8  hearing he had ruled that prior drug activity would be

9  excluded, prior associations between the two men would be

10  permitted and the government had made an offer of what they

11  called signature evidence and the court also excluded that?

12  A.   Yes.

13  Q.   Now, was it your understanding as of the close of that

14  hearing on October 23rd, that you had actually agreed to this

15  Jemal stipulation?

———

16  A.   No.

17  Q.   As you think back about this, at what point in this

18  proceeding did you agree?

19  A.   I don't think I ever agreed to it overtly.  I do believe

20  I agreed to it tacitly.  I did not object to the charge to the

21  jury, it was based on that stipulation.  And I tried the whole

22  case and I believe the government tried its whole case as

23  though I had agreed.

24  Q.    Why didn't you just come out and agree?

25  A.    I was never satisfied that it was the right decision.


15


1  Q.    Now, you mentioned at the time you got the Jencks
                    _____

2  material, there were specifics provided about what the

3  government witnesses would say about prior evidence, correct?

4  A.    Yes.

5  Q.    And would I be correct that the Jencks material would be
                    _____

6  delivered to you sometime right before jury selection began?

7  A.    I can't say that it was right before jury selection.  I

8  can say -- you know, generally the eve of trial kind of

9  situation.  I can say very close in time to doing the case.

10  Q.    As is the usual practice?

11  A.    Yes.

12  Q.    Had you reviewed that Jencks material?
                    _____

13  A.    Yes.

14    Q.    What conclusions, if any, did you draw having reviewed

15    that Jencks material?

_____

16    A.    I thought that perhaps I had not been provided with all

17    of the Jencks material because what I reviewed did not match up

_____

18    with what had been verbally represented by the government as to

19    the nature of the 404(b) evidence against McCoy.  So I was

20    pretty sure that I didn't have everything.

21    Q.    In fact, if I can show you the October 27th transcript,

22    this would have been the day of jury selection or on the eve of

23    and after Mr. Sambroak had indicated that the Jencks material

_____

24    had been delivered to him the night before.  Just referring you

25    to page 73, would you indicate for this record what you asked


16


1    in open court at that time?

2    A.    It says "can we finish up with the evidence" --

3          THE COURT:  Could you speak just a little bit more

4    into the mike.

5          THE WITNESS:  "Can we finish up with the evidence.

6  I still am not clear on what the evidence is that relates to

7  the relationship and how separating that out from the drug

8  trafficking.  All of the additional information that comes

9  forward.  As far as I can tell, it seems to relate directly to

10  Barnette.  This is something we have not been provided yet that

11  talks about a relationship."

12  Q.    And was what the answer?

13  A.    The answer is from Mr. Trucilla, it says "there's only a

14  few witnesses that can say McCoy and Barnette were in fact

15  previous associates.  It's rather limited."  Do you want me to

16  keep going?

17  Q.    No.  You referred to Jencks material.  Have you had an
                    _____

18  opportunity to review what was provided to you as Jencks
                            _____

19  material by the United States in this case?

20  A.    Yes.

21        MR. ANTKOWIAK:  Your Honor, I've discussed this with

22  Mr. Piccinini before the hearing.  I would ask for purposes of

23  this record that the Jencks material be admitted under seal.
              _____

24  There are documents that I'm sure that have not been made

25  public and might refer to other government witnesses, even

17

1  though it's a little old for purposes of this record and, your

2  Honor, I have provided a copy of it, I would ask that the

3  Jencks material be admitted as an exhibit under seal.

———

4        THE COURT:  Is that the government's request as

5  well?

6        MR. PICCININI:  My concern there is that a few of

7  those documents specifically relate to this issue.  The rest of

8  documents do not.  I don't know all of them should be admitted

9  under seal.  As long as they're disclosed publicly, I guess I

10  have no objection.

11        THE COURT:  Sealing doesn't affect this.

12        MR. ANTKOWIAK:  Opening that up to specifically

13  what's part of it.  I'm concerned the complete record of what

14  counsel had received at the time --

15        THE COURT:  I think that's reasonable under the

16  circumstances.

17  BY MR. ANTKOWIAK:

18  Q.   You said you were concerned you didn't think you got

19  everything?

20  A.   Right.

21  Q.   How much of the information in there related to McCoy?

22  A.   Little to none.

23  Q.   Based on your review of that, did you have any concerns

24  of the Jemal stipulation?
        _____

25  A.   Based on my review of the Jencks material, I felt that
             _____


                            18


1  the Jemal stipulation was not in the best interests of McCoy.
      _____

2  Q.   Now, Ms. Diggs, prior to today and as part of this 2255,

3  the court had directed you to go back through your notes of

4  trial and to disclose to Mr. Piccinini and myself any of your

5  notes you took contemporaneously that in any way relates to the

6  Jemal stipulation; and you did that, correct?
      _____

7  A.   Yes.

8  Q.   I'd like to show you what is a folder of trial counsel

9  notes, which already has been made part of this record.

10      THE COURT:  You know what I'm thinking, it's not too

11  late to start right now, but for ease of record review at the

12  circuit, we probably should be identifying these matters as we

13  go because they'll hunt for that through the record and it's

14  going to be very difficult.  Why don't we start now.

15          MR. ANTKOWIAK:  I think if we could designate the

16  government's notices under 404(b) as Defense Exhibit A or

17  Petitioner's Exhibit A.  The Jencks material as Petitioner's

      _____

18  Exhibit B under seal.  And then this document -- this last

19  document I showed you, the notes of trial counsel, would be

20  Petitioner's Exhibit C.

21          THE COURT:  All right.

22  BY MR. ANTKOWIAK:

23  Q.    Now, Ms. Diggs, particularly referring you to the page of

24  those notes that you have identified, you took on or about

25  October 28th, do you have those?


                              19


1  A.    Yes.

2  Q.    Could you read those notes, please?

3  A.    There's a "tc P. Hackney", that would be telephone call

4  with Penn Hackney, who was one of the assistant Federal

5   Defenders in my office as well.  He worked in the Pittsburgh

6   office.  Do you want me read them or explain them, they're

7   chicken scratch kind of notes.

8   Q.   Both.

9   A.   Okay.  And then there's in the corner a note that says

10   "McCoy."  There's a "Rule 14 improper joinder."  And then

11   "404(b) not to be used as evidence."  And then says

12   "prosecutorial misconduct causing tactical decision.

13   Re-evaluate the Jemal stipulation.  What are the consequences.
         _____

14   Might have to sever.  Exclude or stipulate."  And then there's

15   a note that says "hiding the stub."

16   Q.   What did all that mean?

17   A.   It meant that -- I was concerned that I had agreed to the

18   Jemal stipulation based on an inaccurate representation by the
       _____

19   government of what Mr. McCoy's prior bad acts were.  And that I

20   was trying to figure out how to undo the damage.

21   Q.   Did you believe at that point that the Jemal stipulation
           _____

22   was an error?

23   A.   (No response.)

24   Q.   Do you need a moment?

25          THE COURT:  We'll take a short break.


20


1          (Recess from 10:26 a.m.; until 10:28 a.m.)

2          THE COURT:  Mr. Antkowiak.

3    BY MR. ANTKOWIAK:

4    Q.    Did you believe at that time that the Jemal stipulation
                        _____

5    was an error?

6    A.    Yes, it was an error.

7          THE COURT:  Why?

8          THE WITNESS:  Once I actually had the specific

9    evidence that the government would present, if it was allowed

10   to use prior bad acts against McCoy, I felt like it was so far

11   below the nature of evidence that I should be seeking to

12   preclude by the Jemal stipulation.  I felt like that it was so
                _____

13   minimal that there was no advantage in agreeing to defend the

14   case on possession alone.  I felt like the case, I felt

15   basically like I was bamboozled into an agreement that damaged

16   my client, I didn't know how to get out of it.

17   BY MR. ANTKOWIAK:

18  Q.    So you continued to persist in the stipulation and did

19  not object to the jury instruction?

20  A.    Yes.

21  Q.    And I take it from your testimony that there would be no

22  other strategic or tactical purpose to persist in that

23  stipulation that you had?

24  A.    No, the only reason -- that I entered into the Jemal

                 _____

25  stipulation was to keep the jury from hearing some long saga of


21


1  the history of McCoy and Barnette in Erie trafficking drugs.

2  I didn't want that to come out.  And then there was no evidence

3  of that.  Other than that Jemal stipulation, it was of no

          _____

4  benefit.

5  Q.    You tried this case by calling a number of witnesses to

6  try to impeach the credibility of two police officers who

7  claimed to have seen Mr. McCoy with that bag, correct?

8  A.    Yes.

9  Q.    And am I correct that besides those two police officers

10  who claimed he had the bag, there was also Mr. Grier, who came

11  in and testified that he took the bag off the bus in Erie?

12  A.    Yes.  He meaning McCoy?

13  Q.    He meaning McCoy, yes, I'm sorry?

14  A.    Yes.

15  Q.    And there were no witnesses that you were able to offer

16  to say that someone else had taken that bag off the bus in

17  Erie?

18  A.    Correct.

19  Q.    You had mentioned before that Mr. Sambroak had indicated

20  that one of the advantages of this joint stipulation would be

21  inconsistent defenses.  If you had not stipulated to that Jemal

_____

22  stipulation, would you still have been able to call all those

23  witnesses to try to impeach the credibility of McCoy taking the

24  bag off the bus?

25  A.    Yes.


                                    22


1        MR. ANTKOWIAK:  Thank you, that's all I have.

2        MR. PICCININI:  Did you mark this as an exhibit?

3        MR. ANTKOWIAK:  It's C, I believe, Petitioner's

4  Exhibit C.

5    THE COURT:  It is Exhibit C.

6                    CROSS-EXAMINATION

7  BY MR. PICCININI:

8  Q.   Ms. Diggs, I'm going to show you what Mr. Antkowiak has

9  provided to you as Exhibit C, and it appears to be two pages of

10  notes?

11  A.   Yes.

12  Q.   Attached to a cover letter.  Could you indicate to me on

13  the page which refers to prosecutorial misconduct causing

14  tactical decisions and reevaluate Jemal stipulation; how do you

15  know the date of that particular discussion?

16  A.   The cover letter to the notes explains that -- that page

17  was, the specific paragraph covered, "please be advised that

18  the undated document," which is the document you're referring

19  to, "is the top page of a group of five pages which were

20  stapled together, with an underlying page dated October 28th.

21  It is only the top page which appears to be relevant to the

22  Jemal stipulation and has been copied for review."  I was asked

23  by the court to find the documents specific to the Jemal

24  stipulation and that's the only reason I didn't provide all

25  five of the pages that were stapled together.


23


1  Q.    So you have a note somewhere which would indicate that

2  this telephone conversation with Penn Hackney occurred on the

3  28th of October?

4  A.    That would be my best guess since they were stapled

5  together.

6  Q.    But what on those pages indicates that this phone

7  conversation occurred on the 28th; because here at the top of

8  your notes, with regard to this conversation, on this undated

9  page, it says "tc" --

10  A.    Yes.

11  Q.    "P. Hackney", and there's the notes themselves.  What on

12  this page indicates the date under which you had a conversation

13  with Penn Hackney?

14  A.    Nothing on that page indicates the date.

15  Q.    Okay.  So what is it that causes you to believe that this

16  particular phone conversation happened on the 28th, as opposed

17  to, for example, the 16th, where your notes concerning Mr.

18  McCoy exist?

19  A.   I wouldn't try to convince anybody that the conversation

20  happened on that particular date.  I simply wanted everyone who

21  had to look at the notes to know where they were within the

22  body of the file.  And they were stapled to other pages that

23  had the date.  I don't think anybody could look at that page in

24  isolation and say it happened on a particular date.

25  Q.   So, then, that's my question of you.  Do you know today


24


1  that this phone conversation that you had with Penn Hackney

2  occurred on October 28th?

3  A.   No, I couldn't even tell you the date of the trial in

4  this case.

5  Q.   Well, maybe I could help you with that.  The first day of

6  trial where testimony was taken, with the first witness being

7  Mr. Siegworth, occurred on October 28, 1998?

8  A.   Okay.

9  Q.   Were you up here in Erie at the time throughout the trial

10  itself?

11  A.   Yes, I lived here.

12  Q.   And the trial, the first day of witnesses occurred on the

13    28th.  Would you have had a conversation with Penn Hackney on

14    the 28th consistent with these notes?  Let me show you the

15    notes and show you why I'm asking this question.  Because the

16    first line on the notes to Penn Hackney talks about Rule 14

17    improper joinder.  And joinder is a pretrial concern about

18    whether the cases of McCoy and Barnette should have been

19    joined.  Now that the trial had already started and testimony

20    had already been given, that evening after the trial would you

21    have had a conversation with Penn Hackney concerning Rule 14

22    improper joinder?

23    A.    Yes, potentially, and I think it would have been in terms

24    of looking at how to undo the damage and what impact it would

25    have on the process in the court.  Because if I was not still


                                     25


1    going to have these defenses that were consistent, it would

2    have affected the entire process.  If I now had a co-defendant

3    who was prepared to put on a case that damaged the

4    co-defendant, that would affect what the court had to do as

5    well.  So I could have had that conversation with Penn Hackney

6    at that time, as opposed to pretrial.  And the reason that I

7   think it would have occurred then, is that would have been

8   immediately after I got the Jencks material and knew that the

      ———

9   verbal representations of 404(b) evidence were different from

10  the real evidence.

11  Q.    Okay.  Well, the date that you received the Jencks

      ———

12  material would have been on October 27, 1998.  And would you

13  have waited until after having been concerned about a failure

14  to disclose the proper 404(b) evidence, supporting the 404(b),

15  excuse me, would have been concerned to wait after the evening

16  of the 27th, when the information was provided, I believe the

17  Jencks material came to you on Monday the 26th because it

      ———

18  didn't come to you Friday because of some concerns, as the

19  record reflected.  But you weren't given the Jencks material on

      ———

20  the 28th, it would have been closer to the time of the 27th

21  when you were asking Mr. Trucilla or the court whether there

22  was more information.  Would you agree with that; you got the

23  Jencks material on the day that you were asking the court

      ———

24  whether there was anything else from the government?

25  A.    I can't confirm for you the dates or the sequence.  I can

26

1  tell you that we had at least two or three hearings where we

2  were having that same conversation about I need the specifics.

3  And then once I got the specifics, I was concerned that that

4  can't be all of it because this doesn't match.  And then once I

5  had, I guess as close as I would ever get to confirmation, yes,

6  this is all of it, then I was trying to figure out how do I

7  undo this damage.  That's what I think would be the substance

8  of my conversation with Penn Hackney.

9  Q.   Okay.

10  A.   I don't know if that answers your question.

11  Q.   First of all, let's go back.  Do you know when this

12  conversation that you had notes for occurred with Mr. Hackney?

13  A.   I don't know, I can only surmise that it was the 28th

14  because that's the date of the documents it was stapled to, but

15  no, I don't know.

16  Q.   But you'd agree with me that this is the beginning of a

17  conversation with Penn Hackney, this isn't the end of a

18  conversation with Penn Hackney because it says, "tc P. Hackney"

19  without a date.  When you make your phone notes, do you wait

20  four pages in the notes on a particular date to write who the

21  phone conversation is with, obviously, you don't do that, do

22  you -- when you make phone notes concerning your conversation

23  with anybody, wouldn't you put the person's name at the

24  beginning of those notes?

25  A.   If you maybe had the opportunity to look at the notes


27


1  file in its entirety, you would you see it's not that kind of a

2  chronological document.  My notes historically are literally

3  just my notes.  Which, as you see, it's not an orderly thing.

4  It's sort of chicken scratch stream of consciousness thing.  So

5  I don't know how to tell you where it should be or what you

6  should surmise from the order that it's in.  I don't know how

7  to answer that.

8  Q.   So you don't know the date of it?

9  A.   No.

10  Q.   Down further in the notes it says "might have to sever."

11  Have you ever in your many years experience as a defense

12  attorney waited until after the trial has begun to file a

13  motion to sever?

14  A.    I don't think so.

15  Q.    And then later it says, it says the words "exclude or

16  stipulate."  Does that reflect for you your consideration of

17  whether to take steps to exclude the evidence or to stipulate

18  to the Jemal stipulation?

_____

19  A.    That's a reasonable interpretation.  I can't tell you

20  that that's what I meant at the time, but what you said is

21  reasonable.

22  Q.    But you don't know whether these phone notes refer to a

23  pretrial conversation you had with Mr. Hackney or a trial that

24  occurred after the Jencks material was provided?

_____

25  A.    Well, I do know the answer to that.


28


1  Q.    What is the answer?

2  A.    Prosecutorial misconduct notes relate specifically to the

3  Jemal stipulation, which was not a pretrial matter, we were

_____

4  already in trial.

5  Q.    The questioning or the whole discussion concerning the

6  Jemal stipulation occurred at the earlier motion, pretrial

   _____

7  motion, and you had two days of it where you discussed the

8  Jemal stipulation?

   _____

9  A.  Only two days.

10  Q.  Well, there were two days in the beginning, there were

11  particular hearings related to the 404(b) evidence when the

12  Jemal stipulation occurred?

    _____

13  A.  Okay.

14  Q.  Why do you believe that this prosecutorial misconduct

15  causing tactical decisions only occurred after the provision of

16  the Jencks material?

     _____

17  A.  Because I had no thought that there was anything that

18  would be described as prosecutorial misconduct before I had the

19  Jencks material.  Before I had the Jencks, I was going with the

    _____              _____

20  verbal representations.  Once I got the Jencks, it was like

                          _____

21  something is wrong.

22        THE COURT:  Let me jump in here for just a second.

23  Tell me if I have this right.  Upon your receipt of the Jencks

                          _____

24  material and your review of the Jencks material, you came to

         _____

25  the conclusion that the Jencks material did not support the

         _____

29

1  government's representations as to the nature of the 404(b)

2  evidence that they could prove up, is that right?

3        THE WITNESS:  Yes.

4        THE COURT:  And would you have received the 404(b)

5  material prior to, and you did in fact receive that prior to

6  the commencement of trial, is that correct?

7        THE WITNESS:  We might have been picking the jury or

8  it might be immediately preceding that, I don't know.

9        MR. ANTKOWIAK:  May I, I'm sorry.  If I could see

10  the transcript of the 27th --

11        MR. PICCININI:  If I could continue with my

12  questioning.

13        THE COURT:  What are we doing here, we've got a

14  different team on the floor.

15        MR. ANTKOWIAK:  I didn't mean to interrupt.

16        MR. PICCININI:  Typically, we do one counsel and

17   then the other.

18         THE COURT:  Usually one counsel is more than

19   adequate.

20         MR. PICCININI:  If you would allow me to proceed,

21   your Honor, I have the letter, the Jencks letter that was sent

           ———

22   to Ms. Diggs.

23         THE COURT:  All right, that would be fine.  Then I

24   do have one last question.  But go ahead.  If there's something

25   in the record that reflects when she received it, perhaps you


                                30


1   could direct her attention to that, Mr. Piccinini.

2   BY MR. PICCININI:

3   Q.   Ma'am, I'm going to show you the Jencks notice itself,

           ———

4   which is a letter dated October 26, 1998, addressed to you,

5   which provides to you some 41 different sets of documents.  And

6   would you agree with me that on that page dated 10/26/1998, you

7   signed the document?

8   A.   I did sign the document, and I can't tell what the date

9   is, I don't have any reason to disagree with the 26th, though.

10   Q.   It says here "I hereby acknowledge receipt of the

11   above-mentioned Jencks/Brady material and agree to abide by the
        _____

12   restrictions set forth above."

13   A.   Okay.

14   Q.   In your experience, isn't it true on the date the letter

15   is provided to you, you sign it as a receipt and you take the

16   Jencks material?
     _____

17   A.   Yes.

18   Q.   Just as you did in this case, after trial, you send the

19   letter to Mr. Trucilla and send it back.  Here you did so on

20   November 13, 1998?

21   A.   Okay, yes.

22   Q.   So you can accept that?

23   A.   Yes.

24   Q.   So October 26, 1998, is when you get the Jencks material?
            _____

25   A.   Yes.


31


1   Q.   Now, you indicated that until you received the Jencks
           _____

2    material, you were comfortable with accepting Mr. Trucilla's

3    representations concerning what 404(b) evidence is?

4    A.    Yes.

5    Q.    If I can show you the transcript on Friday, October 23rd,

6    this is the hearing on pretrial motions -- I'm going to refer

7    you to page 32 of this document, this is all a discussion about

8    Jencks and the 404(b) material?
      _____

9    A.    Okay.

10         MR. ANTKOWIAK:  Excuse me, what page?

11         MR. PICCININI:  This is page 32, counsel.

12         THE COURT:  What is the date of the hearing?

13         MR. PICCININI:  This is the second day of the

14    pretrial hearings, this is October 23, 1998.

15         THE COURT:  All right.

16    BY MR. PICCININI:

17    Q.    If I can show you on here, there's some discussion

18    between you and Mr. Trucilla, and the court says "Mr. Trucilla,

19    what about that?"  And Mr. Trucilla explains "let me make a

20    note, your Honor."  And you, Ms. Diggs say, "your Honor,

21    actually your orders might help resolve some of this since it

22    is Friday we're due the rest of the discovery items, that may

23  answer a lot of questions that we're standing here arguing

24  about."  So you wanted the Jencks material because you knew by
        ———

25  the end of the day on this Friday, October 23rd, you typically


                                    32


1  would be getting the Jencks material by that time, is that
        ———

2  correct -- was it your practice here in Erie on the Friday

3  before a Monday jury selection that's when you would receive

4  Jencks material?
    ———

5  A.   We didn't have enough of a history at that point to have

6  a practice.  And I do remember that we had a lot of back and

7  forth about when we would get what we would get.  So I can't

8  tell you.

9  Q.   Okay.  So then it goes on further, it says, Mr. Trucilla

10  says, "I'll do it right here, I'm prepared to tell them

11  everything but the name.  And they're going to get the names

12  later today in Jencks material."  And Ms. Diggs, you say
        ———

13  "that's what I meant."  And Mr. Trucilla goes on, "basically,

14  I'm telling you everything except the names.  Through the

15  summer of '97, into the fall of '97, into the winter of '97 and

16  then into early winter of '98, there were, as I believe the

17  testimony will show, that McCoy, who was known as Two-four to

18  the particular individual, sold crack cocaine for Barnette.

19  Now, I'm not saying, your Honor," then he goes all the way

20  through on page 33 with a description about affiliation between

21  Mr. McCoy and Barnette.  Drug dealing between the two of them

22  and these particular baggies that were there.  You indicated

23  you accepted Mr. Trucilla's representation as to the 404(b).

24  But I'd ask you to look at page 34.  You then, you don't just

25  accept it, you actually challenge Mr. Trucilla on what the


33


1  404(b) may be even at that date.  And it says "what is the

2  government saying, that there was prior drug transactions" --

3          THE COURT:  Who is this speaking now?

4          MR. PICCININI:  Ms. Diggs.

5  BY MR. PICCININI:

6  Q.    "What is the government saying, that there were prior

7  drug transactions to the date of indictment, the indictment

8  should include that period of time as a conspiracy.  On or

9   about doesn't mean back it up another year.  Which is what it

10  sounded like is the government is inclined to want to do.

11  Within the context of that proffer, I still don't know, are you

12  talking about one occasion, ten occasions."  And the court says

13  "he just told you, I gather, there are a half dozen occasions

14  or so."  Mr. Trucilla says "I don't know, your Honor, I've read

15  the report of this particular witness, I could specifically

16  find out, I could maybe find out right now."  And you then,

17  still concerned about what you're being told, "that's what

18  today is for.  The order says give those things today.  What

19  I'm saying, he keeps speculating on stuff, if we could just

20  have it, we wouldn't be doing this for an hour and a half." Ms.

21  Diggs, after having read through that with me, do you still

22  believe you were just at the pretrial hearing accepting Mr.

23  Trucilla's representations concerning the 404(b) or isn't it

24  true you were still challenging him about the 404(b)?

25  A.   I heard his representations, I was still challenging the


34


1   need for the details.  The representations he gave me in that

2   page and a half, even if you skipped over, he was outlining

3    history, it did not match up with the documents that were

4    subsequently provided.  That was my problem.

5    Q.    That's not what I'm saying, how can you talk now in the

6    October 23rd discussion claiming that your concern about the

7    404(b) is it didn't match up with the Jencks material; you

        ———————

8    didn't have the Jencks material yet?

        ———————

9    A.    Exactly.

10    Q.    Would you agree with me that on October 23, 1998, long

11    before you got the Jencks material, you were concerned that Mr.

        ———————

12    Trucilla was either overstating or not accurately stating the

13    404(b), that's why you wanted the Jencks material?

        ———————

14    A.    Yes, I would agree with you.

15    Q.    And in light of fact that this occurs on October 23,

16    1998, wouldn't you have called your boss, Mr. Hackney, or your

17    co-worker, Mr. Hackney, even after October 23, 1998, concerned

18    that the government is not providing you enough information?

19    You said earlier that your notes concerning the October 28th

20    conversation or sometime thereafter, had to be after trial, why

21    wouldn't it have been back on October 23, 1998?

22    A.    Because at that point there was no mismatch between what

23  the government said it was prepared to prove and this

24  subsequent documents that they actually produced.  There was no

25  mismatch, I didn't have documents yet.  So I'm going with a

35

1  verbal representation.

2  Q.   Let me go through some of the matters, you indicated to

3  this court that after having reviewed the Jencks material,
                        ———

4  there was practically nothing consistent with what Mr. Trucilla

5  had indicated would be produced in 404(b), is that your

6  testimony?

7  A.   Yes.

8  Q.   I'm going to show you the 404(b), since it's already been

9  marked, your Honor, I'm going to actually talk about the

10  specific documents.

11       THE COURT:  How is it marked by the way?

12       MR. PICCININI:  It was marked by counsel --

13       MR. ANTKOWIAK:  I think it was Petitioner's B, your

14  Honor.

15  BY MR. PICCININI:

16  Q.   These are particular documents within Petitioner's B,

17  I'll clearly explain what those are.  First of all, included

18  within the 404(b) materials was an April 10, 1998 interview

19  with a Roxanne Arnold.  I'm going to ask you to review this

20  particular interview with Roxanne Arnold.  I think if you make

21  it through the first two paragraphs that might save you?

22  A.   Okay.

23  Q.   If I can go over the second paragraph with you.  This is

24  an FD-302 report, dated April 10, 1998, concerning an interview

25  with Roxanne Arnold.  Ma'am, after having reviewed it, would

36

1  you agree with me that this Roxanne Arnold states in the 302,

2  and a 302 is just a recitation of what the interview was, it's

3  not a current interview, it's not your opportunity to actually

4  talk with her, this is the FBI's recitation of that, is that

5  your understanding?

6  A.   Yes.

7  Q.   Here it says "Egypt," who in this case was Mr. Barnette,

8  do you recall?

9  A.   I do.

10    Q.    "Egypt introduced a black male from Detroit as a cousin.

11    He is the one in the photograph with the marked name Mark

12    Chinn."  You'd agree with me that in the course of this trial

13    Mark Chinn was your client, Mr. McCoy?

14    A.    Yes.

15    Q.    "Chinn had a nickname, but Arnold cannot recall it at

16    this time.  This was during the summer of 1997, while Arnold

17    was at Lottie Freeman's apartment at 13th and German.  Chinn

18    hung around with Manis Norman and Joshua Chavers, who were

19    staying with Freeman.  Chinn was hanging around 13th and

20    Parade, selling drugs for Egypt.  Chinn stayed in the apartment

21    building on Parade Street with a Hispanic female.  Chinn's

22    grandmother died during the summer, and Chinn returned to

23    Detroit.  Arnold has not seen Chinn since then."

24          Ma'am, would you agree with me that it was in your

25    client's interests that Roxanne Arnold not testify that Chin


37


1    was hanging around 13th and Parade and was selling drugs for

2    Egypt?

3    A.    Yes.

4   Q.   And it would be in your interest to keep this particular

5   404(b) evidence out?

6   A.   Yes.

7   Q.   And in your consideration of what a Jemal stipulation,
         _____

8   counsel said you didn't know what a Jemal stipulation was, but
         _____

9   you do today?

10  A.   Yes.

11  Q.   And you very accurately stated that the purpose of the

12  Jemal stipulation -- that the purpose of, one of the purposes
    _____

13  of the Jemal stipulation is to keep out this type of bad

14  conduct evidence?

15  A.   Yes.

16  Q.   And you'd agree with me that this 302 provided that

17  information?

18  A.   Yes.

19  Q.   Would you also agree with me that on October 23rd, Mr

20  Trucilla said that in the summer of '97 into the winter, and he

21  talked about timeframes, there would be testimony that your

22  client was selling drugs for Mr. Barnette?

23  A.   Is that what the 302 says?

24  Q.   This 302 says "Chinn was hanging around 13th and Parade

25  selling drugs for Egypt."


                                    38


1  A.   In the summer of?

2  Q.   It says this was during the summer of 1997?

3  A.   Okay, yes.

4  Q.   And then second, another interview of Roxanne Arnold,

5  this is another FBI 302, dated May 22, 1998.  This is an

6  interview conducted by Special Agent Shawn VanSlyke.  Here I'm

7  going to have you read, once again it's a short 302, if you

8  could read through that?

9  A.   Okay.

10  Q.   Would you agree with me that in this particular 302, Ms.

11  Arnold, in this summary of her interview on May 22, 1998,

12  states that "during a previous interview, Arnold had been shown

13  a photograph of Marcresse McCoy by detectives.  At that time

14  Arnold had indicated that she recognized the individual as

15  being an associate of a black male known to Arnold as Egypt."

16  Once again, would you agree with me that Roxanne Arnold was

17  prepared to testify in the course of this 404(b), if it was

18  allowed in, that she recognized your client as being an

19  associate of Egypt, the defendant Barnette?

20  A.   Yes.

21  Q.   And further in the 302, would you agree with me that this

22  Jencks material indicated to you that Arnold recalled that the

23  individual whose photographs she recognized was known to her as

24  Two-four; are you familiar with the fact that one of the

25  nicknames for your client was Two-four?

39

1  A.   Yes.

2  Q.   And she went further, "that Two-four had stayed at the

3  apartments above the old auto parts store on Parade Street,

4  near the intersection of East 13th Street, during the summer of

5  1997.  He stayed there with several Spanish-speaking people.

6  Arnold saw Two-four in Terry Siegworth's car one day with

7  another black male.  Later on that same day, Arnold gave

8  Two-four and Egypt a ride together in her own car."  Now, with

9  regard to the association of Mr. McCoy with Mr. Barnette, was

10  it in your interests to not provide, to not allow the jury to

11  hear of the link between the two of them?

12  A.   That was not a concern.

13  Q.   How about the association, Two-four's association with

14  Terry Seigworth, who was a confidential informant, the first

15  witness that testified in the case; was it in your client's

16  interest to link him with Seigworth and with Barnette

17  throughout the case?

18  A.   I wasn't concerned about that.  I was concerned about the

19  prior history of drug trafficking between Barnette and McCoy.

20  Q.   And then finally a 302 dated October 20, 1998, another

21  interview with Roxanne Arnold.  I would just refer you to

22  probably the third paragraph, that's what I'll question you

23  about?

24  A.   Okay.

25  Q.   You recall that part of what the government wanted to do

40

1  with the 404(b) is to show the similarities in the baggies that

2  were used in a previous drug dealing relationship and the

3  baggies that were found in this case, do you recall that?

4  A.   Yes.

5  Q.   Here Ms. Arnold would, in this 302, in the Jencks

6    material, "identified the various baggies containing crack

7    cocaine shown to her as being packaged in the same manner as

8    Barnette packaged his crack cocaine.  Barnette was the first

9    individual who Arnold had ever known to package cocaine in

10   baggies that small.  Arnold recalled giving Barnette a ride to

11   buy these small baggies in Erie.  Barnette would sometimes buy

12   them at Maurice Tate's store."  Was it in your interest to keep

13   out, even though Mr. McCoy is not mentioned, was to keep out

14   the similarity of the packaging between Mr. Barnette, excuse

15   me, the packaging between prior drug dealings and the dealings

16   in this case?

17   A.   I didn't care about the signature situation, that

18   affected Barnette, it didn't affect McCoy.

19   Q.   But how could it not have affected McCoy when the

20   evidence was going to come in, without a stipulation, that Mr.

21   Barnette and Mr. McCoy were linked together?

22   A.   Because there was never any representation that McCoy was

23   linked to what the government was describing as the signature

24   of those particular baggies.

25   Q.   But if he was in a prior drug dealing relationship with

1   your client and all of the evidence against Mr. Barnette is

2   allowed in, including his being formerly a drug dealer, his

3   being associated with your client, and all the evidence that

4   actually came in about them coming here together, was it in

5   your client's interest for even the 404(b) against Barnette to

6   come in because it would only have further brought Mr. McCoy

7   down with him?

8   A.   I disagree with you.

9   Q.   Okay.  Now, you correctly stated to Mr. Antkowiak that

10  the purpose of entering into the Jemal stipulation, included

11  not only the 404(b) evidence being kept out and other prior bad

12  acts, but also convictions.  In this case didn't you

13  successfully keep the jury from hearing the nature of your

14  client's prior felony firearm conviction from their

15  consideration?

16  A.   Yes, we did enter into a stipulation with regard to that.

17  Q.   Well, there's a couple stipulations.  First of all, there

18  was an Old_Chief stipulation, which allowed you to keep the

19  jury from knowing of it, from the felony possession offense

20   itself.  But even in light of the Old_Chief stipulation, the

21   government was providing, was attempting to provide that

22   conviction as it related to gun convictions, guns being tools

23   of the trade.  His prior conviction being an indication as to

24   why he would have been concealing the particular firearms in

25   the bag itself, and the Jemal stipulation is actually what

42

1   helped to keep out that conviction; do you recall that?

2   A.   I don't think the Jemal stipulation was connected to the

3   firearm.  We entered into stipulations specific and unique to

4   the firearm.

5   Q.   But separate from your Old_Chief stipulation, do you

6   recall the government attempting to get in your client's prior

7   firearm conviction and you having to rely on Jemal or the court

8   utilizing Jemal to keep that particular conviction out.  It

9   wasn't because of Old_Chief, it was because intent and

10 knowledge were not at issue?

11 A.   No, I don't have that recollection.

12 Q.   Ma'am, as we go through -- counsel asked your decision to

13 stipulate with the consent of your client.  If you go back in

14 this case, would you agree with me that your entire defense of

15 this case was that your client did not possess the bag?

16 A.   Yes.

17 Q.   And would you also agree with me that you were not the

18 person who decided for the defendant that that would be the

19 defense?

20 A.   I did decide that.

21 Q.   Well, isn't it more true, Ms. Diggs, that your client

22 decided it for you when he stepped off the bus carrying the bag

23 and himself claimed that the bag was not his.  He claimed

24 adamantly not only that the bag was not his, but he didn't

25 possess the bag and he did not carry the bag off the bus; do

43

1 you recall that?

2 A.   I recall that.

3 Q.   And do you also recall that the testimony showed and your

4   client on the particular date, not only said that the bag

5   wasn't his, said that he never carried it off the bus, but

6   actually stepped away from the bag; do you recall that

7   testimony?

8   A.    You're talking about the testimony of the officers?

9   Q.    Yes, the testimony of the officers with regard to what

10  your client did on that day after he came off the bus?

11  A.    That was the testimony of the police officers, yes.

12  Q.    Well, isn't your client -- that this had to be the only

13  plausible defense because he himself was the one who said I

14  didn't possess the bag, even in light of the evidence, he stuck

15  you with this defense I did not possess the bag?

16  A.    That's not correct.

17  Q.    How could you possibly in this case reasonably have come

18  in, after your client adamantly denied the bag was his, that he

19  adamantly denied that he walked and carried the bag himself,

20  how could you possibly have come into trial and said well,

21  forget what my client said there on that day, he really did

22  possess the bag, even though he said he didn't, but he didn't

23  know what was in it; does that seem like a reasonable defense

24  to you?

25  A.    It seems like part of a reasonable defense.  The Jemal

44

1  stipulation kept me from presenting the entirety of a

2  reasonable defense.

3  Q.   Ma'am, I want to talk a little bit about your

4  representation of this particular client.  I'm going to show

5  you the docket entries on this case, just for identification

6  purposes because these are matters of record, I'll mark them as

7  Government Exhibit 1.  This is just a printout of the criminal

8  docket in Mr. McCoy's case.

9  A.   Okay.

10  Q.   I'd like to go through with you, ma'am, your zealous

11  representation of your client throughout the course of this

12  case because I think it's important for the court and for us to

13  talk about it.  First of all, with regard to this particular

14  case, you'd agree with me that you passionately represented Mr.

15  McCoy in this case?

16  A.   Yes.

17  Q.   You put significant effort into every step of your

18  representation of this man in this courtroom?

19   A.    Yes.

20   Q.    And that representation started at the very beginning of

21   the case through the process of filing the pretrial motions,

22   didn't it?

23   A.    McCoy was my client from the time he was arrested all the

24   way through the trial.  Everything that was done to defend the

25   case was done by me.


45


1   Q.    And in this case, on behalf of your client, in a review

2   of whether you were effective or ineffective, you started off

3   with filing a motion for bill of particulars, not just a

4   boilerplate one, but one where you had specific reasons for

5   requesting the government to provide more information

6   concerning the case; do you recall having done so?

7   A.    I don't have specific recall of each process along the

8   way.  I also don't have any reason to quarrel with anything

9   this is docketed.

10   Q.    All right.  Well, you filed a motion for bill of

11   particulars, a motion in limine to exclude evidence of

12   defendant's prior convictions.  A motion to produce evidence,

13  excuse me, a motion to analyze and weigh the evidence.  In this

14  particular case, here it was a drug case and rather than just

15  accept the government's scientific analysis of the evidence,

16  you actually filed a motion to go so far as to have it

17  independently analyzed and weighed, didn't you?

18  A.    Yes.

19  Q.    Do you do that in every single solitary drug case where

20  you represent defendants?

21  A.    Not in every single solitary one, no.  Whenever the

22  weight is a close issue one way or the other, then yes.

23  Q.    Then you filed and joined in a motion to suppress.

24  Rather than just filing a request for discovery, you filed a

25  specific motion commanding the government to comply with


46


1  discovery, did you not?

2  A.    Yes.

3  Q.    Is that essentially what you did?

4  A.    Yes, I did that.

5  Q.    You then adopted and incorporated Mr. Barnette's motions?

6  A.    Yes.

7   Q.   You then filed a separate motion to exclude for

8   disclosure of and exclusion of statements made by Mr. Barnette,

9   is that correct?

10  A.   I don't think I filed anything with regard to Mr.

11  Barnette.

12  Q.   Motion by Marcresse McCoy to disclose or exclude

13  statements of co-defendant with citations of authority, with

14  proposed order?

15  A.   Okay.

16  Q.   You did a good job there as well, you continued to file

17  all of these pretrial motions on behalf of your client, is that

18  correct?

19  A.   Yes.

20  Q.   In this case there are several indications in the docket

21  that you filed sealed motions.  And likely those are sealed

22  motions to obtain subpoenas for particular evidence or Rule 17

23  for particular evidence in this case.  Do you recall the

24  process that you went through to put together the defense that

25  you presented, specifically, the challenging of two veteran

47

1  police officers and an indication that at trial they lied.

2  What efforts did you put forth to put together that defense?

3  A.    The entire defense of the case I would say were my best

4  efforts, as well as the best efforts of the office, the

5  investigator and the secretary in that office, and at times

6  people from the Pittsburgh office as well.

7  Q.    And you went so far as to actually find a former Erie

8  police officer who would come in here and testify on the stand

9  that the two particular witnesses that you were challenging,

10  police officers, would in fact lie in the course of a drug

11  investigation, you found such a witness?

12  A.    Yes.

13  Q.    And you put forth such a witness?

14  A.    Yes.

15  Q.    And not only did you find that particular witness, Mr.

16  Antkowiak talked about -- well, you know your client was seen

17  by two witnesses come off the bus, two police officers, and a

18  third witness saw him with the bag.  But you didn't just accept

19  that your client was out of luck on the possession charge, did

20  you?

21  A.    No.

22  Q.    Was that all that was there at the time that Mr. McCoy

23  got off the bus, were there just those two police officers and

24  Mr. Grier there to testify concerning the possession of the

25  bag?

48

1  A.    No.

2  Q.    Wasn't it part of your case, didn't you discover that

3  there were as many as 15 police officers that were there; do

4  you recall that?

5  A.    Yes.

6  Q.    And didn't you go so far with regard to this client on

7  the possession defense, as to expose that one of the most

8  senior police officers there, Mr. Bozich, he did not even

9  observe your client come off the bus with the bag?

10  A.    Yes.

11  Q.    And Agent VanSlyke didn't observe him come off the bus,

12  he just merely said he was standing in proximity to the bag?

13  A.    My recollection is the only two people that could

14  identify Mr. McCoy as coming off the bus with the bag were the

15  two Erie police officers.

16  Q.    And consistent with your client's claims on that first

17  day he didn't possess the bag, you did everything you could to

18  drag those police officers and their credibility and I don't

19  mean this derogatorily, but through the mud for that purpose

20  and on behalf of your client?

21  A.   Yes.

22  Q.   During the course of the pretrial discussions, do you

23  recall very clearly stating to the court, even outside the

24  context of the Jemal stipulation, that your defense in this
        _____

25  case was my client didn't possess the bag?


                                49


1  A.   Prior to the Jemal stipulation, the defense on the case
        _____

2  would not have been limited to possession.  That was the point

3  of the Jemal stipulation.  Once we were limited to possession,
        _____

4  then yes, that is what I did.  So the best efforts were put

5  forward to defend on the possession and we relinquished the

6  opportunity to defend on knowledge and intent.

7  Q.   But you never made any request or any indication to the

8  court whatsoever that the wise defense in this case was to

9   challenge knowledge and intent.  There's nothing in the record

10  that ever indicates, even in the pretrial hearings, any of the

11  hearings, even during the discussions of Jemal, that your
                       _____

12  defense, a wise defense, was anything other than my client

13  didn't possess the bags?

14  A.    Are you asking if I agree with you?

15  Q.    Yes, do you agree with me?

16  A.    No.

17  Q.    At what point in time, do you recall any point in time

18  ever indicating to the court, to counsel or anything on the

19  record, that your defense, Jemal stipulation or not, was this
                       _____

20  is not -- my client did not possess the bag?

21  A.    I don't recall being asked by the court how I intended to

22  defend the case.  To the extent that the defense issue came up,

23  it was with regard to the Jemal stipulation.  I don't think the
                       _____

24  court ever asked me what my intentions were.

25  Q.    In your pretrial preparations with regard to tracking


                                50


1   down Sergeant Dollinger, getting all of the evidence concerning

2  your client's health care concerns, do you recall that you

3  ended up getting the government to stipulate to the significant

4  medical concerns that your own client had?

5  A.   I recall that, yes.

6  Q.   All of your pretrial efforts in this case related to a

7  defense of my client did not possess the bag?

8  A.   I disagree that all the pretrial efforts to defend the

9  case were unique to possession.

10  Q.   What else was there, what else did you do in that regard

11  because this was the best defense, what steps did you take with

12  regard to those other two issues?

13       THE COURT:  The other two issues being knowledge and

14  intent?

15  BY MR. PICCININI:

16  Q.   Knowledge and intent as to the PWID charges?

17  A.   I don't even know how to answer that question.

18  Q.   Well, Ms. Diggs, maybe the reason you can't answer is you

19  picked the right defense.  Your client was stuck with the

20  defense of I didn't possess the bags.  Your client, if you

21  didn't enter into the Jemal stipulation, would have been linked

         _____

22  into Mr. Barnette and the best defense here, was because your

23  client gave you it, was that he didn't possess the bag, he was

24  too frail to carry the bag.  He didn't carry the bag, he was so

25  frail that he had the other guys carry off his own personal

51

1  belongings, that was your best defense in this case.  It's

2  great with hindsight to say no, but in this case you chose,

3  because your client was part of it, the defense of I did not

4  possess the bag?

5  A.    You are linking together things that obviously from your

6  position link, they don't link for me.  My client did not

7  choose that defense.  My client was linked to Barnette anyway.

8  But the Jemal stipulation restricted the defense to possession.

9  And yes, I did the best that I thought that I could do within

10  that restriction.  But there was no value in creating that

11  restriction for him or for his defense.  That then gave the

12  opportunity to say to the jury, even if you think I possessed

13  this bag, there is no reason to believe that I knew what was in

14  it or I had the intent to distribute drugs.  And those are

15  equally if not more powerful defenses than do you think I held

16   this bag.  Especially when you have two, as you say, veteran

17   police officers testifying that he did hold the bag.

18   Q.   Ms. Diggs, that is a convenient statement for today

19   but --

20   A.   It's not convenient.

21       THE COURT:  Hang on a second.  Don't talk over each

22   other, he's having a hard time getting this down.  And don't

23   editorialize.

24   BY MR. PICCININI:

25   Q.   Ma'am, with regard to the defense in this case, even


                               52


1   though the record may show these were two veteran police

2   officers, you're the one who went through all this effort to

3   expose two veteran police officers and find their former

4   supervisor, so you're saying that you didn't accept that as

5   being a strong case from the government because you had

6   evidence to show it was weak, didn't you; you had evidence to

7   show that the observations of these two police officers was

8   weak, you exposed it as being weak to this jury?

9   A.   I challenged the credibility of the officers, yes, I did.

10  What I did not do was challenge knowledge and intent.  That's a

11  decision that I made without my client's input and the decision

12  undermined and was counterproductive to the defense of the

13  case.  It was an error in judgment on my part.  And I am the

14  one that had the responsibility to defend him.  And you can

15  stand here in court and say it's convenient today, but you

16  don't know.

17       THE COURT:  All right, we're going to take a break

18  now.

19       (Recess from 11:15 a.m.; until 11:22 a.m.)

20       THE COURT:  All right, let's go.

21  BY MR. PICCININI:

22  Q.   Ms. Diggs, I want to apologize to you, I mean this

23  sincerely, it is not my intention to upset you.  My questions

24  are of you for the purpose of defending your conduct as this

25  particular defendant's counsel.  And these questions are meant


                              53


1  to expose the incredible job that you did in putting together

2  the defense.  And they will probably continue to upset you,

3  that's not my intention, it's my intention to defend your

4  conduct and indicate to this court, if I can, that you were not

5  ineffective because the record does not support a claim of

6  ineffectiveness, particularly against you.  Now, you've

7  indicated earlier on in your testimony on direct that you do

8  not recall specifically entering into the Jemal stipulation

_____

9  until the jury instruction issue came up, is that your

10  recollection?

11  A.   I believe my testimony was that I did not overtly enter

12  into it.  As close as I came was what I would describe as a

13  tacit entering into it, based on my failure to object to the

14  jury charge.  However, it was my understanding that everybody

15  proceeded in this case, I did, the U.S. Attorney did, and I

16  believe the court proceeded as though I entered into it, even

17  though I never signed off on the documents.

18  Q.   Well, there's a couple questions that I want to ask you

19  with regard to that.  First of all, I'm going to show you the

20  transcript of October 23, 1998, the hearing on pretrial

21  motions.  This would be at page 43 of this particular

22  transcript.  This is specifically a detailed discussion of

23  whether you would enter into the Jemal stipulation, okay?

_____

24  A.   Yes.

25  Q.   I'm going to go through it with you.  And this is the


54


1   court on page 43 stating, "I want the record to be very clear

2   here, I'm not asking you to stipulate, I'm not saying you

3   should or you shouldn't, I'm simply doing what I think what

4   Jemal, what the Third Circuit suggests it is useful for the
    _____

5   court pretrial to explore the possibility of a Jemal type
                              _____

6   stipulation.  You're free not to stipulate if you don't want to

7   stipulate."  And you respond, somewhat at this point in a

8   noncommittal fashion, you state "that's how I took the court's

9   inquiry, just the way you stated it, that's how I took it.  To

10  the extent that the court is inclined to allow 404(b) evidence

11  in, I believe that McCoy's willingness to stipulate to

12  knowledge and intent, would preclude that 404(b) evidence.

13  Does that answer the question on Counts two and three, because

14  I don't want to be vague."  The court responds, "well, here's

15  the problem.  I haven't ruled on whether it's going to come in

16  or not.  It seems to me you," Ms. Diggs, "have to make a

17  tactical decision in advance of my ruling in the best interests

18  of the client.  At the end of the day, we still have this

19  conspiracy issue floating around out here.  Now, this much I

20  will say, for instance, I see no basis for the firearm matter

21  absent if intent or knowledge is not in the case.  Insofar as

22  the possession charge is concerned, I see no basis for it and I

23  can't see it coming in."  And Mr. Trucilla then responds, this

24  moves from the bottom to 44, "I would agree if there was a

25  stipulation that knowledge and intent, in other words, he's a


55


1  former convicted felon under the definition of what a felon is

2  or the firearm count, there's no other stated purpose other

3  than knowledge and intent.  So a Jemal stipulation would take
        _____

4  that out, would only leave possession as the issue."  The court

5  says, "right?"  And you Ms. Diggs say "I agree."  And then two

6  lines down the court says, "so we have identical stipulations

7  then from both defendants with respect to knowledge and intent,

8  is that right?"  Ms. Diggs, "yes."  Mr. Sambroak, "yes."

9  Okay.  I want to ask you a couple questions about this, it

10  points out two of the things that we've discussed.  First of

11  all, whether you currently recall having, not tacitly but

12  directly agreed to the stipulation.  I understand what your

13  current recollection is, but going through those two pages, 43

14  and 44, wouldn't you agree, first of all, that whether it was

15  going to be your tactical decision or not, the court, as likely

16  is the proper procedure, in order to resolve the 404(b) issue,

17  allow the parties to enter into a stipulation, he specifically

18  told you that you have to make a tactical decision in advance

19  of my ruling, prior to my ruling on the 404(b), you must make a

20  tactical decision in the best interests of the client.  Don't

21  you read that to say that, I can sit in your place while the

22  judge makes that comment to you, is he telling you prior to the

23  404(b), you make a tactical decision on whether to enter into a

24  Jemal stipulation?
     _____

25  A.   Yes, I agree.


                                   56


1  Q.   In response to that, you would agree that on page 44, "so

2  a Jemal stipulation would take that out, would only leave
     _____

3  possession as to the issue," Mr. Trucilla says.  The court says

4   "right."  You say "I agree."  And the court specifically says

5   to you, so we have identical stipulations?

6          MR. ANTKOWIAK:  Your Honor, can he read the whole

7   thing because counsel is skipping over a line.

8          MR. PICCININI:  Okay.

9          THE COURT:  Back up, go ahead.

10  BY MR. PICCININI:

11  Q.   The court says "right."  Ms. Diggs says, "I agree."  And

12  the court says "you agree with what?"  Ms. Diggs says "I agree

13  that that's accurate and I can present that to my client and

14  will do that."  The court then says, and I apologize, it wasn't

15  my intention to keep that out, the court then says "so we have

16  identical stipulations then from both defendants with respect

17  to knowledge and intent, is that right?"  And you then say

18  "yes."  And Mr. Sambroak says "yes."  Does that appear to be on

19  the record contrary to your current recollection that you

20  didn't tacitly but you did directly agree to the content of the

21  stipulation?

22  A.   No.

23  Q.   Why is that?

24  A.   Because it sounds like you're talking about something

25  related to the firearm.  I don't recall the firearm being part

57

1    of the Jemal stipulation.  Plus it sounds like we were still
      _____

2    going back and forth as we did over and over about whether I

3    had to make a decision on Jemal before or after the court ruled
            _____

4    on the 404(b).  And what I recall is I kept -- hemming and

5    hawing and dragging my feet, for lack of better words, because

6    I didn't know what the 404(b) was yet.  And I kept saying if I

7    knew what it was, I will talk about it with my client, if it

8    makes sense for his case, we'll do it.  And what you just read

9    to me sounds like another one of those exchanges.

10   Q.    I would agree with that.  But here there is no hemming

11   and hawing in the court's statement whether you needed to

12   decide before or after the 404(b).  The court specifically says

13   it seems like you need to make a tactical decision?

14   A.    That's what it says, yes.

15   Q.    And then on a separate issue, we talked earlier about

16   whether your Old_Chief stipulation, I discussed this with you,
            ___  _____

17   or the Jemal stipulation, is what successfully kept out the
           _____

18  former firearm conviction.  And you're correct, this is a

19  discussion in the context of Jemal on page 44, that because of
_____

20  your Jemal stipulation, you were able to keep out the firearm
_____

21  conviction.  Specifically, do you recall that even though you

22  were willing to stipulate to the nature of the firearm

23  conviction, that Mr. Trucilla was attempting to get that

24  firearm conviction in nonetheless as 404(b) as it related to

25  knowledge and intent because your client's former firearm


58


1  conviction was relevant on knowledge and intent as to the guns

2  that were in the bag and his affiliation with firearms and

3  drugs because there was testimony about the guns being tools of

4  the trade.  Wouldn't you agree with this, in the context of

5  your client's former prior conviction for being a felon in

6  possession, Mr. Trucilla indicates his intention to get that

7  into evidence, and he then states, "so a Jemal stipulation
_____

8  would take that out, would only leave possession as to the

9  issue."  The issue he's referring to is the firearm conviction.

10  So even though it may not comport with your current

11  recollection, does it appear, would you agree that it appears

12  from the record that your Jemal stipulation helped to keep out

13  completely from the jury's consideration the former convict not

14  to own a firearm conviction?

15  A.    No.

16  Q.    Why, it says right here, it says right here, "he's a

17  prior convicted felon with the definition of what a felon

18  is" --

19          THE COURT:  You're going too fast.

20  BY MR. PICCININI:

21  Q.    "There's no other stated purpose other than knowledge and

22  intent, the only knowledge and intent in this particular issue

23  related to the drug counts, so a Jemal stipulation would take

24  that out, would only leave possession as the issue."  This is

25  not a discussion under Old_Chief, this isn't your earlier

59

1  attempt to stipulate away the content of the conviction, this

2  is specifically in relation to the government's intention to

3   use a former conviction in support of knowledge and intent of

4   the drug conviction themselves or the drug counts.

5          THE COURT:  Mr. Piccinini, with respect to this

6   issue, at the end of the day I'm going to have to draw my own

7   conclusions as to what the transcript says.  So why don't you

8   move on to another area.

9   BY MR. PICCININI:

10  Q.   Would you also agree with me that in the context of the

11  Jemal stipulation, that all the parties agree that the Jemal
    _____                              _____

12  stipulation did not remove from the government its obligation

13  to prove each and every element of the conspiracy count.  The

14  government still had to prove your defendant's knowing

15  participation in the conspiracy, Jemal or not; do you recall
                                    _____

16  that?

17  A.   No.

18  Q.   Okay.

19  A.   It seems to me that Jemal would apply to the substantive,
                             _____

20  as well as the conspiracy.

21  Q.   But don't you recall the instructions that were given to

22  the jury because what happened with the jury is really what's

23   important, not your recollection, that the judge specifically

24   only gave a stipulation concerning Jemal as it related to the
                          _____

25   two PWID, possession with intent to distribute counts, but not


                                    60


1   the conspiracy?

2   A.   I don't recall that.  If that is the case, it is.  But

3   all that does is makes the Jemal stipulation even less
                          _____

4   valuable.  If it's only going to apply to the substantive count

5   and not going to apply to the conspiracy, then what's the

6   point.

7   Q.   Well, how about your defense in this case, was that your

8   client didn't possess the bag?

9   A.   Yes.

10   Q.   Ma'am, with regard to your statement here today

11   concerning your current belief that you should not have entered

12   into the Jemal stipulation, you should have done a better job
                          _____

13   for your client.  At what point in time after the conviction in

14   this case did you first have discussions with your other

15  counsel in the Public Defender's Office concerning your

16  performance in this case?

17  A.   I didn't -- I wasn't still a federal defender at the time

18  of sentencing.  So I'm sure I had a conversation

19  post-conviction and presentencing.  And then the initial phase

20  of the appeal was done within our office and I would have had a

21  conversation then.

22  Q.   With regard to post-conviction, do you recall as I went

23  through the docket of the zealous representation of your

24  client, after his conviction in this case, is it always your

25  practice to file a post-conviction lengthy motion for judgment


61


1  of acquittal with citations to authorities on behalf of your

2  defendants?

3  A.   If I think it's appropriate, then, yes.

4  Q.   In this particular case your representation, even though

5  you didn't represent him at sentencing, went well beyond the

6  jury deliberation.  You recall that you had requested multiple

7  continuances to make sure you got the transcript, then you

8  actually filed a lengthy and detailed motion for judgment of

9   acquittal, do you recall that?

10   A.    Yes.

11   Q.    In this particular motion for judgment of acquittal, your

12   defense at trial was my client didn't possess the bag.  Do you

13   recall that your defense in the motion for judgment of

14   acquittal particularly focused on that particular issue, that

15   my client did not possess the bag.  You said, judge, how can a

16   jury have disagreed with this defense.  Two police officers,

17   are the only ones who see him with the bag, they are liars.

18   That my client was physically incapable of carrying the bag.

19   The government stipulated to that stuff.  In addition, my

20   client had a particular reason, not because of the conspiracy,

21   but to come here to meet up with this girl.  That, judge, how

22   in the world could a jury reasonably have convicted my client

23   based upon that defense.  I mean at no point did you bring up

24   your faulty decision to enter into a Jemal stipulation, you
                         _____

25   never brought that up at that point in time?


                               62


1   A.    If it wasn't brought up during the course of the trial,

2   how could I bring it up in the post-trial motions.

3  Q.   Well, you bring it up here today?

4  A.   I'm not bringing it up here.  I'm a witness, because it's

5  been brought up here today.

6  Q.   Okay, fair enough.  After the other attorneys got

7  involved in this case, have they not approached you and shown

8  you exactly why it is that in their opinion today you were

9  ineffective back then?

10  A.   No.

11  Q.   When the Public Defender's Office attempted to allege one

12  of their own counsel's ineffectiveness, they didn't approach

13  you and let you know that they really thought you were

14  ineffective in this case?

15  A.   No.

16  Q.   They didn't tell you anything about that?

17  A.   No.  There's not that kind of conversation that goes on.

18  I think we try to leave the ability for the appellate attorney

19  to have an objective perspective.  As opposed to taking on the

20  perspective of the trial attorney.  Unless you're going to do

21  your own appeal work, which I did not in this case.  And then

22  once ineffectiveness was alleged and it went outside of the

23  office, pretty much my interaction was when Mr. Antkowiak asked

24   me to review the file, I did.  And he talked to me about what

25   my process was.  But nobody ever sat down and said look at

63

1   this, Khadija, this is where you messed up or this is why I

2   think you were ineffective.  In fact, I don't think any of them

3   have ever said that.  I think that's the conclusion that I can

4   see when I look at it.

5          MR. PICCININI:  That's all I have, judge.

6          THE COURT:  All right.  Anything further, Mr.

7   Antkowiak?

8          MR. ANTKOWIAK:  I do, just briefly, judge.

9          THE COURT:  All right.

10             REDIRECT EXAMINATION

11   BY MR. ANTKOWIAK:

12   Q.   Ma'am, counsel asked you some questions about Roxanne

13   Arnold.  First of all, she wasn't the only witness who you got

14   Jencks material for, correct?

15   A.   No, both me and Mr. Sambroak received Jencks for all of

16   the potential witnesses, whether they were directed at our

17  client or not, we all had everything.

18  Q.    I previously in pleadings summarized that Jencks

———————

19  material.  You've also looked at it.  Four of the witnesses,

20  Siegworth, Blackwell, Quinn and Smith, said absolutely nothing

21  about McCoy, is that correct?

22  A.    Yes.

23  Q.    And Peterson thought maybe she could identify a picture

24  of seeing him with Barnette at sometime in the distant past,

25  that was all she said, right?

64

1  A.    Yes.

2  Q.    Now, Roxanne Arnold never actually did testify at trial

3  in this case, right?

4  A.    She did not.  There was some saga with regard to her, I

5  don't remember what it was.  But she did not testify.

6  Q.    Now, as the court ruled on the 404(b) evidence, isn't it

7  true the court allowed the government to offer testimony

8  showing the association of these two men in the past?

9  A.    Yes.

10  Q.    But Roxanne Arnold was never called to give any of that

11  testimony, was she?

12  A.   No.

13  Q.   And Roxanne Arnold, the court will see this, gave a bunch

14  of statements, only one of which has any allegation at all

15  about McCoy and drugs, correct?

16  A.   Yes.

17  Q.   And counsel read to you the part that says, this is the

18  one sentence that deals with the drugs, "Chinn was hanging

19  around 13th and Parade selling drugs for Egypt."  Did it say

20  how she knew that?

21  A.   No.

22  Q.   When you read that information in the Jencks material,
                        _____
23  did it cause you to believe, oh my God, thank God I gave this

24  Jemal stipulation because I can keep Roxanne Arnold's
      _____
25  speculation out?

                                    65

1  A.   No.

2  Q.   Were you afraid of Roxanne Arnold to testify?

3  A.   No.

4    Q.    And when she didn't testify, the stipulation still was

5    entered and the jury charge was still given, wasn't it?

6    A.    Yes.  I think I would have had at least as good an

7    opportunity to impeach Roxanne Arnold as I had to impeach two

8    veteran police officers.

9    Q.    Roxanne was a convicted federal drug felon, wasn't she?

10   A.    I knew that there was some saga regarding her at the

11   time, I don't recall the specifics of what it was.  That could

12   very well have been it.

13   Q.    I think it's all in the Jencks material.  Just one last

_____

14   thing.  Counsel asked you about whether you were ever called

15   upon to comment on the record about what your defense was or

16   things of that nature in this case; and, obviously, you didn't,

17   correct?

18   A.    I did not.

19   Q.    Do you remember a time when the government, through Mr.

20   Trucilla, commented on the question of whether or not Mr. McCoy

21   had actually possessed the blue duffel bag and whether or not

22   that was significant?

23   A.    Say that again.

24   Q.    I'll rephrase it this way.  Do you remember as part of

25  your pretrial preparation and trying to gather evidence to

66

1   impeach various government witnesses, you subpoenaed the Erie

2   Police Department for background records of the officers Kress

3   and Liebel?

4   A.   Yes.

5   Q.   And they moved to quash that subpoena?

6   A.   Yes.

7   Q.   And the court held a hearing as to their motion to quash?

8   A.   Yes.

9   Q.   At that hearing the court asked you what do you need this

10  for, and you basically said, well, I'm trying to impeach these

11  two individuals because they said they saw my client with a

12  bag?

13  A.   Yes.

14  Q.   Do you recall what Mr. Trucilla said about that?

15  A.   No.

16  Q.   Page six of the hearing of October 15th.  Mr. Trucilla,

17  "first of all, what it boils down to is these two officers

18  testified that they saw the defendant with the blue canvas bag.

19   In and of itself that's not necessarily an incriminating factor

20   in this particular case, it's not the vital issue," he said.

21   "The vital issue is whether or not McCoy had knowledge of the

22   contents of that bag in conjunction with his possession of it.

23   So, in and of itself the fact that they can testify to the fact

24   he was carrying the bag, is not the ultimate issue." Did he get

25   it right?

67

1        THE COURT:  Is there a question there?

2   BY MR. ANTKOWIAK:

3   Q.   Did he get it right?

4   A.   Yes.

5        MR. ANTKOWIAK:  That's all.

6        THE COURT:  Anything else?

7        MR. PICCININI:  One other issue, your Honor.  Your

8   Honor, what I'd like to do is just note for the record that the

9   affidavit of Robert Sambroak that was provided as an exhibit in

10   our initial objection to the petition itself.

11        THE COURT:  All right, very good.  Ms. Diggs, you're

12   excused, watch your step on the way down.

13          MR. ANTKOWIAK:  We have no other witnesses or

14    testimony at this time, your Honor, thank you.

15          MR. PICCININI:  We have nothing in response, your

16    Honor.

17          THE COURT:  So we're done?

18          MR. PICCININI:  We're done.

19          THE COURT:  I think it would be helpful to me to

20    have post-hearing briefs.  But in fairness to both parties, I

21    think you're going to want the transcript, would you not?

22          MR. ANTKOWIAK:  Yes, your Honor, I would, please.

23          THE COURT:  So I will be looking for the

24    petitioner's brief within 30 days of the receipt of the

25    transcript.  The government will have 30 days in which to


68


1    respond.

2          When I said post-hearing briefs, what I'm really

3    anticipating is something akin to findings of fact and

4    conclusions of law.  All right, thank you, counsel.

5

6          (Whereupon, at 11:46 a.m., the proceedings were

7 concluded.)

8

9    - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

69

1                    C E R T I F I C A T E

2

3

4

5        I, Ronald J. Bench, certify that the foregoing is a

6    correct transcript from the record of proceedings in the

7    above-entitled matter.

8

9

10

11    _____

12    Ronald J. Bench

13

14

15

16

17

18

19

20

21

22

23

24

25