IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      )
                              )
           v.            )   Criminal No. 98-5 Erie
                              )   Civil No. 02-175 Erie
                              )
MARCREESE MCCOY           )

## GOVERNMENT'S PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

AND NOW comes the United States of America, by and through its attorneys, Mary Beth Buchanan, United States Attorney for the Western District of Pennsylvania, and Marshall J. Piccinini, Assistant United States Attorney for said district, and proposes that the Court adopt the following findings of fact and conclusions of law:

## PROPOSED FINDINGS OF FACT

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This matter is before the Court on remand from the Third Circuit Court of Appeals. In an opinion filed on June 6, 2005, the Circuit Court required that we hold an evidentiary hearing prior to deciding the petition for habeas corpus relief filed on behalf of petitioner, Macreese McCoy. The evidentiary hearing was held in this matter on September 16, 2005, at which time the burden was on McCoy to establish that his trial counsel, Khadijia Diggs, was ineffective within the meaning of the United States Supreme

1

Court decision in *Strickland v. Washington*, 466 U.S. 668, (1984).

This Court has had the opportunity on several prior occasions to review the facts and evidence in this case. On November 3, 1999, this Court filed a Memorandum Opinion and Order denying McCoy's motion for Judgement of Acquittal. On May 20, 2003, this Court issued a Memorandum Opinion denying McCoy's petition for habeas corpus relief without an evidentiary hearing. Thus, this Court has previously reviewed the facts of the case in great detail and the findings of fact concerning the evidence adduced at trial included herein are consistent with the factual recitation set forth in our two previous orders. On these two previous occasions, this Court found that the facts presented at trial were more than sufficient to support the verdict rendered. We find no reason, based upon the evidence presented at the evidentiary hearing, to hold otherwise at this time. Since the facts adduced at trial are relevant to the resolution of the legal issues raised in the claim of ineffective assistance of counsel in the habeas petition, they are again set forth herein.

**A.   The Charges**

McCoy and his co-defendant Joseph Barnette, were charged in a five-count indictment with federal drug and firearms offenses. At Count One, Barnette and McCoy were charged with conspiracy to possess with intent to distribute crack cocaine and marihuana on or about March 17, 1998, in violation of 21 U.S.C. § 846. At Counts

Two and Three, the substantive charges underlying Count One, Barnette and McCoy were charged with possession with the intent to distribute in excess of 50 grams of crack cocaine and less than 500 grams of marihuana in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii), and 841(b)(1)(C). At Counts Four and Five, each were separately charged with being felons in knowing possession of firearms in violation of 18 U.S.C. § 922(g)(1).

**B.    Evidence Adduced at Trial**

On the morning of March 17, 1998, an informant by the name of Terry Seigworth disclosed to agents of the Erie Area Gang Law Enforcement (EAGLE) Task Force that he had received a phone call earlier that morning from a drug dealer named "Barnette." According to Seigworth, Barnette stated that he would be traveling from Detroit, Michigan to Erie, Pennsylvania with friends via Greyhound bus, that he would be armed, and that he would be "bringing something" with him. (Trial Transcript, hereinafter "Tr." Vol. II, pp. 42, 52). Seigworth understood "something" to mean crack cocaine. (Id. at 53). Based on this information, EAGLE Task Force agents established surveillance at the bus station. (Id. at 71).

Upon his arrival, Barnette departed the bus with no bags and quickly made his way out the front door of the bus terminal. (Tr. Vol. II, 87-88, Vol. III, 38). Shortly thereafter, three other black males carrying garbage bags and a blue canvas duffel bag

departed the bus, exited the terminal through the front door, and set their bags on the sidewalk next to Barnette. (Tr. Vol. II, 112, Vol. III, 31-34). Two officers, Sergeant Robert Liebel and Sergeant Joseph Kress, observed that McCoy had carried the blue duffel bag through the terminal and had placed it on the sidewalk at his feet. (Tr. Vol. III, pp. 33-34, 195-196). Another individual, later identified as Kendrick Grier, carried two garbage bags. The fourth member of the group, later identified as Michael McQueen, also carried a garbage bag. (Tr. Vol II, p. 111). Once outside, the four men were observed sharing cigarettes and talking as if they knew each other. (Tr. Vol. III, pp.35, 82). After a moment, Barnette went inside to use the pay phone and then returned outside and stood with the group. The officers then approached. (Tr. Vol. II p. 153, Vol. III, 37, 108, Vol. IV, 38, 40-41,).

As officers questioned the individuals separately, they received conflicting information. Barnette, for example, initially identified himself as "Ardell Griffin" and denied knowing any of the other individuals. (Tr. Vol. II, pp. 109, 155, Vol. IV, p. 34). McCoy represented that he was "Mark Chin" and stated that he in fact knew "Ardell Griffin." McCoy denied knowing Grier, who was traveling under the alias "Carlton Davidson". (Tr. Vol. IV, pp. 32, 33, 47). However, Grier admitted traveling with the others and specifically pointed to Barnette and McCoy. (Tr. Vol. II, pp. 108, 114-15).

4

While officers turned their attention to others, Barnette retreated inside the terminal and placed a call at the payphone. (Tr. Vol. IV pp. 34, 36). When approached by an officer and asked if he was "Barnette." Barnette appeared stunned but again claimed to be "Ardell Griffin" and insisted that he had traveled alone. When confronted with another alias he had used in the past, Barnette finally conceded his identity. (Tr. Vol. IV, p. 34).

Meanwhile, another officer approached McCoy, who began acting nervously. (Tr. Vol. III, p. 44). When asked for identification, McCoy produced a bus ticket in the name "Mark Shine." (Tr. Vol. III, 42). The ticket had been issued that morning shortly before 11:00 a.m. and indicated travel from Detroit, Michigan to Erie, Pennsylvania. (Tr. Vol. III, pp. 42-43). When asked his name, McCoy responded "Mark Chin". When asked why he had traveled to Erie, McCoy was evasive and stated that there were "a lot of girls he could meet." (Tr. Vol. II, p. 45; Vol IV, p. 32).

The task force Officers then inquired about ownership of the bags that had been carried off the bus. (Tr. Vol. III, p. 161). McCoy immediately claimed ownership of the garbage bags that Grier had carried off the bus and he gave officers permission to search them. (Tr. Vol. II, p. 111, Vol. III, pp. 94, 161, 183). The two garbage bags contained shoes, shoe boxes and wet clothing. (Tr. Vol. II, p. 99, Vol. III, p. 161, Vol. IV, p. 15). McQueen claimed the remaining garbage bag, which was found to contain clothing (Tr.

5

Vol. II, 111). Only the blue canvas duffel bag remained unclaimed, and all of the group members continually denied ownership of it. (Tr. Vol. II, pp. 111-13). Since the bag rested at McCoy's feet, officers questioned McCoy whether he had carried the bag, he repeatedly denied doing so. (Tr. Vol. II, p. 114, Vol. III, p. 116). As one officer began searching the bag, Barnette began slowly creeping away from it. (Tr. Vol. III, pp. 156, 162).

Inside the duffel bag officers found a 9 mm pistol wrapped in a towel and a .380 caliber pistol covered with a white wash cloth and stuffed inside a pair of jeans. (Tr. Vol. III, p. 164). Officers also recovered a brown paper bag containing several empty plastic baggies and 270 tiny Ziplock baggies storing what appeared (and later proved) to be crack cocaine. (Tr. Vol. II, pp. 120-22, Vol. III, pp. 162-63). In addition, officers found a large Ziplock baggie containing approximately one pound of marihuana. (Tr. Vol. III, p. 163). The duffel bag also contained miscellaneous items of name-brand clothing, including FUBU and Nike Penny Hardaway high-top sneakers. (Tr. Vol. II, pp. 117-18.)

Following the recovery of this contraband, the four men were placed under arrest and brought to the Erie Police Department, where their personal effects were inventoried. (Tr. Vol. II, p. 123.) The evidence revealed that each of the four men had traveled to Erie with bus tickets issued in a fictitious name. (Tr. Vol. IV, p. 70.) All of the tickets had been purchased that day from the

6

same ticket counter within minutes of each other. (Id.) McCoy was found to be in possession of Barnette's bus ticket (issued in the fictitious name of "Ardell Griffin") along with his own ticket (issued in the name of "Mark Chin") and a pager. (Tr. Vol. IV, pp. 66-67.) One of the numbers retrieved from the pager matched a number written on a piece of paper in Barnette's pocket. (Tr. Vol. IV, p. 73.)

After Grier and McCoy were placed in the same holding cell, McCoy asked to speak with F.B.I. Special Agent Sean VanSlyke. (Tr. Vol. II, pp. 124-25). McCoy subsequently admitted to Special Agent VanSlyke that he had adopted "Mark Chin" as an alias. (T.T., Vol. II, 125). He now also admitted traveling to Erie with Grier, but (contrary to his prior statement) insisted that he did not know Barnette or McQueen. (Tr. Vol. II, pp. 124-26).

McCoy was also interviewed separately by Pennsylvania State Trooper Anthony Bozich. In the course of the interview, McCoy insisted that he knew only his cell-mate "Carlton Davidson", who was actually Kendrick Grier. (Tr. Vol. III, pp. 166, 169). McCoy further stated that Grier purchased his ticket in Detroit and the two traveled together to Erie. While McCoy claimed he had come to Erie to visit a girl named "Chereka", he admitted that he did not know Chereka's last name or address. (Tr. Vol. III, p. 170).

Grier, on the other hand, immediately decided to cooperate with law enforcement agents. After disclosing his true identity,

Grier informed officers that he had escaped from a halfway house and was on the run when Barnette, an old friend, offered to take him to Erie. (Tr. Vol. III, p. 91). He later testified at trial about the events that transpired on March 17, 1998. According to Grier, he and Barnette had made plans prior to March 17, 1998, to meet at the home of Barnette's aunt. (Id. at 98). When Grier arrived at the home that day, he observed a blue canvas duffel bag already packed lying on the floor. (Id.). Grier denied having any luggage of his own, a fact confirmed by his bus ticket (which did not account for baggage). (Tr. Vol. III, pp. 94-95). Barnette and Grier picked up McQueen and McCoy, then stopped back briefly at Barnette's aunt's house to pick up the duffel bag before traveling to the bus station. (Tr. Vol. III, pp. 99, 103). According to Grier, Barnette carried the duffel bag into the terminal and provided cash for each person's ticket. (Id. at 95). The tickets were purchased within four minutes of each other and seven minutes before the bus's scheduled departure. (Tr., Vol. IV, pp. 70, 84).

During the bus trip, Barnette made a number of significant admissions to Grier. Barnette indicated that a white male owed him some money and that he (Barnette) was "fixing to get paid." (Tr. Vol. III, p. 105). Barnette also told Grier that he had marihuana in his bag. (Id. at 104). In addition, Barnette commented that the black Penny Hardaway basketball shoes Grier was wearing were similar to a pair of shoes Barnette owned. (T.T., Vol. III, 119).

The latter remark was particularly significant because one of the items recovered from the blue duffel bag was a pair of black Penny Hardaway high-tops which were Barnette's size and uniquely similar to those worn by Grier. (Tr. Vol. II, pp. 161-62, 169-72.)  Upon arriving in Erie, McCoy asked Grier to carry his two plastic garbage bags off the bus, as McCoy was planning to carry the blue duffel bag. (Tr. Vol. III, pp. 106-07). McCoy's possession of the bag as the parties exited the terminal was separately corroborated by the testimony of Sergeants Liebel and Kress (Tr. Vol. III, pp. 33-35, 195-96).

The government's case at trial also included expert testimony from Trooper Bozich concerning certain aspects of the case.  For one, Trooper Bozich established that Detroit is considered a "source city" for narcotics. He also testified that the resale value of the recovered drugs was approximately $10,000 and opined that the owners intent to resell the drugs was evidenced by the packaging materials contained in the duffel bag. In addition, Trooper Bozich testified that beepers and guns, such as those taken from the duffel bag represent "tools of the [drug] trade."

Although neither McCoy nor Barnette chose to testify at trial, McCoy mounted a solid defense and presented several witnesses to testify on his behalf.  We find that the defense strategy mounted by McCoy and his counsel was sound in light of McCoy's immediate claim at the time of his encounter with police that he did not

possess the bag.  We find that mounting a contrary line of defense would have been unproductive and would only have highlighted the fact that even though McCoy was observed carrying the bag, he immediately claimed that he did not do so, and immediately attempted to distance himself from the bag.  The most prudent strategy to challenge the evidence against McCoy was to mount a defense that (consistent with his immediate claims at the time of arrest) he never possessed the bag.

In this regard, McCoy attempted to refute his physical possession of the duffel bag by presenting evidence that a prior back and leg injury precluded him from carrying heavy objects, including the bag. (Tr. Vol. V, pp. 14, 17). McCoy's godmother, Rayven Chinn, testified that McCoy walked with a limp and utilized a leg brace. (Tr. Vol. VI, pp. 9-10). She also testified that, in her opinion, McCoy would not have been able to carry the duffel bag. (Tr., Vol. VI, p. 10).  The defense also established that McCoy was receiving SSI disability payments at the time of his arrest, although he had not received a medical reassessment in some time.

As for McCoy's use of an alias, the defense offered testimony from Ms. Chinn that McCoy was called "Mark" by family members and had been known to use her last name, which was sometimes mistaken for "Shinn". (Tr. Vol. VI, pp. 6-7). Ms. Chinn also testified that McCoy had been nicknamed "Two-Four" by family members. (Tr. Vol.

VI, p. 6).

The defense accounted for McCoy's possession of the beeper through Ms. Chinn's testimony that McCoy had received the beeper from his uncle. The defense also attempted to show that McCoy had an innocent reason for his bus trip. To this end, Ms. Chinn testified that McCoy had told her that he was traveling to Erie to meet a girl. (Tr. Vol. VI, pp. 19-20).

McCoy also presented testimony from Chereka Jackson, who established that she had met McCoy in the summer of 1997 when she saw him every day for approximately one week. Ms. Jackson testified that McCoy was "just a friend" whom she knew only as "Two-Four." She admitted that she did not know how to get in touch with him after he left. Ms. Jackson also acknowledged that she had not seen or heard from McCoy since their parting and was not aware of his arrival in Erie on March 17, 1998. (Tr. Vol. IV, 138, 142-146).

Finally, and significantly, the defense attempted to undermine the credibility of Sergeants Liebel and Kress through the testimony of their former supervisor, Gregory Dollinger. Dollinger asserted that Liebel and Kress would do anything necessary to secure a drug conviction, including lying under oath. (Tr. Vol. IV, pp. 195-96). On cross examination, Dollinger freely acknowledged his dissatisfaction with the way in which the Erie Police Department had been run, particularly the treatment he received when

11

attempting to secure separate funding for the bomb squad. (Id. at p. 181).

The government attempted to undermine Dollinger's credibility attack through the testimony of Detective Christine Mangan of the Erie Police Department.  Detective Mangan testified that, during the several years she and Dollinger worked together, she observed - and Dollinger openly shared - his personal animosity toward members of the SWAT team, which then included Kress and Liebel.  (Tr. Vol. V, p. 21).

The government also attempted to undermine McCoy's defense relative to his alleged physical impairment through several pieces of evidence.  When McCoy left his godmother's house, for example, he was not wearing a leg brace or using an assistive walking device. (Tr. Vol. VI, p. 23).  Kendrick Grier testified that McCoy appeared to have only a slight limp when he and Barnette picked up McCoy on the morning of March 17, 1998. (Tr. Vol. III, p. 141.) He further testified that McCoy's limp did not keep him from carrying the duffel bag as they exited the bus. (Id.) Officers from the EAGLE Task Force testified that McCoy did not appear to limp and received no assistance carrying the duffel bag as he walked hurriedly through the bus station.  The government also called a court security officer on rebuttal who established that McCoy used the stairs at all times during his trial, and on one occasion appeared to employ a "selective limp", when walking by the

presiding judge. (Tr. Vol VI, pp. 30-31.)

### D.    McCoy's Conviction and Sentence

The jury found Barnette and McCoy guilty of conspiracy to possess with intent to distribute crack cocaine and marihuana as charged in Count One.  They were also found guilty of possession with the intent to distribute in excess of 50 grams of crack cocaine and less than 500 grams of marihuana as charged in Counts Two and Three.  However, while the jury found Barnette guilty of felon in knowing possession of two firearms at Count Four, the jury acquitted McCoy of the same charge at Count Five. McCoy was sentenced to a term of imprisonment of 132 months, to be followed by a term of five years of supervised release. His Motion for Judgment of Acquittal based on insufficient evidence was denied.

### E.    Government's Notice of Intention to Use 404(b) Evidence and the *Jemal* Stipulation

The issue that gives rise to McCoy's claim of ineffective assistance of counsel stems from the decision of trial counsel to defend the case by exclusively challenging whether McCoy possessed the duffel bag.  Consistent with that defense, and in response to the government's notice of intention under Federal Rule of Evidence 404(b) to introduce evidence of McCoy's prior firearm conviction and evidence of McCoy's prior drug dealing relationship with Barnette, both Barnette's and McCoy's trial counsel agreed to enter into a *Jemal* stipulation, to keep the 404(b) evidence from reaching the jury.  The *Jemal* stipulation (contemplated by *United States v.*

13

*Jemal*, 26 F.3d 1267 (3d Cir. 1994))and this Court's permissive jury instruction that resulted from the stipulation, were subject to review on direct appeal.

### F.    Affirmance on Direct Appeal

In his direct appeal, McCoy challenged three aspects of his trial:  (1) the pre-trial ruling that he did not have standing to challenge the search of the duffel bag; (2) the evidence was insufficient to support his convictions; and (3) the court erred in instructing the jury regarding the *Jemal* stipulation.

With respect to *Jemal*, the Third Circuit stated as follows:

> Barnette and McCoy argue that this instruction was erroneous because it relieved the government of its burden of proving beyond a reasonable doubt that they knew that the substances in the duffel bag were illegal drugs and that they intended to distribute them.  In effect, Barnette and McCoy maintain that the instructions were incorrect because they held them to the bargain that they made when they entered into the *Jemal* stipulation and thereby avoided the introduction of other crimes evidence that was probative of their knowledge and intent.    We reject this argument.

(*See United States v. McCoy, No. 00-3257/3258*, p. 5).

Finding the instruction to be sound, we note that the Third Circuit observed that "the challenged instruction was merely permissive" and did not remove the elements of intent and knowledge from the jury's consideration. (*Id.* at 5-6).  In addition, without relying on the *Jemal* stipulation, the Third Circuit found that

"[a]fter a careful review of all of the evidence presented at trial, we hold that there was substantial evidence to support the jury's verdict." (*Id.* at 7). In light of its findings, McCoy's judgment of conviction and sentence was affirmed by the Third Circuit on June 7, 2001.

Following the decision, the Federal Public Defender filed a Request for Appointment of Counsel on behalf of McCoy advocating the ineffectiveness claim against one of their own attorneys, trial counsel, Khadija Diggs. The request for appointed counsel was granted by this Court and counsel, Attorney Bruce Antkowiak, assumed representation of McCoy. This timely Section 2255 motion challenging the efficacy of trial counsel is now before the Court. This Court initially rejected the habeas petition without an evidentiary hearing and found that McCoy failed to establish that he was prejudiced by the conduct of his defense counsel within the meaning of *Strickland*. The Third Circuit reviewed this Court's decision not to hold an evidentiary hearing. In rendering its opinion, the Circuit Court stated that the only issue before it was: "whether the District Court erred by denying an evidentiary hearing on McCoy's ineffective assistance of counsel claim." *United States v.* McCoy, 410 F.3d 124, 131 (3d Cir. 2005). We note that although the Circuit Court provided guidance to direct this Court's analysis of the ineffectiveness issue, the Circuit Court deemed that "[t]he issue of whether McCoy's trial counsel was

15

ineffective is not before us." (*Id. at 13 n. 5).* Now that an evidentiary hearing has been held, we readdress the claim of ineffective assistance of counsel.

## A.    The *Strickland* Standard

A defendant claiming ineffective assistance of counsel must satisfy the two-pronged test announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). To do so, the defendant must show "(1) his or her attorney's performance was, under all the circumstances, unreasonable under prevailing professional norms, and (2) there is a 'reasonable probability that, but for counsel's unprofessional errors, the result would have been different.' " *United States v. Day*, 969 F.2d 39, 42 (3d Cir. 1992)(citing *Strickland*, 466 U.S. at 687-96). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

This Court's scrutiny of counsel's performance must be "highly deferential" and we must make "every effort... to eliminate the distorting effects of hindsight" and "to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Review of an ineffective assistance claim begins with a "strong presumption" that counsel's performance was reasonable. *See Strickland,* 466 U.S. at 689. "The defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* at 689; *United*

16

*States v. Kauffman*, 109 F.3d 186, 189-90 (3d Cir. 1997). "It is []
only the rare claim of ineffective assistance of counsel that
should succeed under the properly deferential standard to be
applied in scrutinizing counsel's performance." *United States v.
Gray*, 878 F.2d 702, 711 (3d Cir. 1989).

The "deficiency" step asks whether counsel's conduct "fell
below an objective standard of reasonableness" viewed as of the
time it occurred. *Strickland,* 466 U.S. at 688, 690; *see also, Gray*,
878 F.2d at 711. The "prejudice" prerequisite asks whether "there
is a reasonable probability that, but for counsel's unprofessional
errors, the result of the proceeding would have been different."
*Strickland*, 466 U.S. at 694; *see also, United States v. Headley*,
923 F.2d 1079, 1083 (3d Cir. 1991). McCoy will meet his burden only
after both *Strickland* prongs are satisfied. Although this Court
heeds the advice of the Third Circuit to consider the prejudice
prong before examining the performance of counsel, we find that
McCoy has failed to establish either prong of *Strickland*, and will
address both prongs herein.

> **1.    Counsel's Performance Was Not Deficient;
> Therefore, a Claim of Ineffective Assistance
> Cannot Be Supported**

We find that the defense strategy employed by trial counsel
did not fall below an objective standard of reasonableness. We
find that McCoy has failed to establish that focusing the defense
exclusively on McCoy's claim that he did not possess the bag and,

17

as part of that defense entering into a *Jemal* stipulation, was sound and reasonable from a *Strickland* standpoint.  As for deficiency, McCoy argues that there was no reasonable or tactical basis for counsel's decision to enter into the *Jemal* stipulation. He alleges that counsel's actions were "far outside the realm of reasonable judgments made by otherwise competent trial counsel." (Pet.'s Mot. at 5).  We disagree.

In this case, there can be no dispute that mounting a defense focused on the lack of possession of the bag and entering into the *Jemal* stipulation as part of that defense, was a strategic decision.  We find that this is not a case where the government or former counsel is merely labeling a decision as "strategic" in order to benefit from the highly deferential review of trial counsel's performance.  Here, this Court required defense counsel to consider the strategic choice of entering into the *Jemal* stipulation.  Although we did not require trial counsel to stipulate, we specifically told counsel, prior to the decision on the admission of 404(b) evidence, that a strategic decision had to be made.  Requiring counsel to make such a decision prior to issuance of an evidentiary ruling was contemplated by *Jemal*.  Since counsel clearly made a tactical and strategic decision to focus on possession rather than knowledge and intent, our review of that strategic choice is guided by *Strickland* and its progeny on this issue.  Thus, we consider whether McCoy's attorney's performance

was, under all the circumstances, reasonable under prevailing professional norms.

Since we are dealing with a question as to a strategic choice, McCoy must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689; *United States v. Kauffman*, 109 F.3d 186, 189-90 (3d Cir. 1997). Again, as we set forth above, "It is [] only the rare claim of ineffective assistance of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance." *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989). As the Third Circuit noted in its remand opinion, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *McCoy*, 410 F.3d at 135 (citing *Strickland*, 466 U.S. at 690).

Here, we find that counsel's decision to defend the case on the possession element was consistent with McCoy's adamant denial that he did not possess the duffel bag, and, under all the circumstances, was reasonable under prevailing professional norms. With regard to the *Jemal* stipulation, which we find flowed naturally from a defense which focused on challenging possession, we find that counsel's choice was reasonable as well.

Trial counsel claims now that without the *Jemal* stipulation, the defense of the case would not have been limited to possession.

19

We find that counsel's current testimony in this regard is not credible. There is no support in the record for counsel's current claim (which we find to be flawed, not by intention, but by the blinding effects of hindsight and resulting from years of second guessing a hard fought trial that did not end as planned). We are mindful of our charge not to allow second guessing and hindsight to rule the day when it comes to addressing the effectiveness of trial counsel. Trial counsel may now wish she would have pursued an additional or alternative line of defense, but that in no way establishes that the defense she did mount was ineffective. The record is devoid of any example of any other preparations made to defend the case on a basis other than possession. There is no indication of any other pretrial preparation, any other witnesses being prepared to testify, any statement to the court, or any example whatsoever of an attempt to defend the case by challenging knowledge and intent prior to the *Jemal* stipulation. Likewise, there is no indication as to what evidence was not produced at trial as a result of the *Jemal* stipulation. This Court finds that with or without the *Jemal* stipulation, the defense strategy was to wisely defend the case by challenging possession. We find that the *Jemal* stipulation did not keep the defense from challenging knowledge and intent because the defense was already focused on exclusively challenging possession. Again, trial counsel's current recollection on this point is not credible. At the evidentiary

20

hearing, trial counsel was asked whether she recalled ever indicating to the court prior to trial that her defense in the case was that her client did not possess the duffel bag. She responded that she did not recall being asked, and, if so, it was only in the context of the *Jemal* stipulation (Tr. Evidentiary Hearing, 9/16/05, p. 49.) However, at the hearing on the pretrial motions held on October 15, 1998, twelve days before trial, this Court stated in the context of consideration of the *Jemal* stipulation: "Let me make sure I understand the thrust of the defense insofar as the duffel bag is concerned. I gather it's not my bag, I don't know anything about that bag, is that right?" Trial counsel responded "Correct." We find that trial counsel did not intend to defend the case on knowledge and intent, but rather, tactically chose to defend on possession, even before the *Jemal* stipulation was entered. The record supports this finding because trial counsel independently objected to the admission of the 404(b) evidence without relying on a *Jemal* stipulation to persuade the court. Trial counsel intimated at that time that the defense of the case would not challenge knowledge and intent. In the pretrial motion hearing held on October 23, 1998, Attorney Diggs stated "...to the extent that the court is inclined to allow them [the prior bad acts] in then, I believe that it would be appropriate to do a *Jemal* type stipulation because our client would not argue knowledge and intent." (Tr. Hearing on Pretrial Motions, 10/23/98, p. 41).

In our assessment of the reasonableness of counsel's performance, this Court finds, contrary to counsel's current recollection, that the *Jemal* stipulation, as part of the overall defense of challenging possession, did provide a benefit to McCoy. First, we find that the *Jemal* stipulation successfully kept the government from introducing the nature of McCoy's prior firearm conviction. Even though there appeared to be no dispute as to this benefit when the matter was argued by the parties in April 2003, trial counsel testified at the evidentiary hearing that she does not currently recall that the introduction of the firearm conviction was impacted by the *Jemal* stipulation. (Tr. Evidentiary Hearing, 9/16/05, pp. 56-57). Again, trial counsel's testimony is not supported by the record. The record clearly reflects, and this Court recalls, that in light of the *Jemal* stipulation, we precluded the government from introducing that conviction. The government sought to include the nature of that conviction because it was relevant to prove the defendant's knowledge and intent with regard to the contents of the bag. Coupled with the expert testimony from Trooper Bozich that firearms are tools of the trade for drug dealers, we find that it was wise, and professionally reasonable, for counsel to keep the nature of the conviction from the jury. The *Jemal* stipulation resulted in this Court's ruling that the nature of that conviction would be kept from the jury.

In addition, we find that the *Jemal* stipulation was a

reasonable course chosen to keep the government from offering evidence of a prior drug dealing relationship between McCoy and Barnett.   Reference has been made in these proceedings to the Jencks Act material submitted by the government to defense counsel prior to trial as required by the provisions of Title 18, United States Code, section 3500.   This Court finds that a review of the Jencks material alone, as suggested by McCoy, misleads our analysis and does little to identify exactly what evidence was being offered by the government to support the admission of 404(b) evidence. Jencks material includes prior statements and reports made by a witness who testifies at trial.   The Jencks Act only requires the government to produce such material after the witness has been called to testify.   As a reasonable accommodation in this Court, the government regularly provides Jencks material to defense counsel just prior to trial.   There is no requirement that Jencks material include all verbal statements made by witnesses, just that all written statements in possession of the government be produced. Here, the record supports that the written Jencks material alone was not the only source of the 404(b) evidence and the record supports the finding that additional verbal statements, not included in the Jencks material, may have supported the government's request for admission of the evidence.

In preparation for the 404(b) hearing and at the hearing itself, we find that the government made several good faith

disclosures of the evidence to which, it believed, witnesses would testify concerning McCoy and Barnett's prior drug dealing relationship. When asked for clarification concerning certain details, the record does not reflect that government counsel referred to the Jencks Act material alone, but rather attempted to have the FBI agent seek clarification directly from the potential witnesses. In the October 23, 2005 hearing on pretrial motions, when asked to provide a more specific date for the prior drug dealing association between McCoy and Barnette, government counsel stated "Basically, we went to call a witness and get a specific answer so we could put it right in the court's lap. But we're waiting for a page back, is that correct?" (Tr. Hearing on Pretrial Motion, 10/23/98, pp. 49-50). This appears to be a reference to the FBI agent waiting for the witness to send a numeric page to the agent, in order to verbally provide more details of the prior relationship.

It also appears from the record that after this Court ruled that the 404(b) was not going to be admitted, the government understandably removed from the Jencks Act material statements from witnesses who were no longer going to be called to testify. After this Court indicated its intention to exclude the 404(b) evidence, government counsel stated, with regard to the witness statements: "But right now I don't want to turn those statements over, there are people that he doesn't need to know that are prepared to

testify against him.  Its not coming in, according to the court's ruling, they're not anticipated to be witnesses.  I have to go back through all my Jencks, all indexing of it, and take them out." (Tr. October 23, 1998, p. 99).  Thus, reliance on the Jencks material to resolve any issue concerning the full nature of the 404(b) evidence is not helpful.

Thus, this Court finds that the verbal representations made by government counsel represented the nature of the 404(b) evidence, even beyond what appears in the Jencks Act material.  To the extent that the government's verbal representations concerning the nature of its 404(b) evidence was broader than the content of the Jencks material that was provided after this Court's ruling on the inadmissibility of the evidence, we find that any variance is not the product of prosecutorial misconduct (as suggested by trial counsel's notes admitted as an exhibit at the evidentiary hearing) but rather from the misperception that the content of the Jencks material was the only source for the evidence.  Based on the notice of intention to introduce 404(b) evidence and on the representations of government counsel, trial counsel was on notice that government witness(es) would testify that from the Summer of 1997 through the early Winter of 1998, McCoy sold crack cocaine for Barnette. Whether the specifics of this testimony were included in what was provided as Jencks material after the 404(b) decision was rendered, is immaterial.  We find that the decision to enter into

25

the *Jemal* stipulation based upon the information that was known to trial counsel at the time was reasonable.

In addition, we find that the nature of the 404(b) evidence included in the Jencks Act material alone provided counsel a reasonable basis for entering into a *Jemal* stipulation. We find, and trial counsel agreed at the evidentiary hearing, that it was in McCoy's best interest to keep Roxanne Arnold from testifying that in the Summer of 1997, McCoy was selling drugs for Barnette, and that McCoy was an "associate" of Barnette. (Tr. Evidentiary Hearing, 9/16/05, pp. 35-39.) Even though trial counsel currently claims that she would have been prepared to deal with Roxanne Arnold's testimony, it would have been unreasonable for counsel to risk having this particular witness testify that in the Summer of 1997, McCoy was hanging around 13th and Parade Streets in Erie, Pennsylvania selling drugs for Barnette. Although the record reflects that this Court ruled against the government independent of the *Jemal* stipulation, the *Jemal* stipulation certainly kept this Court from readdressing the 404(b) decision. We reserved the right to think about the issue of the admission of the 404(b) evidence further, and if counsel withdrew the *Jemal* stipulation, we find that she jeopardized a reconsideration of this Court's ruling. (Tr. Pretrial Hearing, October 23, 1998, pp. 95, 100.)

We find that Ms. Diggs' decision to defend the case on possession and enter into the *Jemal* stipulation was not only a

reasonable strategic choice, but we also find that the decision was one made after thorough investigation of the law and facts relevant to plausible options in this case.   We find that when the *Jemal* stipulation was initially addressed, trial counsel discussed the issue with experienced co-counsel, Robert Sambroak.   We find that trial counsel clearly perceived the difference between the benefit that the *Jemal* stipulation provided to Barnette versus McCoy.   We find that after Ms. Diggs and her co-counsel debated the wisdom of their consistent defense strategy, she took the matter under advisement. (Tr. Evidentiary hearing, 9/16/03, p. 11;  Sambroak Affidavit).[1]   We find that although the *Jemal* stipulation concept was initially unfamiliar to Ms. Diggs, she researched the issue before agreeing to stipulate.  (Tr. Evidentiary hearing, 9/16/03, p. 11) Likewise, we find that Ms. Diggs sought out the advice of a senior colleague within the Federal Public Defender's office.  We find that the notes admitted at the evidentiary hearing reflect the thorough consideration that trial counsel made of the matter.  In this regard, we find that Ms. Diggs not only initially researched and considered the wisdom of the *Jemal* stipulation, her notes reflect that she re-evaluated the decision and considered the

---

[1]We find that Ms. Diggs' decision to defend the case and stipulate as she did was not the product of undue influence by Barnette's counsel.  Mr. Sambroak's affidavit reflects reasoned discussions between Ms. Diggs and Mr. Sambroak.   There is no support for a claim that Ms. Diggs was unduly influenced by co-counsel.  In fact, Ms. Diggs testimony does not even suggest any undue influence on Mr. Sambroak's part.

consequences of not stipulating. In light of our finding above that the stipulation did provide a benefit to her client, and that the defense she mounted was professionally reasonable, we find that after she re-evaluated the stipulation and decided not to withdraw it, that this decision was reasonable as well. We again find that trial counsel's current claim that she found herself bound by a stipulation that she did not know how to get out of incredible. We cannot believe that even after discussing the matter with her colleagues, that she found herself unable to correct an apparent wrong. Rather, we find that counsel wisely chose a trial strategy and wisely reaffirmed that strategy after reconsideration. We note that not until she reviewed the record in preparation for the evidentiary hearing, did trial counsel realize that this Court rejected the 404(b) evidence of prior drug dealing independent of the *Jemal* stipulation. (Tr., Evidentiary hearing 9/16/05, p. 14.) Therefore, trial counsel's decision not to withdraw the stipulation is all the more reasonable, because at the time, she would have believed that the stipulation not only kept out the prior conviction, but that it also caused the court to exclude the evidence of a prior drug dealing relationship between McCoy and Barnette.

Thus, we conclude that McCoy has failed to establish the first prong of the *Strickland* standard because he has failed to establish that his attorney's performance was, under all the circumstances,

unreasonable under prevailing professional norms.

## 2. Prejudice

In our original Memorandum Opinion in this case, we rejected McCoy's claim of ineffective assistance of counsel based on the prejudice prong alone and found "that McCoy has not shown that he was prejudiced by [Ms. Diggs'] conduct within the meaning of *Strickland*." (Memorandum Opinion, 5/22/03, p. 26.)  Having previously found a lack of prejudice, we now reevaluate that determination in light of the testimony offered at the evidentiary hearing.  We now find, after the evidentiary hearing, that even if counsel's performance were deemed to be deficient, McCoy has again failed to establish prejudice under *Strickland*.  The testimony and exhibits offered at the evidentiary hearing failed to establish that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different.

As part of our prejudice analysis, we find that the entire notion that the *Jemal* stipulation resulted in  McCoy's conviction even if McCoy did not know what was in the duffel bag is plainly wrong.  As the Third Circuit recognized, the *Jemal* instruction was permissive and did not alleviate the government from its burden of proving beyond a reasonable doubt that McCoy "possessed" the items knowingly.  The court's instruction clearly told the jurors that "possession" required proof that the possession was "knowing."  The

court explained to the jury that an "[a]ct is done knowingly if done voluntarily and intentionally and not because of mistake or accident or other innocent reason." (Tr., Volume VI, p. 124). In addition to the stipulation, and contrary to McCoy's current claim that the stipulation "denied him his principal defense," we further instructed that "[m]ere proximity to illegal drugs, mere presence on the property where drugs are located, or mere association with the drugs, without more, is not sufficient to support a finding of possession." *Id.* Thus, we instructed the jury that McCoy's mere physical possession of the bag was insufficient, without more, to prove possession. The court instructed the jury further, however, that "a person's proximity to the drugs, presence on the property where the drugs are located, and association with the drugs is evidence that you may consider to support a finding of possession when accompanied by testimony connecting the defendant with the incriminating circumstances." *Id*. Thus, the stipulation did not deny McCoy his principal defense. In light of the permissive nature of the instruction, we find that the *Jemal* stipulation may have served to keep the government from attempting to introduce certain incriminating evidence, but it did not completely alleviate the government from its burden of proving knowledge and intent.

Our original findings concerning prejudice remain firm today:

> McCoy claims that, in light of the government's proof, trial counsel should have done a number of things differently, *to wit*: she should have conceded that McCoy physically carried the duffel bag off the bus in Erie;

she should have disputed his knowledge and intent as to
the PWID counts; she should have painted McCoy as an
unwitting stooge and likened his status to that of
McQueen and Grier, who were never charged in this case;
and she should have pursued a defense antagonistic to
that of Barnette by attempting to show that the drugs and
guns belonged to Barnette and that he alone intended to
possess and distribute the drugs.

Even assuming that Ms. Diggs had pursued this tack,
we are not persuaded that there is a reasonable
probability that McCoy would have been acquitted on the
drug charges because, for one thing, McCoy has not shown
that the nature of the government's proof and the
evidence presented by the defense would have
significantly changed. McCoy claims, for example, that
Kendrick Grier should have been called as a defense
witness to establish that: Grier was with Barnette in
Detroit when the blue duffle bag (which had already been
packed) was picked up at the home of Barnette's aunt;
McCoy was the last person to be picked up on the way to
the bus terminal; there was no discussion at that time
about what was in the bag; the bag was never opened in
front of the others; McQueen carried the bag off the bus
terminal in Cleveland; and McCoy was simply the person
who carried the bag off the bus in Erie. However, most
or all of these facts did come into evidence and were
therefore made known to the jury.

Further, the evidence relative to McCoy's knowledge
and intent would not have significantly changed even if
these elements had been formally contested. In
attempting to prove McCoy's guilt on the conspiracy
count, the government presented evidence chiefly directed
at establishing McCoy's consciousness of guilt and his
ties to Barnette (who was circumstantially tied to the
contents of the bag). There was evidence, for example,
that McCoy traveled under an alias and was in possession
of a beeper registered to another individual. When
questioned by police, McCoy gave a different version of
his alias and claimed that he had traveled to Erie to
meet girls. Upon subsequent questioning, McCoy claimed
that he had come to Erie to meet a girl named "Chereka,"
but could not give any information as to her last name or
address. Even more incriminating was the fact that McCoy
had acted nervously at the bus station and falsely
claimed that he had traveled only with Barnette (whom he
referred to as "Ardell Griffin") but did not know Grier;
later, he changed his story and claimed to have traveled

only with Grier, stating that he did not know Barnette. Perhaps most significantly, McCoy adamantly denied having carried that blue duffel bag and attempted to inch himself away from the bag when approached by law enforcement officers. In terms of tying McCoy to Barnette, the government introduced evidence showing that Barnette had paid for McCoy's ticket (as well as McQueen's and Grier's tickets) and that they had been smoking and talking together at the Erie Greyhound bus terminal. McCoy was also found to be in possession of Barnette's bus ticket, and a number retrieved from McCoy's beeper matched a number that Barnette had within his possession. While this evidence was introduced by the government to prove the illicit conspiracy between McCoy and Barnette, it was also circumstantially demonstrative of McCoy's knowledge of the contents of the bag. Many of these pieces of evidence were challenged by the defense as to the conspiracy charge[2]; however, in the end, the jury found this evidence credible enough to establish McCoy's guilt on the conspiracy charge beyond a reasonable doubt. McCoy has not demonstrated any reasonable probability that the outcome would have been different relative to the PWID charges, even if Ms. Diggs had pursued the trial strategy he now advocates.

Assuming the jury found that McCoy had knowledge of the drugs and guns within the bag, his intent to distribute the drugs would have been easily established. The street value of the drugs, their packaging, the baggies found along with the contraband, the presence of drugs, McCoy's use of a pager, and the group's arrival in route from Detroit were all circumstantial factors that, according to the jury, established an illicit plan to possess and eventually distribute the drugs. Here again, McCoy has not shown any reasonable probability that his preferred trial strategy would have resulted in an acquittal on these charges.

Moreover we do not agree with McCoy's assertion that he received no benefit from the *Jemal* stipulation. At the very least, all parties agree that the nature of McCoy's previous felony conviction for possession of a

---

[2]

As discussed, *supra*, the defense introduced witnesses to account for McCoy's possession of the beeper, his use of the alias, and his reason for traveling to Erie.

concealed weapon was kept from the jury as a result of the stipulation.[3]    Although McCoy places little significant on this prior conviction, we perceive at least some potential benefit to McCoy as a result of keeping this information from the jury.  Had the jury known of McCoy's prior involvement in concealed weapons, this arguably could have prejudiced McCoy's (successful) defense as to the firearms charge at Count 5, especially since the firearms in this case were wrapped up in a concealed fashion within the blue duffel bag.    In addition, because a jury may well have inferred that McCoy's prior weapons conviction involved a firearm and because there was expert testimony in this case establishing guns as common tools of the drug trade, admission of McCoy's prior weapon conviction could have prejudiced his defense as to the drug counts as well.

    We also note the government's point that the stipulation in actuality provided very little benefit to the government in terms of proving its case.    The government never relied on the stipulation in arguing its proof relative to Counts 2 and 3.    Furthermore, the Court's instructions to the jury were "permissive" in the sense that they allowed - but did not require - the jury to find the elements of knowledge and intent, consistent with the stipulation.  Elsewhere, the Court informed the jury as to the elements of the PWID charges and instructed the jury that "possession" of the duffel bag would require proof that McCoy's possession was "knowing" - i.e., done voluntarily and intentionally and not because of mistake, accident, or other innocent reason. (*See* Tr. Vol. IV, p. 124).

    McCoy's present counsel insists that Ms. Diggs should have likened McCoy's status to that of McQueen and Grier who were never charged with criminal wrongdoing. However, the record in this case included considerable evidence of McCoy's consciousness of guilt, his possession of a beeper in another person's name, and circumstantial ties to Barnette (his possession of Barnette's train ticket, Barnette's possession of the phone number retrieved from McCoy's beeper) - which

---

[3]

As with Barnette, the parties stipulated to the *fact* of McCoy's predicate felony conviction for purposes of Count 5, but the *nature* of the offense was kept from the jury.

arguably distinguished him from McQueen and Grier.
Moreover, it is not clear to what extent McCoy's counsel
would have been permitted to pursue this strategy, given
the risk that McCoy's criminal proceedings would have
devolved into collateral criminal trials.[4]

    In sum, taking all of present counsel's arguments
into account in light of the record, McCoy has not
established a reasonable probability that, but for the
alleged errors of his trial counsel, he would have been
acquitted on Counts 1, 2 and 3 of the Superseding
Indictment. ...

(Memorandum Opinion, 5/22/03, pp. 26-30).

    The testimony of trial counsel at the evidentiary hearing does
not change this Court's finding concerning the absence of prejudice
under *Strickland*.  Even if the *Jemal* stipulation impacted the
jury's finding of guilt on the substantive charges of possession
with intent to distribute the drugs in counts two and three of the
superseding indictment, the *Jemal* stipulation had no impact on the
conspiracy conviction at count one.  Although trial counsel
testified that she currently believes that the *Jemal* stipulation
applied to the conspiracy count, this Court and the Third Circuit

---

    [4]

As to the criticism that Ms. Diggs should have sought to
differentiate McCoy as much as possible from Barnette by, e.g.
advocating the admission of Barnette's prior bad acts evidence at
trial, this strategy is somewhat dubious.  First, it is not at all
clear that McCoy's counsel would have had proper standing to argue
the admission of Barnette's prior bad acts evidence.  Even if she
did, McCoy has not demonstrated a reasonable probability that the
evidence would have been admitted.  We are aware of no basis that
would have changed this Court's ruling on the 404(b) evidence
proffered against Barnette, nor do we have any basis for concluding
that Mr. Sambroak would have withdrawn his client's *Jemal*
stipulation, even if McCoy's counsel had pursued a defense adverse
to that of Barnette.

recognize that it did not. (Tr., Evidentiary hearing, 9/16/03, p. 59; Third Circuit Opinion, p. 6 (*Jemal* stipulation did not extend to the conspiracy count)). We find, as the Third Circuit found in McCoy's direct appeal, that there was substantial evidence of McCoy's guilt as to the conspiracy count. Since the *Jemal* stipulation did not apply to the conspiracy count, it cannot be said that entering into the *Jemal* stipulation prejudiced McCoy as to the conviction on that count. We find that the sentencing guideline range that applied to the conspiracy charge under U.S.S.G. Section 2D1.1 was the same as the sentencing guideline range that applied to the substantive drug charges. Therefore, even if McCoy achieved a reversal of his convictions on the substantive charges, the conspiracy conviction was not impacted by the *Jemal* stipulation, and the sentence at that count would remain intact. We find that McCoy would not be entitled to a new trial.

To the extent that McCoy claims that counsel's unjustified concession to the elements of knowledge and intent in the *Jemal* stipulation altered the outcome of these proceedings by removing the elements of intent and knowledge from consideration by the jury, his claim has already been rejected by the Third Circuit. For the same reasons the Third Circuit found no prejudicial error in the jury instructions on direct review, this Court finds no prejudice under *Strickland*.

As we found when we originally rejected McCoy's challenge, the

jury's verdict itself evidences the jurors understanding that they should separately consider each element, and were not restricted by the *Jemal* stipulation.  In this respect, if the *Jemal* stipulation had the prejudicial impact that McCoy now asserts, then there is no plausible explanation why the jury convicted McCoy on counts two and three, yet refused to find McCoy guilty of possession of a firearm at count five.  Although we hesitate to attempt to read meaning into the jury's verdict as to count five, we do find that if the stipulation was as damning as McCoy now claims, then he likely would have been convicted of that count as well.  This is so because if the jury merely focused on physical possession of the bag (which McCoy now claims the stipulation forced them to do) as opposed to focusing on the court's instruction on the law concerning the term "possession", then if McCoy merely held the bag he would have been guilty of possessing both the drugs and the guns.  We find that the stipulation had no such damning effect and McCoy has not proven prejudice.

## IV.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the government respectfully requests that the petitioner's motion be denied.

Respectfully submitted,
MARY BETH BUCHANAN
United States Attorney


/s/ Marshall J. Piccinini
MARSHALL J. PICCININI
Assistant U.S. Attorney
PA ID No. 56362

37