**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA    )
                                )     Criminal Action No. 98-5 Erie
        v.               )
                                )     Civil Action No. 02-182 Erie
MARCRESSE McCOY            )

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

McLAUGHLIN, SEAN J., DISTRICT J.,

      This matter arises from a petition filed by the Defendant, Marcresse McCoy,

pursuant to 28 U.S.C. § 2255 challenging his conviction and sentence for certain drug-

related offenses.  On May 20, 2003, this Court entered a Memorandum Opinion and

Order dismissing McCoy's petition.  On June 6, 2005 the Third Circuit Court of Appeals

reversed that decision and remanded the matter back to this Court with instructions that

we hold an evidentiary hearing on McCoy's claim that his trial counsel, Khadija Diggs,

Esq., was ineffective.  The circuit court's mandate was entered on the district court

docket on July 6, 2005, and an evidentiary hearing was held before the undersigned on

September 16, 2005.  Because this Court's ruling on McCoy's § 2255 claim must be

made in the context of the entire case, we set forth below in some detail the relevant

background and procedural history.


Background Facts

      On the afternoon of March 17, 1998, an informant by the name of Terry

Seigworth disclosed to agents of the Erie Area Gang and Law Enforcement ("EAGLE")

Task Force that he had received a phone call earlier that morning from an individual

named Joseph Barnette, also known to Seigworth as "Egygt."  (Trial Transcript,

1

hereinafter "Trial Tr.," Vol. 2 at pp. 41-42, 69.)[1]  Barnette had indicated to Seigworth that he would be arriving in Erie, Pennsylvania on a Greyhound bus at 5:15 p.m. and asked Seigworth to pick him up at the bus station.  (Id. at 42, 52, 56, 70.)  According to Seigworth, Barnette had also indicated that he would be "bringing something" with him. Seigworth understood that "something" to mean crack cocaine.  (Id. at 42, 52-53, 70.) Based on this information, Eagle Task Force agents established surveillance at the bus station.  (Id. at 70-71.)

Upon his arrival, Barnette departed the bus with no bags, hurriedly made his way out the front door of the bus terminal, and began surveying the area.  (Trial Tr. Vol. 2, pp. 87-88; Vol. 3, pp. 29-30, 37-38.)  Shortly thereafter, three other black males carrying various bags departed the bus, exited the terminal through the front door, and set their bags on the sidewalk near Barnette.  (Trial Tr. Vol. 2, pp. 104-05; 112; Vol. 3, pp. 31-34, 162.)  One of the individuals, later identified as Kendrick Grier, carried two garbage bags.  (Trial Tr. Vol. 3, p. 195.)  Another member of the group, later identified as Michael McQueen, carried a blue plastic bag.  (Trial Tr. Vol. 2, pp. 104-05, 108, 111; Vol. 3, pp. 30-33, 70.)  The fourth member of the group, later identified as Defendant McCoy, was observed by two Erie police officers – Sergeant Robert Liebel and Sergeant Joseph Kress – carrying a blue duffel bag from the terminal and placing it on the sidewalk at his feet.  (Trial Tr. Vol. 3, pp. 33-35, 195-96.)  According to Sgt. Kress, McCoy – like Barnette –  appeared to walk in a hurried manner.  (Trial Tr. Vol. 3, p. 56.)

Once outside, the four men were observed sharing cigarettes and talking as if they knew each other.  (Trial Tr. Vol. 2, pp. 92, 104; Vol. 3, pp. 35, 70, 82, 196-97; Vol.

---

[1] References to the trial transcript are indicated by the volume number which corresponds to the day of trial, i.e.:  Trial Tr. Vol. 1 (10/27/98 [Doc. # 135]), Trial Tr. Vol. 2 (10/28/98 [Doc. # 136]), Trial Tr. Vol. 3 (10/29/98 [Doc. # 137]), Trial Tr. Vol. 4 (10/30/98 [Doc. # 138], Trial Tr. Vol. 5 (11/2/98 [Doc. # 139]), Trial Tr. Vol. 6 (11/3/98 [Doc. # 140]), Trial Tr. Vol. 7 (11/4/98 [Doc. # 141]).

4, p. 25.) They also appeared to be scanning the parking lot in a suspicious fashion. (Trial Tr. Vol. 3, p. 35, 38.) After a moment, Barnette went inside to use the pay phone and then returned outside and stood with the group. (Trial Tr. Vol. 3, p. 69; Vol. 4, pp. 27-30.) Officers then approached the four men. (Trial Tr. Vol. 2, p. 154; Vol. 3, pp. 35-38; Vol. 4, pp. 28-29, 31, 38.)

As officers questioned the individuals separately, they received conflicting information. Barnette, for example, initially identified himself as "Ardell Griffin" and denied traveling with any of the other individuals. (Trial Tr. Vol. 2, p. 109, 155; Vol. 4, pp. 33-36.) However, when Detective Daniel Spizarny questioned McCoy, McCoy represented that his name was "Mark Chin" and stated that he was traveling with the others, specifically identifying "Ardell Griffin" (meaning Barnette) and "Mike" (meaning Michael McQueen). McCoy initially stated that he did not know the name of the individual later identified as Kendrick Grier. (Trial Tr. Vol. 4, p. 32-33, 47-48.) Grier, when questioned, identified himself as "Carlton Davidson" and admitted to traveling with the others. (Trial Tr. Vol. 2, pp. 107-08, 114-15.) Michael McQueen identified himself by the name "Demetriu." (Trial Tr. Vol. 4, p. 48.)

While officers were attending to members of the group, Sgt. Kress took McCoy aside and questioned him directly as to his identification and purpose for travel. (Trial Tr. Vol. 3, pp. 41-43, 73.) McCoy produced only a bus ticket in the name of "Mark Shinne" and identified himself by that name, giving two different spellings of his name – "Chinne" and "Shinne." (Id. at pp. 44, 59.) At this point, McCoy appeared to be extremely nervous. When asked about the purpose of his trip to Erie, he was somewhat evasive, indicating that he had heard "there were a lot of girls that he could meet here." (Id. at 44-45.) When questioned whether he was traveling with anyone else, he indicated that he knew "Ardell Griffin." (Id. at p. 45.)

Meanwhile, Barnette returned inside the terminal and attempted to place a call at a payphone, his hand visibly shaking. (Trial Tr. Vol. 4, pp. 33-34, 36.) When Detective Daniel Spizarny approached him and asked whether he was "Joseph Barnette," he appeared stunned but denied that that was his name. (Trial Tr. Vol. 4, pp. 33-34.) When Detective Spizarny confronted him with another alias that he had used in the past (i.e., "Ramone Griffin"), Barnette finally acknowledge his true identity, but denied traveling with anyone. (Trial Tr. Vol. 4, pp. 34-36.)

The task force officers then inquired about ownership of the bags that had been carried off the bus. McCoy promptly claimed ownership of the garbage bags that Grier had carried and gave officers permission to search them. (Trial Tr. Vol. 2, pp. 110-111, 143; Vol. 3, pp. 50, 94, 161, 183.) The two garbage bags contained shoes, shoe boxes and wet clothing. (Trial Tr. Vol. 2, pp. 94, 96-97, 99; Vol. 3, pp. 50, 161; Vol. 4, pp. 15, 23-24, 48-49.) McQueen claimed the remaining garbage bag, which was found to contain clothing. (Trial Tr. Vol. 2, pp. 94-95, 97, 111.) Only the blue canvas duffel bag remained unclaimed, and all of the group members denied owning it or knowing anything about it. (Trial Tr. Vol. 2, pp. 111-13; Vol. 3, pp. 46-47, 161-62, 172-73.) Since the bag rested at McCoy's feet (Trial Tr. Vol. 2, pp. 104-05; Vol. 3, pp. 172-73), officers questioned McCoy whether he had carried the bag. He specifically denied carrying it. (Trial Tr. Vol. 2, p. 114; Vol. 3, p. 116.)

Officers then proceeded to conduct a search of the duffel bag. Inside they found a 9 mm pistol wrapped in a towel and a .380 caliber pistol covered with a white wash cloth and stuffed inside a pair of jeans. (Trial Tr. Vol. 2, p. 116; Vol. 3 at p. 164.) Officers also recovered a brown paper bag containing several empty plastic baggies and 270 tiny Ziplock baggies storing what appeared (and later proved to be crack cocaine. (Trial Tr. Vol. 2, pp. 120-22; Vol. 3 pp. 162-63.) In addition, officers retrieved a large Ziplock baggie containing approximately one pound of marijuana. (Trial Tr. Vol.

4

2, p. 119; Vol. 3, p. 163.)  The duffel bag also contained miscellaneous items of name-brand clothing, including a pair of FUBU jeans and a pair of Nike Penny Hardaway high-top basketball shoes.  (Trial Tr. Vol. 2, pp. 117-18.)

Upon the officers' recovery of the contraband, the four men were placed under arrest and brought to the Erie Police Department, where their personal effects were inventoried.  (Trial Tr. Vol. 2, p. 123.)  The evidence revealed that each of the four men had traveled from Detroit to Erie with bus tickets issued under an alias:  Barnette's ticket was in the name of "Ardell Griffin," McCoy's ticket was in the name of "Mark Shinne," Grier's ticket was in the name of "Carlton Davidson," and McQueen's ticket was in the name of "Demetriu McQueen."  (Trial Tr. Vol. 4, pp. 61-62, 70, 74.)  All of the tickets had been purchased that day within four minutes of each other.  (Id. at pp. 70-71.)  McCoy was found to be in possession of Barnette's bus ticket along with his own ticket.  (Trial Tr. Vol. 4, pp. 66-67, 74.)  He was also in possession of a beeper registered to a Detroit address under the name of "Marshal Divine."  (Id. at p. 68; Trial Tr. Vol. 4, pp. 93-95.)  One of the numbers retrieved from the pager matched a number written on a piece of paper that was recovered from Barnette's pocket.  (Trial Tr. Vol. 4, p. 73.)[2]

At the police station, McCoy was given his Miranda rights by Pennsylvania State Trooper Anthony Bozich.  After waiving those rights, McCoy was asked to sign a form acknowledging the waiver.  (Trial Tr. Vol. 3, p. 166.)  At that point, McCoy asked Trooper Bozich what name he should sign the form under, to which Trooper Bozich replied that McCoy should use his "true" name.  (Trial Tr. Vol. 3, p. 169.)  McCoy then inquired what name he had been arrested under and was again advised by Trooper

---

[2] The common phone number was registered to a female by the name of Lashana Johnson, a resident of Detroit.  (Trial Tr. Vol. 4, pp. 87, 95-96.)  There is no evidence or allegation that Ms. Johnson is somehow connected with the events of March 17, 1998.

Bozich to simply sign his true name.  (Id.)  McCoy signed the form under the name "Marcresse McCoy."  (Id.)  He then gave a statement to Trooper Bozich in which he denied any involvement with the drugs and indicated that he had traveled to Erie for the purpose of seeing a girl named "Chereka."  (Id. at p. 169.)  McCoy could not provide Trooper Bozich her last name or address, indicating only that she lived in the Franklin Terrace apartments.  (Id.)  When asked why he had purchased a ticket in the name of Mark Shinne, he indicated that his nickname was "Mark" and his mother's maiden name was "Chin."  (Id. at p. 170.)  When asked whom he was traveling with from Detroit, McCoy claimed that the only person he knew amongst the four was the individual he knew only as "Carlton" (meaning Grier).  (Id.)  He denied knowing Barnette or McQueen and claimed that "Carlton" had purchased both their tickets in Detroit.  (Id. at pp. 170-71.)  As to the bags in question, McCoy claimed that he had traveled only with the two garbage bags which he had identified at the bus station.  (Id. at p. 171.)

At some point after Grier and McCoy had been placed in the same holding cell, McCoy asked to speak with F.B.I. Special Agent Shawn VanSlyke.  (Trial Tr. Vol. 2, pp. 123-27.)  McCoy gave Agent VanSlyke the same explanation that he had given to Trooper Bozich for using "Mark Chin" as an alias.  (Id. at p. 125.)  He again admitted traveling to Erie with Grier, but (contrary to his original statement to Detective Spizarny) continued to insist that he did not know Barnette or McQueen.  (Trial Tr. Vol. 2, p. 125.)  In fact, he claimed that he had "only met the guy in the red jacket" (meaning Barnette) on the bus when Barnette asked him for a cigarette.  He was adamant in insisting that he and Grier had traveled together and that he did not know the other two individuals. (Id.)  During this conversation with Special Agent VanSlyke, McCoy was looking to Grier for support.  However Grier, having previously admitted to officers that all four individuals had traveled together, kept his head down and declined to make any comment.  (Id. at pp. 126-27.)

Ultimately, Grier decided to cooperate with the law enforcement agents and later testified at the Defendants' trial concerning his account of the day in question. Following his arrest, Grier disclosed his true identity and informed the agents that he had escaped from a half-way house in Detroit and was on the run when Barnette, an old friend, offered to take him to Erie.  (Trial Tr. Vol. 3, pp. 88-91, 95, 117-18, 127.) Grier and Barnette had made plans a couple days prior to March 17, 1998 to meet at the home of Barnette's Aunt Lee-Lee.  (Id. at p. 98.)  When Grier arrived at her home on the morning of March 17, 1998, he observed a blue canvas duffel bag already packed and lying on the floor.  (Id. at 98-99.)  Grier denied having any luggage of his own, explaining that he resisted returning to his own home for clothes because he knew that "bounty hunters" were looking for him.  (Id. at 90-91, 94-95.)  Grier's claim that he had traveled without any baggage was consistent with his bus ticket, which did not account for baggage.

After Grier arrived at the home of Barnette's aunt on the morning of March 17, he and Barnette left, without the blue duffel bag, to pick up McQueen and McCoy.  (Trial Tr. Vol. 3, p. 99.)  McCoy brought two garbage bags with him, while McQueen brought a blue garbage bag.  (Trial Tr. Vol. 3, p. 99.)  The four men then stopped back at Barnette's aunt's house to pick up the duffel bag before traveling to the bus station. (Trial Tr. Vol. 3, pp. 99, 103.)  According to Grier, Barnette carried the duffel bag into the terminal and provided cash for each person's ticket.  (Id. at pp. 95, 103.)  Barnette gave McCoy money with which to purchase tickets for himself and Grier, while Barnette purchased tickets for himself and McQueen.  (Id. at p. 95.)  The tickets were purchased from the same ticket counter within four minutes of each other and within seven minutes of the bus's scheduled departure.  (Trial Tr. Vol. 4, pp. 70-71, 84.)

From Detroit, the group traveled to Cleveland, where they changed buses en route to Erie.  (Trial Tr. Vol. 3, pp. 103-04.)  According to Grier, the blue duffel had been

placed in the luggage compartment during the trip from Detroit to Cleveland but was claimed in Cleveland. (Trial Tr. Vol. 3, pp. 132-33.) While Grier believed that McQueen might have handled the duffel bag for a period of time in Cleveland, he recalled that McQueen turned the bag over to Barnette during the changeover in Cleveland and that Barnette had carried the bag during the Cleveland portion of the trip. (Id. at 105, 129, 133-34, 137.) Based on his observations of the origination and handling of the blue duffel bag, Grier concluded that it belonged to Barnette. (Id. at 104-05.)

Grier further disclosed that, during the bus trip, Barnette made several noteworthy statements. At one point, while addressing McQueen and McCoy, Barnette made a comment about "fixing to get paid" or "we're going to get some money," apparently referring to the fact that a white male in Erie owed Barnette money. (Trial Tr. Vol. 3, p. 105-06, 134-35.) Barnette also advised Grier that he (Barnette) had "a couple of joints," but he never disclosed to Grier the full extent of the contraband in the bag. (Id. at p. 104.) In addition, Barnette commented that the black Penny Hardaway basketball shoes Grier was wearing on the day in question were "just like" a pair that Barnette owned. (Id. at 119.) This latter remark was particularly significant because one of the items recovered from the blue duffel bag was a pair of black Penny Hardaway high-tops which were roughly Barnette's size and uniquely similar to those worn by Grier on March 17, 1998. (Trial Tr. Vol. 2, pp. 161-62, 169-72.)

Upon arriving in Erie, McCoy asked Grier to carry his two plastic garbage bags off the bus, and McCoy carried the blue duffel bag. (Trial Tr. Vol. 3, pp. 106-07, 132, 136.) Grier observed not only that McCoy carried the blue duffel bag upon the group's arrival in Erie, but that he stood closest to the bag while the group gathered in front of the bus terminal. (Id. at 106-07, 130-31.) While they were standing out in front of the bus terminal, Grier noticed a couple of the officers (still, at this point, undercover) and suggested to McCoy that they might be law enforcement. In reply, McCoy make a

remark to the effect that "all the police down here wear uniforms." (Id. at 110.)  Shortly
thereafter, the police approached. (Id.)  While they were questioned by the officers,
Grier observed that McCoy specifically denied having carried the blue duffel bag and
Barnette specifically denied owning it. (Id. at 116.)

The Indictment

On April 14, 1998 Barnette and McCoy were charged in a three-count indictment
with federal drug offenses.  [See Doc. # 1.]  A superseding indictment was filed in June
of 1998, adding additional firearms-related charges.  [See Doc. # 34.]  At Count 1,
Barnette and McCoy were charged with conspiring to distribute and possess with the
intent to distribute crack cocaine and marijuana.  At Count 2 both Defendants were
charged with possession with the intent to distribute in excess of 50 grams of crack
cocaine.  At Count 3, the Defendants were charged with possession with the intent to
distribute less than 500 grams of marijuana.  At Counts 4 and 5, Barnette and McCoy
were respectively charged with being convicted felons in possession of a firearm.

Pre-Trial Proceedings

    *i. The Government's Notice of Intent to Use Rule 404(b) Evidence*

On October 14, 1998, the government filed its notice of intent to use certain
evidence under Fed.R.Evid. 403 and 404(b) relative to the Defendants' prior bad acts.
[See Doc. # 63.]  Specifically, the government sought to introduce evidence:

> 1.  that Barnette sold crack cocaine in Erie, Pennsylvania on a
> number of occasions prior to March 17, 1998, that he had distributed this
> crack cocaine in small, zip-lock type baggies, similar to the ones found in
> the blue canvas bag at issue in the present case, that Barnette was
> obtaining his crack cocaine for distribution in the Erie area from Detroit,
> Michigan, that Barnette possessed large quantities of cocaine and
> marihuana with the intent to resell it on these prior occasions, and that
> during these occasions he always carried a handgun;

9

2.  that McCoy was an associate of Barnette's who sold cocaine for Barnette on previous occasions in Erie in the months preceding the March 17, 1998 arrest date;

3.  that Barnette has a 1993 felony drug conviction for dealing in cocaine in the State of Indiana;

4.  that McCoy has a 1991 felony conviction for carrying a concealed weapon (handgun) in Michigan under the name of Jerron McCoy; and

5.  that the guns in the blue duffel bag, which were the subject of Counts 4 and 5, were not registered to either Barnette or McCoy and had been reported stolen.

(Id. at pp. 1-3.)  In support of its theory, the government argued that the charges against the Defendants involved "specific intent crimes," that the Defendants had squarely put the issues of their knowledge and intent into contention by virtue of their "not guilty" pleas, and that the 404(b) evidence would be probative as to these issues. (Id. at pp. 6-7.)

    ii.  The October 15, 1998 Pretrial Conference

The following day, the court held a pretrial conference during which the parties addressed the government's 404(b) notice.  The government asserted that evidence of prior drug-dealing by Barnette and McCoy would demonstrate a prior relationship between the two men which would be important to the context of the conspiracy charge and help establish the Defendants' knowledge and intent.  (Pretrial Hrg. Tr. (10/15/98 [Doc. # 175]) at pp. 15, 17.)  Similarly, the government sought to introduce Barnette's prior conviction for dealing in cocaine as proof of his knowledge, intent, and lack of mistake relative to the drug charges at issue.  (Id. at 11-12.)  The government argued that McCoy's prior firearm conviction would be relevant to show his lack of mistake, as well as his knowledge and intent, in possessing the concealed firearms recovered from the duffel bag. (Id. at 14-15.)

10

In response to these arguments, counsel for Barnette, Robert Sambroak, Jr., Esq., indicated that he would "very likely" be entering a stipulation pursuant to <u>U.S. v. Jemal</u>,[3] that could make the issues of knowledge and intent irrelevant to the prosecution's case. (<u>Id</u>. at 18-19.) The government acknowledged that such a stipulation might "dramatically" change its theory as to the 404(b) evidence. (<u>Id</u>. at 18.)

The following discussion then ensued between the Court and Ms. Diggs:

THE COURT: ... [Y]ou have just heard Mr. Sambroak indicate a possibility that his client would enter into a <u>Jemal</u> stipulation with respect to intent. Without holding you to any decision one way or the other, is there some possibility we may see the same thing from your client?

MS. DIGGS: There's always a possibility, so I don't want to say no, and I'm certainly willing to try to look at that and consider it. I appreciate what Mr. Sambroak said, however, in Mr. McCoy's case, I think it's a little different. Mr. McCoy doesn't have a prior conviction for drug trafficking. Mr. McCoy has a prior conviction for carrying a concealed weapon. So I would need to look at how a stipulation would affect him since there's a little variation on how the prior bad acts that the government proposes to put on with reference to some evidence of drug dealing involving these two people before March 17th would impact, but I'm perfectly willing to look at the possibility of that. And that was my first thing I wanted to address to the court is Mr. McCoy doesn't have a prior conviction that could be set forth to say here's an indication of knowledge and intent. So to allow the government to put forth evidence which we know means Mr. McCoy has previously in the Erie area been involved in drug trafficking with Mr. Barnette, does exactly what the rules prohibit, it allows the jury to then say, well, if he's done it before, then surely he's doing it again. That really is the only legitimate effect that is directed against Mr. McCoy. With reference to carrying a concealed weapon conviction, which Mr. McCoy does have, and the government desires to put that forward as a prior bad act, I think potentially that results in a trial. Because then we would need the opportunity to say this prior conviction was extremely different circumstances then [sic] this gun related matter that the government is putting forth now. The government argues that Mr. McCoy was charged with the firearms, pled and was convicted of one. And they want to compare that to the firearms being found in the duffel bag. However, the prior conviction involved the firearms on Mr. McCoy's person. Not something wrapped in the bag or wrapped in the towel in the duffel bag and some carry on luggage. I think the circumstances are very different and, once again, it's clear that the government's purpose here is to tell the jury this person has been in possession

---

[3] <u>See</u> <u>United States v. Jemal</u>, 26 F.3d 1267, 1268-69, 1274 (3d Cir. 1994) (holding that a defendant may prevent the government from putting on evidence of the defendant's prior bad acts by offering a comprehensive and unreserved stipulation that he possessed the knowledge, intent, motive, opportunity, or other fact sought to be established by the proffered Rule 404(b) evidence).

of guns before, therefore, you should believe that they're in possession of guns now. I don't quite understand under what circumstances or by what means the government would attempt to put on this evidence of some prior drug trafficking. I think in the interest of fairness and due process, we should be told, well, where is this evidence or who is this evidence coming from of prior drug trafficking because, frankly, if it's as clear as that, it shouldn't be a prior bad act, it should be part of the conspiracy that the government is alleging involving these two same parties. So to me this is just a very blatant attempt to do what would I [sic] generally call smear the defendants. It's an opportunity for the government to say, look, they've been bad before, so you should believe they're being bad now. ...

THE COURT: Let me make sure I understand the thrust of the defense insofar as the duffel bag is concerned. I gather [the defense is] it's not my bag, I don't know anything about that bag, is that right?

MS. DIGGS: Correct.

THE COURT: I'm going to let you pursue that with your client, see what you want to do.

MS. DIGGS: Thank you.           ***

THE COURT: .... Ms. Diggs, ... let someone on my staff know by Monday [October 19, 1998] whether or not your client is going to pursue a <u>Jemal</u> stipulation.

MS. DIGGS: Yes, I will.

THE COURT: Because it's going to be important on how I rule on this 404(b) material. ...

(<u>Id</u>. at pp. 21-23, 25.)


    *iii. The Government's Supplemental Notice*

On Friday, October 16, 1998, the government filed a supplemental notice of intent to use Rule 404(b) evidence. [<u>See</u> Doc. # 74.] In that notice, the government advised that, notwithstanding the Defendants' possible entry of a <u>Jemal</u> stipulation,

[t]he government would still seek to admit the prior drug transactions engaged in by Barnette and McCoy and their prior relationship with one another to establish the parameters and circumstances surrounding proof required to show the conspiracy and that these two had acted in concert with an unlawful purpose.
The prior drug transaction of Barnette and McCoy, and their prior relationship would also be utilized to demonstrate defendant McCoy's consciousness of guilt. If the court will recollect, McCoy denied even

12

knowing who Barnette was and having any association with him whatsoever.  If the government can establish that McCoy had a prior association with Barnette, particularly one involving the sale of cocaine, this would demonstrate McCoy's consciousness of guilt in his denial of knowing co-defendant Barnette.  The obvious and logical inference and one the government would be entitled to utilize, would be that McCoy's denial of knowing Barnette was only done because of McCoy's knowledge of the conspiratorial relationship he (McCoy) was seeking to protect.

(Id.)

### iv.  Barnette's <u>Jemal</u> Stipulation

On Monday, October 19, 1998 – the deadline which the Court had set for the Defendants' entry of a <u>Jemal</u> stipulation – Barnette and his counsel, Mr. Sambroak, signed a written stipulation.  The stipulation read as follows:

(a)  With regard to the two (2) charges of possession with intent to distribute cocaine and marijuana, I agree and stipulate that in the event the jury finds as a matter of fact that I possessed the blue duffel bag seized at the Greyhound Bus Station in which the drugs were found, then the jury may also find without further evidence that I would know that the substances which were contained in the bag were cocaine and marijuana and further that I intended them.  My defense in this case is that I was not in possession of the bag or the drugs or guns found in it.

By its terms, the stipulation did not extend to the conspiracy charged in Count One of the Superseding Indictment.

### v.  The October 23, 1998 Pretrial Conference

Another pretrial conference was held on October 23, 1998, the Friday prior to the scheduled trial date.  (See Pretrial Hrg. Tr. (10/23/98 [Doc. # 176]).)  At this conference, the government articulated its theory for introducing "signature packaging" evidence – i.e., evidence that, in prior drug transactions, Barnette had packaged his cocaine in a manner uniquely similar to the manner in which the drugs in the blue duffel bag were packaged.  (Id. at 3.)  The government represented that one witness could also implicate McCoy with prior dealing involving this "signature" type packaging.  (Id. at p. 9.)

13

The prosecution asserted that this "signature packaging evidence" was relevant to the conspiracy charge and that it ought to be admitted, notwithstanding Barnette's entry of a Jemal stipulation, because the stipulation did not go far enough: *to wit,* the stipulation did not address "the [Defendants] common plan to distribute the drugs or [the] signature type aspect of the bag" which, in the government's view, tied Barnette to the baggies of crack in the blue duffel bag and thereby helped establish his possession and ownership of it. (Id. at 8.) The government viewed this "signature" evidence as so essential to its case that, without it, the prosecution would be "cut off at the knees." (Id. at 8.) Apart from this "signature packaging" evidence, the government wanted to introduce evidence – notwithstanding Barnette's Jemal stipulation – of the Defendants' drug dealing activities in order to buttress the criminal conspiracy charge at Count One. (Id. at 36.)

Ms. Diggs, for her part, indicated that the Jemal stipulation was still "a problem" from her client's perspective because she still did not know precisely what the intended 404(b) evidence against McCoy consisted of:

> I have a feeling I should be addressing this signature crime information, however, the government has yet to provide us a sufficient proffer.... That's sort of this whole 404(b), takes this whole Jemal stipulation problem, we have yet to be told what the evidence is. It goes back and forth, as far as I can tell, what connects McCoy to these bags, other than the government's witnesses who say he was carrying the duffel bag. I don't know whether to participate in the signature crime business or not because the only thing I heard was something to the effect of some witness is going to relate McCoy to the tiny baggies, what is that?

(Id. at 22.)

In response, the Assistant U.S. Attorney proffered that he was "prepared to tell them everything" about the government's 404(b) evidence except for the witnesses' names, which would be revealed later in the day when the government turned over its Jencks materials. (Id. at 33.)

14

> Basically, I'm telling you everything except the names. Through the summer of '97 and then into the early winter of '98, there were, as I believe the testimony will show, that McCoy, ... sold crack cocaine for Barnette. Now, I'm not saying, your Honor, that it was sold in those signature bags, okay, what I am specifying, in particular, specifying a particular type of drug. And that's important because I'm not just saying he sold drugs for him, I'm saying he sold crack cocaine, of which this case is about. Of which it's a specific intent crime because if you're going to be in agreement, then you have to know the specific purpose of the agreement. And part of that specific purpose was the knowing intent to sell and, further, the distribution of crack cocaine or cocaine base. And this would be one link of relevancy to establish that knowledge and intent as it related to McCoy and Barnette and how crack cocaine was sold. ...

(Id. at 32-33.)

Ms. Diggs continued to insist that, if she could have the specific information concerning McCoy's alleged prior bad acts, then she could meaningfully assess the government's proffer. (Id. at 34.) Thereafter, the Assistant U.S. Attorney made attempts to locate the pertinent witness who could supply specifics as to McCoy's prior bad acts. (Id. at 34, 60.)

Meanwhile, the Court again questioned Ms. Diggs as to whether McCoy intended to enter into a Jemal stipulation relative to the substantive drug counts and the firearm count. The following discussion ensued:

> MS. DIGGS: With reference to the drug count, it is our position that the prior bad acts should not come in anyway. To the extent for the reasons we've already discussed, to the extent that the court is inclined to allow them in then, I believe it would be appropriate to do a Jemal type stipulation because our client would not argue knowledge and intent. That's for the drug count. He would be arguing possession as to the firearm, knowledge and intent are a non-issue there. The firearm is either you are or you are not. A former felon being defined whether or not a prior conviction subjected you to imprisonment exceeding a year.
>
> ***
>
> THE COURT: All right. So what you're telling me is, insofar as Count two, the possession count for cocaine, crack cocaine, and Count three, the possession for marijuana, and Count five, the possession with firearm by a previous convicted felon, you are stipulating on behalf of your client that knowledge and intent need not be proved by the government relative to those counts?

MS. DIGGS:  That's the second thing I'm saying.  The first thing I'm saying is to Counts two and three, McCoy should not even be asked to stipulate based on my understanding of the government's 404(b) proffer because that information is not appropriate as against McCoy.  However, that's the court's discretionary call.

THE COURT:  I want the record to be very clear here.  I'm not asking you to stipulate, I'm not saying you should or you shouldn't, I'm simply doing what I think what <u>Jemal</u>, what the Third Circuit suggests it is useful for the court pretrial to explore the possibility of a <u>Jemal</u> type stipulation.  You're free not to stipulate if you don't want to stipulate.

MS. DIGGS:  That's how I took the court's inquiry, just the way you stated it, that's how I took it.  To the extent that the court is inclined to allow 404(b) evidence in, I believe that McCoy's willingness to stipulate to knowledge and intent, would preclude that 404(b) evidence.  Does that answer the question on Counts two and three, because I don't want to be vague.

THE COURT:  Well, here's the problem.  I haven't ruled on whether it's going to come in or not.  It seems to me you have to make a tactical decision in advance of my ruling in the best interests of the client.  At the end of the day, we still have this conspiracy issue floating around out here.  Now, this much I will say, for instance, I see no basis for the firearm matter absent if intent or knowledge is not in the case.  Insofar as the possession charge is concerned, I see no basis for it and I can't see it coming in.

MR. TRUCILLA:     I would agree if there was a stipulation that knowledge and intent, in other words, he's a prior convicted felon under the definition of what a felon is for the firearm count, there's no other stated purpose other than knowledge and intent.  So a <u>Jemal</u> stipulation would take that out, would only leave possession as the issue.

THE COURT:  Right.

MS. DIGGS:  I agree.

THE COURT:  You agree with what?

MS DIGGS:  I agree that that's accurate and I can present that to my client and will do that.

THE COURT:  So we have identical stipulations then from both defendants with respect to knowledge and intent, is that right?

MS. DIGGS:  Yes.

MR. SAMBROAK:  Yes.

(<u>Id</u>. at 41-44.)

16

Following this discussion, the government made efforts to provide specific details about its 404(b) evidence relative to McCoy. The government estimated that there were 2 or 3 prior drug transactions involving Barnette and McCoy, the most recent having occurred in July of 1997. (Id. at 45, 61, 88.)

Ultimately, the parties agreed during the October 23 pretrial that it would be helpful for the Court to rule "right now" on the admissibility of the government's proffered 404(b) evidence as it pertained to the conspiracy charge, so as to "crystallize" those issues on which the parties were, and were not, in agreement. (Id. at 49.) The Court then ruled that the evidence as to the Defendants' prior involvement in dealing drugs would be excluded on the ground that it was too remote in time relative to the conspiracy alleged in the Superseding Indictment and that its prejudicial effect would outweigh its probative value – i.e., jurors would likely conclude that, because the Defendants had conspired to sell crack cocaine in the past, they have a propensity to have similarly conspired on this particular occasion. (Id. at p. 89-90.) However, the government would be permitted to introduce evidence, more generically, that the Defendants knew one another and had a prior association, contrary to their statements to the police. (Id.) In addition, the Court ruled that the government's "signature evidence" relative to the packaging of the drugs was not unique enough to warrant admissibility. (Id. at 90-91.) Finally, the Court ruled that the government could introduce evidence to establish the *fact* of Barnette's prior conviction and, thus, his status as a convicted felon for purposes of the firearms charge at Count Four; however, in light of Barnette's Jemal stipulation, the government would be restricted from discussing the *nature* of his prior conviction for drug dealing. The Court did not expressly rule on whether the nature of McCoy's prior felony was admissible.

17

*vi. The October 27, 1998 Pretrial Conference*

A final pretrial conference was held on the morning of jury selection.  (See Pretrial Conf. Tr. (10/27/98 [Doc. # 177]).)  During that conference, Ms. Diggs expressed that she was still not clear on what the government's evidence would be relative to a prior (non drug-trafficking) relationship between Barnette and McCoy.  (Id. at 73.)  Ms. Diggs noted, "As far as I can tell, [the government's Jencks material] seems to be related directly to Barnette; is there something we have not been provided yet that talks about a relationship?"  (Id.)  The government acknowledged its evidence was "rather limited" and that there were "only a few witnesses that can say McCoy and Barnette were in fact previous associates."  (Id.)  The government confirmed that these witnesses included, specifically, four individuals as to whom Ms. Diggs had received Jencks materials.  (Id. at 74.)

The government also inquired about the Defendants' Jemal stipulations and how that would be handled, noting, "I have not received this stipulation on behalf of Barnette. I do not have a stipulation for McCoy yet?"  (Id. at 90.)  Mr. Sambroak reported that he had filed a copy of Barnette's stipulation and made it part of the record, although he did not intend for the stipulation to be read to the jury.  (Id. at 90-91.)  The following discussion ensued in the presence of Ms. Diggs, but apparently without any direct input from her:

> THE COURT:  That takes care of that issue.  Because, as I remember my decision, you had an opportunity to review that stipulation, she heard your explanation to the court, she adopted it on behalf of her client.  Since the jury is not going to hear it, we don't have to worry about it.
>
> MR. TRUCILLA:  Before the court fashions what would be read regarding this stipulation, could I have an opportunity to review that?
>
> MR. SAMBROAK:  I don't believe it's necessary to read it, I'm not going to renege on the stipulation.
>
> MR. TRUCILLA:  Since it's a stipulation, as a point of evidence, perhaps it should come in through the court.

18

MR. SAMBROAK:  I'm open to suggestion, it doesn't really matter how we do it.

THE COURT:  This was my suggestion. You've already got your stipulation on the record.  I was simply going to tell the jury in the charge, I was going to tell them what the elements of the crime are and tell them that based upon the stipulation of counsel, the only element you need be concerned with, to the extent this is applicable, would, for instance, be possession.

MR. SAMBROAK:  I think that's the way to go.  I submitted proposed jury instructions — which basically says that, too.

*** 

(Id. at 91-92.)

The Trial

Jury selection in this matter commenced on Tuesday, October 27, 1998 and a verdict was returned on November 4, 1998.

*i. The Government's Case-in-Chief*

In its case in chief, the government called as fact witnesses five different law enforcement officers who had been present at the Greyhound bus terminal on March 17, 1998.  The government also called as a fact witnesses Terry Seigworth and Kendrick Grier.  Collectively, these witnesses testified as to the events of March 17, 1998, as set forth above in our discussion of the background facts.  In particular, Kendrick Grier, Sgt. Joseph Kress, and Sgt. Robert Liebel placed McCoy in actual physical possession of the blue duffel bag upon the group's arrival at the Erie Greyhound terminal.  Special Agent Van Slyke and Kendrick Grier both testified that McCoy had specifically denied ever carrying the bag when questioned by the officers at the bus station.  It was undisputed that all four individuals in Barnette's group had implicitly or explicitly denied any knowledge or possessory interest in the bag when questioned by the police.

19

In addition to the facts discussed in the "Background" section above, other evidence was introduced at trial by the government, including several pieces of evidence that circumstantially tied Barnette to the contents of the blue duffel bag. For one, the government established that Barnette was wearing a FUBU designer jacket on the day of his arrest; FUBU name-brand clothing was also found inside the duffel bag, which appeared to have originated from Detroit.[4]  (Trial Tr. Vol. 2, pp. 117, 161; Vol. 3, p. 100.)

Second, the duffel bag was found to contain a pair of size 10 Penny Hardaway basketball shoes similar to the pair worn by Kendrick Grier on March 17, 1998. (Trial Tr. Vol. 2, p. 118, 145, 161, 169.) This was significant because Grier testified that, during the bus trip, Barnette had noticed Grier's shoes and remarked that he owned a pair just like them; Barnette was not wearing the Penny Hardaway basketball shoes at the time. (Trial Tr. Vol. 3, p. 119.) The government was able to circumstantially establish that the Penny Hardaway basketball shoes recovered from the blue duffel bag were consistent with Barnette's shoe size. (Trial Tr. Vol. 3, at pp. 161-62, 169-70; Trial Tr. Vol. 2, p. 170.)

Third, a witness by the name of Belinda Peterson testified that the 9 mm handgun found in the duffel bag was similar to one she had observed Barnette carrying. (Trial Tr. Vol. 3, pp. 6-7.) Peterson also identified at trial a shoulder holster which Barnette had stored at her apartment. This shoulder holster fit the 9 mm handgun retrieved from the blue canvas duffel bag. (Id. at pp. 13-15.)

Fourth, a witness by the name of Marion Smith testified that another individual named Jerome Henderson had previously been in possession of a .380 caliber handgun identical to the one recovered from the duffel bag. Smith testified that, at a

---

[4]  The duffel bag was found to contain various papers which appeared to be an inventory list of vehicles from a Detroit Police Department auction. (Trial Tr. Vol. 4, p. 78.)

point in time prior to March 17, 1998, Henderson had held the gun overnight.  Smith was able to establish circumstantially that Henderson returned the gun to Barnette the following day.  (Trial Tr. Vol. 3, pp. 22-23.)

Fifth, the trial evidence showed that, while neither of the handguns recovered from the duffel bag were registered either to Barnette or McCoy, the .380 caliber handgun was registered in the city of Anderson, Indiana.  (Trial Tr. Vol. 3, p. 216; Vol. 4, p. 110.)  The government provided testimony from Terry Seigworth, with corroborating documents such as phone records and hotel receipts, to establish that Barnette had a connection to Anderson, Indiana.  (Trial Tr. Vol. 2, pp. 41, 64-65; Vol. 4, p. 110.)

The government's case at trial also included expert testimony from Trooper Bozich concerning certain aspects of the drug trade.  Trooper Bozich established that Detroit is considered a "source city" for narcotics distributed in Erie.  (Trial Tr. Vol. 4, p. 103.)  He also testified that the resale value of the crack cocaine recovered from the duffel bag was approximately $9,400, while the recovered marijuana may have retailed for as much as $4,000.  (Id. at 105, 107-08.)  Trooper Bozich opined that the owner's intent to resell the drugs was evidenced by the various packaging materials contained in the duffel bag and their close proximity to the guns.  (Id. at 104-06, 108.)  In addition, Trooper Bozich testified that beepers and guns, particularly when registered in the name of someone other than their possessor, represent "tools of the [drug] trade."  (Id. at 103, 106-07.)

### ii.  The Defense's Case

Although neither McCoy nor Barnette chose to testify at trial, McCoy presented several witnesses to testify on his behalf.  McCoy attempted to refute his physical possession of the duffel bag by presenting evidence that a prior back injury precluded

him from carrying heavy objects, including the bag.  (Trial Tr. Vol. 5, pp. 14-16.)
McCoy's godmother, Rayven Chinn, testified that McCoy walked with a limp and utilized
a leg brace as a result of his injury.  (Trial Tr. Vol. 6, pp. 8-9, 24.)  She opined that
McCoy would not have been capable of carrying the blue duffel bag due to his prior
injury.  (Id. at 8-11.)  The defense also established that McCoy was receiving SSI
disability payments at the time of his arrest, although he had not received a medical
reassessment since September of 1997.  (Trial Tr. Vol. 5, pp. 16-17.)

As for McCoy's use of an alias, the defense offered testimony from Ms. Chinn
that McCoy was called "Mark" by family members and had been known to use her last
name, which was sometimes mistaken for "Shinn" or "Shinne."  (Trial Tr. Vol. 6, pp. 6-
7.)  Ms. Chinn further testified that McCoy had been nick-named "Two-four" by family
members.  (Trial Tr. Vol. 6, p. 6.)

The defense accounted for McCoy's possession of the beeper through Ms.
Chinn's testimony that McCoy had received a beeper from his uncle.  (Trial Tr. Vol. 6, p.
20.)  Ms. Chinn explained that her brother, Ronald Young, had received a pager in the
mail.  (Id.)  According to Ms. Chinn, Mr. Young believed the pager was for his girlfriend,
but because Mr. Young and his girlfriend were feuding at the time, Mr. Young offered
the pager to McCoy.  (Id.)

The defense also attempted to show that McCoy had an innocent reason for his
bus trip.  To this end, Ms. Chinn testified that McCoy had told her he was going to Erie
to meet a girl and that she did not consider this unusual behavior for him, as he dated a
lot of girls and "might get up and go with a girl any time."  (Trial Tr. Vol. 6, pp. 19, 22,
25.)  Moreover, Ms. Diggs presented testimony from Chereka Jackson, who established
that she had met McCoy in the summer of 1997 when she saw him every day for
approximately one or two weeks.  (Trial Tr. Vol. 4, pp. 139-40.)  Ms. Jackson testified
that McCoy was just a friend whom she knew only as "Two-Four."  (Id. at 139, 142-43.)

She admitted that she did not know McCoy's real name and did not know how to get in touch with him after he left. (Id. at 143-46.) Ms. Jackson also acknowledged that she had not seen or heard from McCoy since their parting and was not aware of his arrival in Erie on March 17, 1998. (Id. at 139, 146.) Nevertheless, Ms. Jackson testified that, while she was not expecting to see McCoy on the day in question, he would have been welcome had he shown up at her residence. (Id. at 146-47.)

In addition, the defense circumstantially established that, on the day of the Defendants' arrests, there had been a claim-check ticket stub attached to the blue duffel bag. Ms. Diggs presented evidence that, when the defense team inspected and photographed the government's evidence on April 1, 1998, there was at that time a luggage claim-check stub attached to the blue duffel bag. (Trial Tr. Vol. 4, pp. 194-98.) Moreover, Ms. Diggs presented testimony from a Greyhound employee who recalled being approached on March 17, 1998 by a police officer who was in possession of a claim ticket stub and who was inquiring about a piece of luggage. (Trial Tr. Vol. 4, pp. 148-50.) The employee recalled advising the officer that the portion of the ticket stub he was holding had come from the bag, as opposed to the portion meant to be retained by the customer (and used to match up a particular piece of luggage). (Id. at 150-53.) Through this evidence, the defense was able to show not only that the ticket stub had since disappeared from the bag (id. at 195, 200-01; Vol. 5, pp. 23-24, 57-60), but that the government had never located the other half of the ticket stub (presumably retained by the bag's owner) and had made no attempt to ascertain the true owner of the duffel bag by other means, such as attempting to analyze the bar code on the stub.

Ms. Diggs further presented testimony from Detective Jeffrey Greene, a member of the Erie Police Department who had been present during the surveillance at the Greyhound bus station. Through Detective Greene's testimony it was established that, despite his possession of a camera on the day of the arrests, Detective Greene never

23

took any photographs of the four men while they were disembarking the bus or departing the terminal with their baggage. (Trial Tr. Vol. 4, pp. 166-67, 172-73, 176-77.) In addition, Detective Green never photographed the bags, or their arrangement on the sidewalk at the bus station prior to the time they were searched.[5] (Id. at 174, 177.) Moreover, even after the blue duffel bag had been searched and the contraband discovered, Detective Green did not photograph the duffel bag. (Id. at 177.) While he did take some photographs of the suspects after the officers had approached them, he admitted that he only obtained his camera as an afterthought, and was not focusing on Barnette or on any particular bag while the events were unfolding. (Id. at 173, 175-77.) Therefore, he could not recollect which bags were possessed by whom on the day in question. (Id. at 161-63, 176.)

Finally, the defense attempted to undermine the credibility of Sergeants Liebel and Kress through the testimony of their former colleague and supervisor, Gregory Dollinger. Dollinger asserted that Sgt. Kress would do anything necessary to secure a drug conviction, including lying under oath or planting evidence. (Trial Tr. Vol. 4, pp. 185-86.) He also insinuated that Sgt. Liebel would do or say whatever he felt was necessary in order to back up Sgt. Kress. (Id. at 187.) Dollinger expressed dissatisfaction with the way in which he perceived the Erie Police Department had been run, particularly "with the stress that they put on integrity in the wrong direction." (Id. at 181.) On cross examination, he freely acknowledged his dissatisfaction with the Department's lack of technical support for the bomb squad unit, of which he was a member prior to his retirement. (Id. at p. 182, 190.)

---

[5] Detective Greene acknowledged that the arrangement of the bags on the sidewalk was affected by the officers' search of the bags. (Trial Tr. Vol. 4 at 176-77.)

24

*iii.  The Government's Case in Rebuttal*

In rebuttal, the government attempted to undermine Dollinger's credibility through the testimony of Detective Christine Mangan of the Erie Police Department.  Detective Mangan testified that, during the several years she and Dollinger worked together, she observed – and Dollinger openly shared – his personal animosity toward members of the SWAT team, which then included Kress and Liebel.  According to Detective Mangan, this animosity was based on Dollinger's unjustified perception that the SWAT team received preferential treatment and that members of the SWAT team had something against him personally.  (Trial Tr. Vol. 5, pp. 20-21.)  Detective Mangan further testified that Dollinger's reputation was such that he was not attributed much truthfulness, was not taken very seriously, and was thought to be emotionally unstable. (Id. at 21-22.)

The government also attempted to rebut McCoy's defense relative to his alleged physical impairment through the testimony of a court security officer.  This officer established that McCoy had been using the stairs at all times during the trial and that, on one occasion, McCoy had appeared to employ a "selective limp" when passing by the undersigned judge, who was presiding over his trial.  (Trial Tr. Vol. 6, pp. 30-32.)

*iv.  Jury Instructions*

In its closing instructions to the jury the Court described in detail the elements of each offense charged in the Superseding Indictment and further instructed that each element had to be proven by the government beyond a reasonable doubt.  (Trial. Tr. Vol. 6 at 116-128.)  The Court gave the following instruction concerning the Jemal Stipulation:

> [I]n this case, the defendants have stipulated to certain elements of each of the offenses.  That is with regard to the crimes of possession with intent to distribute marijuana and possession with intent to distribute cocaine.  If you should find from all of the

evidence that the government has proven beyond a reasonable doubt that Joseph Barnette and/or Marcresse McCoy were in possession of the blue duffel bag seized by law enforcement officers at any time, then you may conclude without further evidence that Joseph Barnette and Marcresse McCoy knew that the blue duffel bag contained cocaine and marijuana and that they or he intended to distribute them.  However, you may conclude this only in the event that you find that the government has proved beyond a reasonable doubt that Joseph Barnette and/or Marcresse McCoy were in possession of the blue duffel bag.  The defense of each defendant in this case is that they were not in possession of the blue duffel bag.

(Id. at 122-23.)

The jury was instructed that *actual* possession is established if a person knowingly has direct physical control over a thing, while *constructive* possession is established if the person knowingly has both the power and the intention to exercise dominion or control over a thing.  (Id. at p. 123.)  A defendant's mere proximity to drugs, mere presence on the property where drugs are found, or association with the drugs, the jury was told, would not be sufficient by themselves to establish possession of the drugs, but were instead factors that the jury could consider to support a finding of possession "when accompanied by testimony connecting the defendant with the incriminating surrounding circumstances."  (Id. at 124.)

### v. Verdict and Sentence

On November 4, 1998, the jury returned a verdict of guilty as to Counts 1-4 of the indictment.  Thus, McCoy was convicted on the count of conspiracy as well as the substantive counts of possession with intent to distribute crack cocaine and marijuana.  McCoy was acquitted of the firearms charge at Count 5.

On March 3, 2000 McCoy was sentenced to concurrent terms of 132 months' imprisonment each at Counts 1 and 2 and 60 months' imprisonment at Count 3.

Direct Appeal

        Barnette and McCoy appealed their respective convictions and sentences and
the cases were consolidated on appeal.  On appeal, McCoy argued (among other
things) that:  (i) the evidence presented at trial was insufficient to support the conviction
for possession and conspiracy to distribute drugs and (ii) this Court committed
reversible error in charging the jury relative to the Jemal stipulation.

        In a memorandum opinion dated June 7, 2001, the U.S. Court of Appeals for the
Third Circuit affirmed the judgments entered against Barnette and McCoy.  (See United
States v. McCoy, Nos. 00-3257 and 00-3258 (Jan. 23, 2001).)  As to the challenged jury
instruction, the court of appeals found no plain error[6] in the wording of the Jemal
instruction.  The court specifically rejected Defendants' argument that the instruction
had improperly relieved the government of its burden of proving the Defendants'
knowledge of the drugs and intent to distribute them; the court declined to address on
direct appeal Barnette's claim that his counsel had been ineffective in entering into the
stipulation.  The court of appeals also summarily rejected Defendants' claim that there
was insufficient evidence to support their convictions for drug possession or conspiracy,
finding after "careful review of all of the evidence presented at trial" that there was
"substantial evidence to support the jury's verdict."  (Id. at p. 7.)


§ 2255 Proceedings

        McCoy filed his §2255 petition on May 30, 2002, alleging that Ms. Diggs had
been ineffective in entering into the Jemal stipulation.  McCoy theorized that "there was
no reasonable or tactical basis for counsel to stipulate away" the elements of
knowledge and intent relative to the drug charges.  See United States v. McCoy, 410

_____

        [6] The "plain error" standard was applied because defense counsel had waived
the objection by not raising it in a timely fashion before the District Court.

F.3d at 130.  By opinion and order dated May 20, 2003, this Court dismissed McCoy's § 2255 petition without a hearing, finding that the lack of evidence relative to the prejudice prong of McCoy's ineffective assistance claim was dispositive of the matter.

On June 6, 2005, the Third Circuit Court of Appeals reversed our May 20, 2003 order and found that this Court had abused its discretion by denying McCoy an evidentiary hearing on his ineffective-assistance-of-counsel claim.  The court concluded that the files and records relative to McCoy's case were inconclusive on the issues of prejudice as well as the reasonableness of Ms. Diggs' performance.  Accordingly, the court reversed our judgment and remanded the matter with instructions that we hold an evidentiary hearing on the ineffectiveness claim.  The court's mandate was entered on the District Court docket on July 6, 2005.

On September 16, 2005, this Court held an evidentiary hearing on McCoy's § 2255 petition.  Ms. Diggs was the sole witness at the hearing.  She testified as to the circumstances surrounding her decision to join in the Jemal stipulation on behalf of McCoy.  In addition to presiding over the evidentiary hearing, this Court has since reviewed in detail significant portions of the record that are pertinent to the instant motion.

Based upon the testimony and the other evidence of record, we find, by a preponderance of the evidence,[7] that the following facts are established:

## I. FINDINGS OF FACT

1.  The issue of a Jemal stipulation first became relevant on October 14, 1998 when the government filed its initial notice of intention to use 404(b) evidence against the Defendants.  In that notice, the government argued that its proffered 404(b) evidence would help prove the elements of the Defendants' knowledge and intent

---

[7] See U.S. v. Cabiness, 278 F. Supp. 2d 478, 485 (E.D. Pa. 2003) (applying a preponderance of the evidence standard to ineffectiveness claim); Bowen v. Blaine, 243 F. Supp.2d 296, 307 (E.D. Pa. 2003) (same).

relative to the various drug charges and that the defense had done nothing to remove those elements from the case by way of, e.g., a <u>Jemal</u> stipulation. (<u>See</u> Govt.'s Notice of Intention to Use 404(b) Evidence [Doc. # 63] at pp. 6-7.)

2.    While Barnette's trial counsel indicated at the October 15, 1998 pretrial conference that he was considering the entry of a <u>Jemal</u> stipulation, Ms. Diggs' initial inclination, as reflected in the transcript of the October 15, 1998 proceedings, was to question the value of a <u>Jemal</u> stipulation in relation to McCoy's case because she viewed McCoy's defense posture as significantly different from that of Barnette. (Evid. Hrg. Tr. (9/16/05 [Doc. # 248]), p. 9; Pretrial Conf. Tr. (10/15/98 [Doc. # 175]) at pp. 21-23, 25.)

3.    Fundamentally, Ms. Diggs perceived material differences between Barnette's case and McCoy's case with respect to their prior criminal histories. (Evid. Hrg. Tr. (9/16/05) at pp. 11-12.)  Whereas Barnette had a prior conviction for drug trafficking, McCoy's prior conviction was for carrying a concealed weapon, and Ms. Diggs felt less concern with respect to the possibility that the nature of this prior offense might prejudice his defense if a jury learned of it. (<u>Id</u>.; Pretrial Hrg. Tr. (10/15/98), at pp. 21-23.)

4.    Ms. Diggs' primary concern for McCoy, relative to the government's 404(b) evidence, was to keep out evidence of "some long saga of the history of McCoy and Barnette in Erie trafficking drugs.  I didn't want that to come out." (Evid. Hrg. (9/16/05) at 20-21.)

5.    Throughout the pretrial proceedings, two factors impeded Ms. Diggs's ability to make a fully informed decision concerning entry of a <u>Jemal</u> stipulation.  The first factor was the lack of particularity concerning the government's 404(b) evidence as it pertained to McCoy. (Evid. Hrg. Tr. (9/16/05) at pp. 9-10.)  As to this factor, Ms. Diggs received verbal representations from the government concerning the approximate

date(s) of McCoy's prior drug dealings, but no specifics were disclosed concerning the identity of the government's witnesses or the exact nature of their anticipated testimony until the government provided its <u>Jencks</u> materials to Ms. Diggs on October 26, 1998. (<u>Id</u>. at 9-10, 15, 25, 30.)

6.  The second factor impeding Ms. Diggs's decision relative to the stipulation was her uncertainty as to how this Court would rule on the admissibility of the 404(b) evidence.  With respect to this factor, to some extent the Court and Ms. Diggs were working at logger-heads:  the Court considered that, consistent with <u>Jemal</u>, it should await making a ruling on the 404(b) evidence until *after McCoy's counsel determined whether she would enter into a stipulation*, which would thereby inform the Court's decision as to the relevance *vel non* of the proffered 404(b) evidence[8]; on the other

---

[8] This appears to have been the procedure generally contemplated in <u>Jemal</u>:

> [A]lthough we leave the door open, we believe that district courts should generally deem prior bad acts evidence inadmissible to prove an issue that the defendant makes clear he is not contesting. The relevance of the prior bad acts evidence will be minimal in most such cases, since the evidence will not bear on the issues being contested.  And the undue prejudice will be quite high, since prior bad acts evidence tends to be quite persuasive.  This is consistent with *[United States v.] Provenzano's* rule that stipulations should be taken into account in conducting a Rule 403 balancing analysis.  ...
>
> We emphasize, however, that to succeed, the defendant's proffer must be comprehensive and unreserved, completely eliminating the government's need to prove the point it would otherwise try to establish using 404(b) evidence.
> ***
> Finally, we note that even if the defendant is unwilling to make sufficient concessions to completely remove an issue from the case, the district court should weigh prejudice against probative value only after taking into account the defendant's "partial" stipulation, a weighing that we will review for abuse of discretion.

26 F.3d 1267, 1274 (3d Cir. 1994) (discussing <u>United States v. Provenzano</u>, 620 F.2d

hand, Ms. Diggs felt she could not make an informed decision concerning the value of a stipulation to her client without first knowing whether, absent a stipulation, the 404(b) evidence would likely be admitted at trial and, thus, it was in Ms. Diggs's interest to delay making a formal decision on the stipulation until *after this Court made its 404(b) ruling.*  (See Pretrial Conf. Tr. (10/23/98) at 41-43.)

7.   Thus, in the days leading up to the trial in this case, Ms. Diggs felt some degree of pressure concerning her decision on the Jemal stipulation, not only from this Court but also from Barnette's counsel (who encouraged her to join in the stipulation so as to maintain a defense consistent with that of Barnette (see Evid. Hrg. Tr. (9/16/05) at pp. 12-13) and from the government (which was pressing for the admission of its 404(b) evidence while simultaneously resisting premature disclosure of its Jencks materials[9]).  (Id. at 12.)  Ms. Diggs felt, as she stated, that she was being forced to make a decision about the stipulation without knowing the specifics of the government's 404(b) evidence against McCoy. (Id. at 9.)

8.   In the days preceding trial, Ms. Diggs consistently pressed the government to disclose the details of its proof relative to McCoy's prior alleged drug dealing activity in order to make an informed decision about McCoy's defense.  (Evid. Hrg. Tr. (9/16/05) at p. 13.)  As we noted above, her main concern was to keep out evidence of McCoy's prior history of drug trafficking with Barnette in Erie.  (Id. at 20-21.)

---

985, 1003-04 (3d Cir. 1980)).

[9] Under the Jencks Act, the government is not required to turn over statements or reports made by a government witness until after that witness testifies on direct examination.  See 18 U.S.C. § 3500.  As a matter of custom and practice in this Court, the government normally provides its Jencks materials to the defense on the Friday before jury selection is scheduled to commence.  In this particular case, the government produced its Jencks materials on Monday, October 26, 1998, the day before jury selection.  (See note 9, *infra*.)

31

9. As of Friday, October 23, 1998, Ms. Diggs had the benefit of this Court's ruling relative to the government's proffer of 404(b) evidence insofar as it related to the conspiracy charge. As of that date, the Court had determined that the government would be prohibited from introducing evidence of Barnette's and McCoy's prior drug-dealing activities. The Court had also ruled that evidence as to the alleged "signature drug packaging" would be excluded. Nevertheless, the significance of this ruling apparently escaped Ms. Diggs' notice. (See Evid. Hrg. (9/16/05) at p. 14 (Diggs testifying that "never during the course of the hearing or at trial did I realize that Judge McLaughlin had ruled [on the government's proffered 404(b) evidence].").)

10. On Monday, October 26, 1998, on the eve of jury selection in this case, the government turned over its Jencks materials to defense counsel.[10] (Evid. Hrg. Tr. (9/16/05) at p. 30.) These Jencks materials were admitted under seal as exhibits during the September 16, 2005 evidentiary hearing. (See Def.'s Ex. B.)

11. Once Ms. Diggs had an opportunity to review the government's Jencks materials, she concluded that a Jemal stipulation was not of any great benefit to McCoy and not in the best interests of his defense. (Evid. Hrg. Tr. at pp. 17-18, 20-21.) Ms. Diggs' review of the Jencks materials led her to conclude that most of the government's 404(b) evidence of prior bad acts related to Barnette as opposed to McCoy. It was Ms. Diggs' view that very little of the Jencks materials related to or incriminated McCoy. (Id.

---

[10] Although it is customary in this Court for the prosecution to provide its Jencks materials to the defense on the Friday before jury selection is scheduled to commence, in this particular case, the government produced its Jencks materials on Monday, October 26, 1998, the day before jury selection, which commenced on Tuesday, October 27. This delay was attributable to the government's professed need, based on this Court's in limine ruling on Friday, October 23, 1998 – which restricted the government's use of the 404(b) evidence – for additional time to redact its Jencks materials consistent with the Court's ruling. In this case, the government had legitimate concerns that a premature or unnecessarily broad disclosure of its Jencks materials might jeopardize the safety of certain witnesses. (See Pretrial Hrg. Tr. (10/23/98 [Doc. # 176]) at pp. 98-100.)

at 15, 17.)  More specifically, it appears from the <u>Jencks</u> materials of record that only a few witnesses could establish any prior association between Barnette and McCoy and only one witness – a convicted federal drug felon – would say that McCoy had sold crack for Barnette during the summer of 1997.  (<u>Id</u>. at 64.)  Thus, following her review of the <u>Jencks</u> materials, Ms. Diggs perceived that she had committed to a stipulation which was harmful to her client and was concerned about finding a way to "undo" the perceived damage.  (<u>Id</u>. at 20.)

12. Ms. Diggs concluded that the <u>Jemal</u> stipulation was prejudicial to McCoy's defense in that it restricted her from contesting his knowledge of the contents of the blue duffel bag as well as his intent to sell the drugs while at the same time focusing the jury's attention on McCoy's physical possession of the bag, the latter fact being one of which the government had substantial direct proof.  Ms. Diggs concluded that, without the stipulation, she could contest McCoy's physical possession of the bag while also arguing his lack of knowledge or intent.  As she explained at the hearing:

> [T]he <u>Jemal</u> stipulation restricted the defense to possession.  And yes, I did the best that I thought that I could do within that restriction.  But there was no value in creating that restriction for [McCoy] or for his defense. [Foregoing the stipulation] then gave [McCoy] the opportunity to say to the jury, even if you think I possessed this bag, there is no reason to believe that I knew what was in it or [that] I had the intent to distribute drugs.  And those are equally if not more powerful defenses that do you think I held this bag.  Especially when you have two, as you say, veteran police officers testifying that he did hold the bag.

(Evid. Hrg. Tr., p. 51.)

13. Ms. Diggs also believed that the government's representations as to its evidence against McCoy had been overstated relative to what was actually reflected in the <u>Jencks</u> materials.  In fact, Ms. Diggs contemplated the possibility that the government had engaged in prosecutorial misconduct by (in her view) exacting a stipulation based on an overstated proffer of 404(b) evidence against McCoy.  (Evid. Hrg. Tr., p. 28.)

14.  Ms. Diggs never formally entered into a <u>Jemal</u> stipulation on behalf of her client during the pretrial proceedings.  Nevertheless, her defense of McCoy throughout the trial reflected her tacit agreement with the stipulation.  Ms. Diggs' earliest indication that she was expressly joining in the stipulation came no sooner than November 2, 1998 when, during the jury charge conference, she indicated her approval of the proposed instruction that would explain the effect of the stipulation to the jury.  (<u>See</u> Trial Tr., Vol. 5 (11/2/98 [Doc. No. 139]) at pp. 29-30.)

15.  Although the record is somewhat ambiguous as to when Ms. Diggs actually committed her client to the <u>Jemal</u> stipulation, the record is clear that she expressly indicated during the October 23 pretrial conference that she would be discussing the stipulation with her client.  This Court thereafter assumed that, for all intents and purposes, McCoy would be joining in the <u>Jemal</u> stipulation.  This assumption is reflected in the Court's remarks which occurred during the October 27 pretrial conference after the prosecution observed that it had not yet received any written stipulation from McCoy:

> THE COURT:  [A]s I remember my decision, you had an opportunity to review that stipulation, she heard your explanation to the court, she adopted it on behalf of her client. ...

(Pretrial Conf. Tr. (10/27/98) at 91-92.)  Ms. Diggs never objected to the Court's remark, although it was clear from the remark and the discussion that ensued that, at least as of October 27, 1998, this Court and the other parties were under the impression that McCoy was joining in the <u>Jemal</u> stipulation.

16.  As of October 27, 1998, Ms. Diggs had benefit of both the government's <u>Jencks</u> disclosure as well as this Court's October 23 *in limine* ruling.  Therefore, Ms. Diggs was in a position, no later than October 27, 1998, to fully and meaningfully assess the usefulness of a <u>Jemal</u> stipulation relative to McCoy's defense and to clarify for the Court and the other parties what her client's defense would be.  If Ms. Diggs had

34

not, in fact, previously intended to bind her client to a <u>Jemal</u> stipulation, then she had the opportunity on October 27, 1998 to disabuse this Court of any misconception it may have been laboring under relative to her joining in the stipulation.  Alternatively, even if Ms. Diggs had previously acquiesced in the <u>Jemal</u> stipulation, she had the opportunity, as of October 27, 1998, to reassess that decision and to request leave from this Court to withdraw the stipulation.

17.  Nevertheless, as the trial commenced, Ms. Diggs – apparently believing that her client was irrevocably bound by the <u>Jemal</u> stipulation – proceeded in tacit agreement with the stipulation and conducted her defense of McCoy accordingly. (Evid. Hrg. Tr. (9/16/05 at p. 14.)  In so doing, Ms. Diggs did not undertake McCoy's defense with any particular strategy in mind relative to the <u>Jemal</u> stipulation.  Rather, her conduct in abiding by the stipulation was borne solely of the assumption that she and her client were now bound by a stipulation that provided him no real strategic benefit and into which, she believed, she had been "bamboozled."  (Evid. Hrg. Tr. at pp. 19-20.)

18.  McCoy never personally consented to the <u>Jemal</u> stipulation.  Ms. Diggs first consulted him about the stipulation at some point during the trial.  At that time he did not appear to understand the concept of the stipulation.  (Evid. Hrg. Tr. at pp. 6-7.) Nevertheless, as noted, Ms. Diggs conducted her defense in a manner consistent with the stipulation, and she never objected to this Court's instruction at the end of the case that, if the jury found McCoy in possession of the blue duffel bag, they could infer without any additional proof that he knew there were drugs in the bag and that he had intended to distribute them.

## II. CONCLUSIONS OF LAW

1.  A defendant claiming ineffective assistance of counsel must satisfy the two-pronged test announced by the Supreme Court in <u>Strickland v. Washington</u>, 466 U.S.

35

668 (1984).  To do so, the defendant must show that "(1) his or her attorney's performance was, under all the circumstances, unreasonable under prevailing professional norms," and "(2) there is a 'reasonable probability that, but for counsel's unprofessional errors, the result would have been different.'"  United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992) (quoting Strickland, 466 U.S. at 687-91, 694)).

2.  The "deficiency" step asks whether counsel's conduct "fell below an objective standard of reasonableness" viewed as of the time it occurred.  Strickland, 466 U.S. at 688, 690.  As to this prong, our scrutiny of counsel's performance must be "highly deferential" and we must make "every effort .... to eliminate the distorting effects of hindsight" and "to evaluate the conduct from counsel's perspective at the time."  Strickland, 466 U.S. at 689.  Review of an ineffective assistance claim begins with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id.  Therefore, it is "only the rare claim of ineffective assistance of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance."  United States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989) (citations omitted); United States v. Kauffman, 109 F.3d 186, 190 (3d Cir. 1997).

3.  It is the defendant's burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Strickland, 466 U.S. at 689; Kauffman, 109 at 189-90.  On the other hand, "merely labeling a decision as 'strategic' will not remove it from an inquiry of reasonableness."  United States v. McCoy, 410 F.3d 124, 135 (3d Cir. 2005) (citing Davidson v. United States, 951 F. Supp. 555, 558 (W.D. Pa. 1996); Gov't of the V.I. v. Weatherwax, 77 F.3d 1425, 1431-32 (3d Cir. 1996)).

4.  Assuming the defendant can establish that his counsel's performance was objectively unreasonable, we must then determine whether there is a "reasonable

probability that, but for counsel's unprofessional errors, the result would have been different." Day, 969 at 42 (quoting Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

A.    The Objective Reasonableness of Defense Counsel's Conduct

5.  The Jemal stipulation provided that, if the jury found beyond a reasonable doubt that McCoy actually or constructively possessed the blue duffel bag, then it could also conclude, *without any further evidence*, that McCoy knew there were drugs inside the bag and intended to distribute them.  The net effect of this stipulation and the related jury instruction was to focus the jury's attention on the issue of possession of the duffel bag rather than the issues of McCoy's knowledge and intent and, in fact, to permit the jury to infer the requisite knowledge and intent upon a finding of possession alone.  At the same time, by virtue of the stipulation, defense counsel was ensured that evidence as to the nature of McCoy's prior conviction (i.e., carrying a concealed weapon) would be kept from the jury.[11]

_____

[11] The court of appeals suggested in its June 6, 2005 decision that, under Old Chief v. United States, McCoy may well have been able to keep out evidence as to the nature of his prior conviction even without entering into a Jemal stipulation.  See United States v. McCoy, 410 F.3d 124, 134 (3d Cir. 2005) (citing Old Chief v. United States, 519 U.S. 172 (1997), for the proposition that a district court abuses its discretion under Fed. R. Evid. 403 where it refuses to permit a defendant, charged under 18 U.S.C. § 922(g)(1), to stipulate to his/her status as a convicted felon when the nature of the prior conviction is unduly prejudicial and where the purpose of the evidence is solely to prove the element of prior conviction).  We note, however, that the government zealously sought admission of McCoy's prior handgun conviction, notwithstanding the holding of Old Chief and on grounds arguably consistent with its rule of law.  Under the circumstances of this case, we do not believe that reasonably objective and competent defense counsel could be expected to predict the outcome of such a scenario and, therefore, we conclude that competent counsel could reasonably have viewed the Jemal stipulation as ensuring that the jury would not learn of McCoy's prior handgun conviction.  In fact, McCoy's present counsel appears to have acknowledged that the stipulation kept out evidence concerning the nature of McCoy's prior conviction.  (See Tr. of Arg. on § 2255 Motion (4/21/03) [Doc. #216] at pp. 17-18, 26, 36-37.)

6.  The stipulation provided no overall benefit in the context of McCoy's defense.

Indeed, the Third Circuit Court of Appeals observed that:

> [a]s a result of the Jemal stipulation, the prosecution was left with the relatively simple burden of proving that at some point McCoy was in possession of the blue duffel bag. Three witnesses, two of them police officers, testified that McCoy carried the duffel bag from the bus to the sidewalk outside the Erie bus station. Although McCoy attempted to rebut this testimony through evidence of his physical ailment, which he alleged would have prevented him from carrying the bag, and through impeachment of the Government's witnesses for bias, the issue of possession vel non amounted to a determination of credibility. Faced with overwhelming first-hand accounts of multiple witnesses observing McCoy carrying the blue duffel bag, and no first-hand witnesses contesting these accounts, the jury could easily have reached its conclusion that the Government satisfied its burden with respect to the possession element. However, even if the jury believed that McCoy carried the duffel bag from the bus to the Erie station, it would not be dispositive of the key issue of whether McCoy was aware of the contents of the bag.
>
> The knowledge and intent elements presented a far greater burden for the Government. McCoy contends, and we agree, that the Government's evidence against him in this regard, was "no different in any meaningful respect than the facts the [G]overnment had against the other two men [Grier and McQueen]" who were not even indicted. ...

410 F.3d at 132.

7.  Absent the stipulation, the facts of this case intrinsically provided McCoy an avenue by which to argue that he had no involvement in packing the bag, no ownership interest in the bag or its contents, and no knowledge of or intent to sell the drugs inside. Kendrick Grier's testimony established that the bag had been packed at the home of Barnette's aunt earlier in the day and prior to the time that McCoy was picked up by the others.  There was no evidence to suggest that the bag had been opened or its contents altered prior to its arrival in Erie.  Further, there was no evidence of any admissions by McCoy during the trip that would establish his knowledge and intent.[12]

------------------------------------------------------------

[12] There was evidence that Barnette made a comment, apparently directed to McCoy and McQueen, about "fixing to get paid," – a comment upon which the government relied substantially in its closing arguments and which it interpreted as "we are fixing to get paid."  However, this did not constitute any admission by McCoy and its probative force was far greater as against Barnette than as against McCoy.  In

None of the contents of the bag were directly tied to McCoy and, at all times, it was the government's theory that the bag actually belonged to Barnette.  The government's "knowledge" evidence against McCoy therefore came primarily, if not exclusively, in the form of evidence as to his "consciousness of guilt."  Our circuit court of appeals has observed that, "in several cases with facts even more compelling than those in the present case, this court has held that there was insufficient evidence to support the element of knowledge in a drug conspiracy."  United States v. McCoy, 410 F.3d at 133 (discussing United States v. Wexler, 838 F.2d 88 (3d Cir.1988); United States v. Cartwright, 359 F.3d 281, 291 (3d Cir.2004); United States v. Thomas, 114 F.3d 403, 405-06 (3d Cir.1997); United States v. Brown, 3 F.3d 673, 680-84 (1993); and United States v. Salmon, 944 F.2d 1106, 1112- 15 (3d Cir.1991).)[13]

    8.  Ultimately, the only evidence directly tying McCoy to the contraband was his physical possession of the bag at the Erie bus station, which was observed by three different individuals.  The stipulation was problematic because McCoy's physical

_____

recounting this episode, Grier acknowledged that it was not clear based on his own observations whether McCoy was actually expecting to get paid.  Grier also explained that the comment was made in apparent reference to the fact that a white male in Erie owed Barnette money.


[13] We recognize that a panel of the Third Circuit Court of Appeals, on direct review of McCoy's conviction and sentence, found that the evidence was legally sufficient to support McCoy's conviction on the possession and conspiracy charges.  See United States v. McCoy, Nos. 00-3257 and 00-3258 (3d Cir. June 7, 2001).  We presume that the Court of Appeals, in determining the sufficiency of the evidence relative to the conspiracy conviction, gave no consideration to the Jemal stipulation, since the stipulation did not apply to that particular count.
    We find no inherent conflict between this ruling and the observations (quoted above) which the appellate court made in reversing of our original § 2255 ruling.  We interpret the appellate court's citation to Wexler et al. not as an attempt to formally re-adjudicate the sufficiency of the evidence, but simply as an observation that, without the benefit of the Jemal stipulation, the government's proof of McCoy's knowledge and intent was comparatively weak.

possession of the bag – a fact which the defense would likely have difficulty overcoming[14] – became the springboard from which the jury could permissibly find, without any further proof, that McCoy knew what the contents of the bag were and intended to distribute the drugs inside.

9. As noted above, it does appear that the Jemal stipulation prevented the jury from learning about McCoy's prior conviction for carrying a concealed weapon. However, even if that evidence had been admitted, it was not likely to greatly prejudice his defense on the drug charges. Though there was evidence that guns are tools of the drug trade, it would not have been an obvious logical leap for the jury to conclude that, because McCoy concealed a weapon on a prior occasion, he therefore knew of and intended to distribute the drugs in the duffel bag. See U.S. v. McCoy 410 F.3d at 134 (observing that the probative value of McCoy's prior conviction relative to the conspiracy and drug charges appears to have been "minimal.").

10. Nor would the prior gun conviction have provided a strong inference that, because McCoy had carried a weapon in the past, he therefore must have constructively possessed the weapons in the blue duffel bag. As Ms. Diggs herself observed during October 15, 1998 pretrial proceedings, the prior weapons conviction involved concealment of a gun on McCoy's person, not concealment in a manner consistent with the guns found in the blue duffel bag. Therefore, it is doubtful that

---

[14] Despite the government's substantial evidence of McCoy's physical possession of the bag, Ms. Diggs was not ineffective or objectively unreasonable in her decision to contest that issue. McCoy himself put that very issue into contention by virtue of his conduct on the day in question when he repeatedly denied any handling of the bag or any association with its ostensible owner, Barnette. Furthermore, aside from Grier's testimony, which was itself subject to credibility challenges, there was little evidence to definitively establish the bag's owner. Consequently, evidence as to whom exercised physical dominion over the bag (i.e. possession) was necessarily going to be an important factor in the case. For all these reasons, this Court would not find Ms. Diggs ineffective based on her decision *not* to concede the issue of physical possession.

admission of the handgun conviction would have weakened McCoy's defense as to the Count 5 charge of being a felon in possession of a handgun (of which he was acquitted).

11. Moreover, even if admission of McCoy's prior weapons conviction might have prejudiced his defense of Count 5, the stipulation still was of no overall benefit to McCoy because it weakened his defense of the drug possession charge at Count 2, which carried a heavier penalty and exposed McCoy to more jail time. C.f. 21 U.S.C. § 841(b)(1)(A)(iii) (penalty for possession with intent to distribute 50 grams or more of crack cocaine is a mandatory minimum term of imprisonment of 10 years and a maximum possible term of life imprisonment) with 18 U.S.C. § 924(a)(2) (maximum possible penalty for being a convicted felon in a possession of a handgun in violation of 18 U.S.C. § 922(g) is imprisonment for up to ten years).

12. Prior to October 23, 1998, Ms. Diggs could not have known how this Court would rule on the 404(b) evidence against McCoy; she also did not know the specifics of the evidence proffered against her client. Therefore, her decision up to that point to entertain the possibility of a Jemal stipulation while deferring any final decision was objectively reasonable, as she could not have made a fully informed decision on the matter prior to October 23, 1998.

13. Nevertheless, as of Friday, October 23, 1998, Ms. Diggs had the benefit of this Court's *in limine* ruling on the 404(b) evidence as it related to the conspiracy charge at Count 1. In that ruling, this Court precluded evidence of both the Defendants' prior drug dealing activities and the "signature drug packaging" on grounds that were, ostensibly, wholly independent of the Jemal stipulation. The nature of the Court's ruling suggests that the Court would likewise have excluded such evidence relative to Counts 2 and 3, even in the absence of a Jemal stipulation. Thus, as of October 23, 1998, Ms. Diggs should have been aware that evidence as to McCoy's prior drug dealing activities

41

– the type of "bad acts" evidence which most concerned her – would not be admitted at time of trial.  Based on this Court's comments during the October 23 pretrial conference, Ms. Diggs was also in a position to know that a Jemal stipulation would likely prevent the government from introducing evidence as to the nature of McCoy's prior gun conviction.

14.  Moreover, by Monday, October 26, 1998, the government had made its disclosure of Jencks materials.  Because the government represented that it would be culling and/or redacting certain 404(b)-related evidence from its Jencks materials in accordance with the Court's October 23, 1998 in limine ruling (see Pretrial Hrg. Tr. (10/23/98 [Doc. # 176]) at pp. 98-100), this Court cannot make a definitive conclusion as to whether or not Ms. Diggs received the full extent of the government's potential proof relative to prior drug dealing activity on the part of McCoy.  However, we can (and do) conclude that the government's Jencks disclosure, such as it was, would have included any prior statements by witnesses who the government believed could offer admissible testimony consistent with the October 23 ruling.  In this sense, the Jencks disclosure was reflective of the government's intended proof at time of trial.  Notably, most of these Jencks materials related to Barnette, rather than McCoy.[15]

15.  Objectively reasonable counsel in Ms. Diggs' position would have determined, no later than October 27, 1998, that a Jemal stipulation was not in the best interest of her client and, during the October 27 pretrial conference, would have alerted this Court and the parties to the fact that no such stipulation would be forthcoming.  To the extent the Court viewed counsel as already having committed to the stipulation, reasonably objective counsel would have sought permission on that date to withdraw

---

[15] Having reviewed in detail both the pretrial record in this case and the Jencks materials that were provided to defense counsel, we find no evidence of misconduct on the part of the prosecution with respect to its 404(b) proffer as it related to McCoy.

the stipulation based on counsel's consideration of the Court's 404(b) ruling and a review of the government's <u>Jencks</u> materials.

16.  By tacitly agreeing to the <u>Jemal</u> stipulation and persisting in a defense consistent the stipulation, Ms. Diggs acted without any particular strategic purpose in mind.  Accordingly, her conduct is not afforded any particular deference.

17.  Ms. Diggs' failure to reject and/or withdraw the <u>Jemal</u> stipulation on or after October 27, 1998 was objectively unreasonable and contrary to prevailing professional norms.

B.    <u>Prejudice</u>

    *i. Counts 2 and 3 (The Substantive Possession Charges)*

18.  The <u>Jemal</u> stipulation technically applied only to Counts 2 and 3 of the Superseding Indictment – the charges of possession with intent to distribute ("PWID") crack cocaine and marijuana.

19.  As we discussed above, and for all the reasons previously stated, the <u>Jemal</u> stipulation provided no overall benefit to McCoy in the context of this case.  The net effect of the stipulation was to focus McCoy's defense on the issue of whether or not he had possession of the bag at any point on March 17, 1998.  This was a relatively simple burden for the government to meet, given that the government had three witnesses establishing McCoy's possession of the bag and McCoy had no witnesses to directly contradict this testimony.  <u>See</u> <u>United States v. McCoy</u>, 410 F.3d at 132.  Although the unique facts of this case would have provided McCoy a plausible avenue for contesting his knowledge of the drugs and his intent to distribute them, <u>see</u> <u>McCoy</u>, *supra*, at 132-33 (observing that knowledge and intent presented a far greater burden for the government), the stipulation permitted the jury to conclude, based on a finding of mere possession alone, that these other two elements were established as well.  To the

extent that the stipulation kept out evidence of McCoy's prior conviction for carrying a concealed weapon, this achievement was of little value because the conviction would have been only minimally probative relative to the most serious drug-related charges. See McCoy, *supra*, at 134.

20.  Notwithstanding this Court's assumption, following the October 23, 1998 pretrial, that McCoy would be joining in the Jemal stipulation, it was clear that McCoy had not, and could not, have been personally consulted on that date.  Even by October 27, no written or formal stipulation signifying McCoy's consent had been submitted by Ms. Diggs.  Therefore, even assuming that Ms. Diggs *had* somehow bound her client to the Jemal stipulation during the October 23 pretrial, if Ms. Diggs had indicated during the October 27 pretrial conference that, in fact, McCoy had not consented to the stipulation and/or that she had reconsidered its utility on his behalf, it is unlikely in the extreme that this Court would have required her to abide by the stipulation.  On the contrary, it is most likely that this Court would have afforded Ms. Diggs the discretion to try McCoy's defense in the manner she thought most beneficial to him.

21.  For all of the reasons discussed above and incorporated herein by reference, we conclude that McCoy has successfully met his burden of proving that, under the unique facts of this case, there is a reasonable probability that the jury would have acquitted him on Counts 2 and 3 if Ms. Diggs had foregone the Jemal stipulation and contested the elements of knowledge and intent.  The likelihood that McCoy would have been acquitted is sufficient to undermine this Court's confidence in the jury's verdict relative to Counts 2 and 3.

*ii.  Count 1 (The Conspiracy Charge)*

22.  The Jemal stipulation applied only to Counts 2 and 3 of the Superseding Indictment and therefore did not technically apply to the conspiracy charge at Count 1.

44

As to Count 1, the jury was instructed that, in order to convict McCoy of conspiracy, they would have to find beyond any reasonable doubt:  (1) that McCoy came to a mutual understanding or agreement with another person to try to accomplish a common and unlawful plan to distribute crack cocaine and marihuana; and (2) that McCoy knowingly and intentionally became a member of such a conspiracy.  The Court made no reference to the Jemal stipulation relative to the conspiracy count.

23.    The knowledge and intent elements relative to the conspiracy count were technically distinct from the knowledge and intent elements relative to the PWID counts. That is to say, with respect to Counts 2 and 3, the jury had to find that McCoy knowingly possessed drugs and intended to distribute them.  With respect to Count 1, on the other hand, the jury had to find that McCoy knowingly and intentionally came to an agreement with another person to possess the drugs in the blue duffel bag for purposes of distributing them.

24.    Nevertheless, under the unique facts of this case, there is a reasonable probability that, absent the Jemal stipulation and assuming that McCoy had defended the knowledge and intent elements under Counts 2 and 3, the jury would have acquitted him not only on those counts but also on Count 1 as well.  Significantly, the conspiracy in this case consisted only of the events of March 17, 1998 – the very same events giving rise to the substantive possession charges.  Moreover, the evidence in support of the conspiracy charge was inextricably intertwined (and essentially coextensive) with the evidence supporting the substantive drug charges.  Accordingly, there is at least a reasonable probability that the jury's verdict to convict on Counts 2 and 3 (which was made easier by virtue of the Jemal stipulation) informed and drove, in large measure, its verdict to convict on Count 1.

25.  Having thus concluded that our confidence in the jury's verdict relative to Counts 2 and 3 is undermined, we also conclude that our confidence in the verdict relative to Count 1 is likewise undermined.

### III.  CONCLUSION

For all of the foregoing reasons, we conclude that McCoy has successfully met his burden of proving both:  (a) that Ms. Diggs' performance was objectively unreasonable insofar as she acquiesced in the Jemal stipulation during and through the trial in this case, and (b) that Ms. Diggs' deficient performance in this regard prejudiced his defense of Counts 1 through 3 of the Superseding Indictment.   As McCoy has made a successful claim for ineffective assistance of counsel under 28 U.S.C. § 2255, appropriate relief will be ordered contemporaneously herewith.

s/      Sean J. McLaughlin
        SEAN J. McLAUGHLIN
        United States District Judge

Dated:        February 2, 2006

cm:           All counsel of record.